1  MICHAEL L. MALLOW (SBN 188745)
   mmallow@loeb.com
2  MICHAEL THURMAN (SBN 123303)
   mthurman@loeb.com
3  LOEB & LOEB LLP
   10100 Santa Monica Boulevard, Suite 2200
4  Los Angeles, California 90067-4120
   Telephone:    310-282-2000
5  Facsimile:    310-282-2200

6  Attorneys for Defendants
   SWISH MARKETING, INC. and
7  MATTHEW PATTERSON

8  LINDA L. NORTHRUP (SBN 102156)
   lnorthrup@nsplc.com
9  NORTHRUP SCHLUETER, APLC
   31365 Oak Crest Drive, Suite 250
10 West Lake Village, California 91361
   Telephone:    818-707-2600
11 Facsimile:    818-707-2675

12 Attorney for Defendant
   JASON STROBER
13

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                  SAN JOSE DIVISION

17

18 FEDERAL TRADE COMMISSION,            )  Case No.  C09 03814 RS
                                        )
19         Plaintiff,                   )  Date:    January 6, 2010
                                        )  Time:    10:30 a.m.
20         v.                           )  Ctrm:    4, 5th Floor
                                        )
21 SWISH MARKETING, INC., a corporation,)  **DEFENDANTS' MOTION TO STRIKE**
   MARK BENNING, individually and as an )  **AND SUPPORTING MEMORANDUM OF**
22 officer of SWISH MARKETING, INC.,    )  **POINTS AND AUTHORITIES**
   MATTHEW PATTERSON, individually and  )
23 as an officer of SWISH MARKETING, INC.,)
   and JASON STROBER, individually and as an)
24 officer of SWISH MARKETING, INC.,    )
                                        )
25         Defendants.                  )
                                        )
26 _____ )

27

28

LA1911403.4
213782-10001

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 2

II.   FACTUAL AND PROCEDURAL SUMMARY ......................................... 3

III.  LEGAL ARGUMENTS .............................................................................. 5

    A.   The FTC Is Not Authorized To Obtain Monetary Relief Under
        Section 13(b). ....................................................................................... 5

        1.   Overview of The FTC's Section 13(b) Expansion Strategy ....... 5

        2.   The Express Language of Section 13(b) Provides Only
             Injunctive, Not Equitable, Relief ............................................... 7

        3.   Congress Did Not Intend To Nor Did It Grant The Power To
             Obtain Monetary Relief In Section 13(b) .................................. 8

        4.   Congress' Intended Sections 13(b) and 19 To Work Together
             As A "Statutory Plan For The Protection Of The … Public" .......... 12

        5.   Before the FTC Began Its Campaign To Expand The
             Available Remedies Under § 13(b), The FTC Act
             Amendments Were Scrutinized By The Fifth and District of
             Columbia Circuit Courts ............................................................. 13

        6.   In The Early 1980's, The FTC Launches Its Campaign To
             Expand The Remedies Available Under Section 13(b) In The
             Ninth Circuit ............................................................................... 15

        7.   Recent Decisions Have Articulated The Limits of Porter and
             Mitchell. ...................................................................................... 19

             a.   In Meghrig, The Supreme Court Held That Equitable
                 Remedies Cannot Be Implied Where Congress Has
                 Provided "Elaborate Enforcement Provisions" ............................. 19

             b.   Equitable Disgorgement Cannot Be Implied In
                 Section 13(b) Where The Statutory Remedies
                 Provided By Congress Are "Forward-Looking." .......................... 21

IV.   CONCLUSION .......................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,*
483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) .......................................... 23

*American Bar Ass'n v. FTC,*
430 F.2d 457 (D.C. Cir. 2005) ........................................................................ 12

*American Bar Association v. Federal Trade Commission,*
Case No. 09-1636 ........................................................................................... 12

*Federal Trade Commission v. R.A. Walker & Assocs.,*
No. 83-2138, 1991 WL 185162, 1991 U.S. Dist. LEXIS 14114 (D.D.C. July 26, 1991) ....... 18

*FTC v. Febre,*
128 F.3d 530 (7th Cir.1997) ........................................................................... 18

*FTC v. Gem Merchandising,*
87 F.3d 466 (11th Cir.1996) ........................................................................... 18

*FTC v. H.N. Singer, Inc.,*
668 F.2d 1107 (9th Cir.1982) .................................................................... Passim

*FTC v. Mylan Laboratories, Inc.*
62 F.Supp.2d 25 (D.D.C. 1999) ...................................................................... 18

*FTC v. Pantron,*
33 F.3d 1088 (9th Cir.1994) ........................................................................... 18

*FTC v. Security Rare Coin,*
931 F.2d 1312 (8th Cir.1991) ......................................................................... 18

*FTC v. Southwest Sunsites, Inc.,*
665 F.2d 711 (5th Cir. 1982) .................................................................... Passim

*FTC v. Stefanchik,*
559 F.3d 924 (9th Cir. 2009) ........................................................................... 6

*FTC v. Verity Intern., Ltd.,*
443 F.3d 48 (2d Cir. 2006) ............................................................................... 4

*FTC v. Weyerhaeuser Company,*
665 F.2d 1072 (D.C. Cir. 1981) ..........................................................13-14, 16, 18

*Great-West Life & Annuity Ins. Co. v. Knudsen,*
534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ..................................... 4, 24

**Page(s)**

*Holmes v. Securities Investor Protection Corp.,*
    503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) ........................................................ 23

*Kokkonen v. Guardian Life Ins. Co. of America,*
    511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ........................................................ 22

*Meghrig v. KFC Western, Inc.,*
    516 U.S. 479, 116 S.Ct. 1251 (1996) .................................................................... Passim

*Middlesex County Sewerage Authority v. National Sea Clammers Assn.,*
    453 U.S., 101 S.Ct. 2615 (1981) ........................................................................... 21

*Mitchell v. Robert DeMario Jewelry, Inc.,*
    361 U.S. 288, 80 S.Ct. 332 (1960) .................................................................... Passim

*Porter v. Warner Holdings Co.,*
    328 U.S. 395, 66 S.Ct. 1086 (1946) .................................................................. Passim

*Ry. Labor Exec. Assn. v. Nat'l Mediation Board,*
    29 F.3d 655 (D.C. Cir. 1994) ............................................................................. 12

*United States v. Phillip Morris,*
    396 F.3d 1190 (D.C. Cir. 2005) ................................................................... 7, 22-24

**STATUTES**

15 U.S.C. ¶ 52(b) ...................................................................................................... 2

15 U.S.C. § 5(b) .................................................................................................. 2, 15

15 U.S.C. § 52(b) ...................................................................................................... 7

15 U.S.C. § 55(b) .............................................................................................. Passim

15 U.S.C. § 57b .................................................................................................. Passim

15 U.S.C. § 57b(1)-(2) ........................................................................................... 21

15 U.S.C. § 6801(a) ................................................................................................ 12

18 U.S.C. 1964(a) .................................................................................................... 22

18 U.S.C. § 1963(l) ................................................................................................. 23

18 U.S.C. § 3282 .................................................................................................... 23

29 U.S.C. § 215, 52 Stat. 1060 (1938) ........................................................................... 23

**Page(s)**

42 U.S.C. § 6972 ................................................................................................................ 19

42 U.S.C. § 9601 et. seq. ................................................................................................... 19

Alaskan Pipeline Act § 408 ................................................................................................. 8

Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 94
    Stat. 2767 ................................................................................................................ 19-21

Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix ....................................... 16

Emergency Price Control Act § 205(b)-(c), 56 Stat. 23, 33 (1942) ............................... 23

Federal Trade Commission Act Section 13(b) .......................................................... Passim

Federal Trade Commission Act § 13 ................................................................................ 21

Federal Trade Commission Act § 19(a) ..................................................................... 10-11

Federal Trade Commission Act § 19(b) ............................................................ 6-7, 10-11

Federal Trade Commission Act § 45(a)(1) ...................................................................... 10

Federal Trade Commission Act § 5 ............................................................................ Passim

Federal Trade Commission Act § 5(a) .............................................................. 8, 11, 16

Federal Trade Improvement Act, P.L. 93-637 § 210 ......................................................... 9

Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub.L. No. 93-
    637, 88 Stat. 2183 ................................................................................................ 10, 15

Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub.L. No. 93-
    637, 88 Stat. 2183 § 19 ............................................................................................. 10

RICO Act § 1963(a) .......................................................................................................... 23

RICO Act § 1964(a) ...................................................................................................... 22-23

RICO Act § 1964(c) .......................................................................................................... 23

Trans-Alaska Pipeline Authorization Act, Pub.L. No. 93-153, 15 ................................. 14

Trans-Alaska Pipeline Authorization Act, Pub.L. No. 93-153, 15 U.S.C. s 53(b) (1976) ...... 10, 15

**OTHER AUTHORITIES**

119 Cong.Rec. 22979 (July 10, 1973) ............................................................................. 15

|  | Page(s) |
|---|---|
| 119 Cong.Rec. 36608-9 (Nov. 12, 1973) | 8 |
| CERCLA § 6972(a)(1)(B) | 20 |
| F. Civ. Proc., 12(f) | 2, 5 |
| Federal Trade Commission, House Report 93-1107, p. 7716 | 8 |
| S. Rep. 93-1408, p. 7774 | 11 |
| S. Rep. 93-151, 30-31 | 9-10 |
| S. Rep. 93-151, p. 30-31 | 18 |
| Spears, James M., "Comment For Federal Trade Commission," | 7 |
| U.S. Code Cong. & Admin. News 1973, p. 2533 | 14 |

1     PLEASE TAKE NOTICE that on January 6, 2010, at 10:30 a.m., or as soon thereafter as

2  the matter may be heard in Courtroom 4 on the Fifth Floor of the above-entitled Court, located at

3  280 South 1st Street, San Jose, California, Defendants Swish Marketing, Inc. ("Swish"), Matthew

4  Patterson and Jason Strober will and hereby do move to strike certain portions of the Complaint

5  For Preliminary Injunction and Other Equitable Relief ("Complaint") in this action pursuant to

6  Rule 12(f) of the Federal Rules of Civil Procedure ("FRCP").  This motion is made on the grounds

7  that the Federal Trade Commission ("FTC") is not authorized to seek or obtain monetary relief

8  under Section 13(b) of the FTC Act (15 U.S.C. ¶ 52(b)).

9     Specifically, these Defendants move to strike the following portions of the FTC's

10  Complaint:

11     1.     In Paragraph 1 of the Complaint, strike the words "rescission or reformation of

12  contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies and other

13  equitable relief."

14     2.     In Paragraph 6 of the Complaint, strike the words "including restitution and

15  disgorgement."

16     3.     In the first sentence of Paragraph 35 of the Complaint, strike the words "and

17  redress."

18     4.     In the second sentence of Paragraph 35 of the Complaint, strike the words

19  "including rescission or reformation of contracts, restitution, the refund of monies paid,

20  disgorgement of ill-gotten monies."

21     5.     Strike the entire Paragraph B of the "Prayer for Relief."

22  **I.     INTRODUCTION**

23     The Federal Trade Commission has a substantial arsenal of procedural resources at its

24  disposal with which to enforce Section 5's prohibition against "unfair or deceptive acts or

25  practices."  The FTC Act authorizes the FTC to institute administrative proceedings against

26  violators resulting in the issuance of cease-and-desist orders that are enforceable by federal courts.

27  (Section 5(b), 15 U.S.C. § 5(b))  If the agency is able to establish, through a detailed

28

1   administrative process, that a defendant knowingly violated an existing trade rule or cease-and-

2   desist order, Congress has provided for the FTC to seek and obtain extensive remedies in federal

3   court, including but not limited to rescission, reformation of contracts, the refund of money, the

4   return of property and damages.  (Section 19, 15 U.S.C. § 57b).  Finally, when the FTC has reason

5   to believe that a defendant is violating or is likely to violate a law enforced by the agency, it can

6   seek and obtain a temporary restraining order or preliminary injunction, halting the illegal conduct

7   pending the institution and completion of administrative proceedings, or a permanent injunction,

8   bringing the illegal conduct to an end indefinitely.  (Section 13(b), 15 U.S.C. § 55(b)).

9           In the early 1980's, the FTC apparently concluded that the administrative enforcement

10  process created by Congress was too cumbersome, and it implemented a strategy to obtain the

11  expansive remedies made available by Section 19 with the expedited procedures of Section 13(b).

12  By carefully selecting enforcement targets that were unlikely to challenge the agency's authority,

13  and involving egregious factual circumstances where courts were less inclined to scrutinize the

14  agency's expanded exercise of authority, the FTC successfully convinced a number of courts,

15  including the Ninth Circuit, to approve this broad expansion of the agency's powers.

16          However, the language of the statutes themselves as well as even a cursory review of the

17  accompanying legislative histories make clear that Congress never intended for the FTC to

18  shortcut the procedural requirements it established for the award of monetary relief.  In addition,

19  more recent Supreme Court and District of Columbia Circuit decisions have made clear that the

20  agency's hegemonic expansionism has reached its limits.

21          This motion challenges the FTC's claimed authority under Section 13(b) to recover

22  monetary relief, and requests the Court to strike all of the allegations in the Complaint that

23  contend otherwise and/or seek the recovery of monetary relief from Defendants.

24  **II.      FACTUAL AND PROCEDURAL SUMMARY**

25          The Complaint alleges that from about September 2006 through about September 2007,

26  Swish was a marketing affiliate of VirtualWorks, LLC, which offered prepaid debit cards to the

27  public on the Internet.  *See* Complaint for Permanent Injunction and Other Equitable Relief

28  ("Complaint"), ¶ 12, 14 and 15.  Swish displayed on its websites the text of VirtualWorks'

1   advertisements, which was prepared by VirtualWorks.  *Id.* at ¶ 22.  The Complaint contains no

2   allegations that Swish received any consumer funds for displaying VirtualWorks' advertisements.

3       In March 2009, after the FTC apparently determined that VirtualWorks and its principals

4   were unable to pay any substantial consumer redress,[1] the FTC threatened Defendants that it

5   would initiate this action unless Defendants agreed to pay $5,450,367, the total amount the FTC

6   claims has been lost by consumers, after reimbursements, in connection with their purchases of

7   VirtualWorks' debit cards. *See* Complaint For Declaratory Relief (the "D.C. Complaint") filed by

8   Defendants in the District of Columbia on May 18, 2009, attached as Exhibit 1 to Docket Item No.

9   5, ¶ 16.  In April 2009, Defendants provided the FTC with a Second Circuit Court of Appeal

10  opinion holding that principles of equity limit the amount that can be recovered from

11  "middleman" defendants (as opposed to direct defendants, such as VirtualWorks) to those funds

12  that are "traceable into the[ir] hands."[2]  *Id.* at 19.  As such, in April 2009, without admitting

13  liability, Defendants offered to pay approximately $1.8 million to the FTC to resolve this action.

14  *Id.*

15      After the FTC informed Defendants that it did not agree with the *Verity* decision, and

16  continued to demand the full amount of the alleged consumer losses relating to the VirtualWorks

17  campaign, Defendants Swish, Matthew Patterson and Jason Strober filed a declaratory judgment

18  action in the District Court for the District of Columbia in an effort to obtain an expedited

19  resolution of the following issues: 1) is the FTC is authorized by Section 13(b) to seek and obtain

20  monetary damages, and 2) if so, do principles of equity limit the amount of damages that can be

21  obtained by the FTC to the consumer losses that are "traceable into the hands" of Defendants? *Id.*

22      On November 11, 2009, the D.C. court granted the FTC's motion to dismiss this action,

23  declining to exercise its discretion to hear these issues.  As such, these issues are now presented

---

[1]  The FTC recently announced that it has settled all claims against VirtualWorks and its principals for a payment of $52,000.  *See* FTC press release dated August 20, 2009: "FTC Settlement Bars Deceptive Online Marketing Tactics; Payday Loan Applicants Were Charged for Unwanted Debit Cards" (attached hereto as Exhibit "A" and available at http://www2.ftc.gov/opa/2009/08/everprivate.shtm).

[2]  *FTC v. Verity Intern., Ltd.*, 443 F.3d 48 (2d Cir. 2006) (citing *Great-West Life & Annuity Ins. Co. v. Knudsen*, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).

1   for resolution by this Court.  Since the FTC has not alleged the amount or nature of the monetary

2   relief it seeks from Defendants in this action, Defendants cannot raise the second issue (whether

3   principles of equity limit the damages that can be obtained by the FTC to the amounts of consumer

4   losses that are "traceable into the hands" of Defendants) in a Rule 12 motion at this time.  For that

5   reason, only the first of the two issues is raised in this motion.

6   **III.    LEGAL ARGUMENTS**

7         **A.    The FTC Is Not Authorized To Obtain Monetary Relief Under Section 13(b).**

8               **1.    Overview of The FTC's Section 13(b) Expansion Strategy**

9         Over the past 28 years, the FTC, exploiting cases that involved egregious wrongdoing by

10   various defendants, slowly and meticulously undertook a concerted and deliberate campaign to

11   expand the remedies available under Section 13(b) of the FTC Act without Congressional

12   approval.[3]  The Commission understandably found the injunctive remedies available in § 13(b) to

13   be particularly valuable tools because they enable it "to obtain an order not only permanently

14   barring deceptive practices, but also imposing various kinds of monetary equitable relief (i.e.

15   restitution and rescission of contracts) to remedy past violations."[4]

16         The FTC accomplished this unauthorized expansion of Section 13(b) by convincing courts

17   that "equitable" monetary relief could include expanded forms of "restitution" and "disgorgement"

18   against defendants accused of violating Section 5 of the FTC Act, which prohibits "unfair or

19   deceptive acts or practices."  The FTC persuaded the courts to make these awards based on two

20   old Supreme Court decisions that authorized the use of the courts' "inherent equity powers" to

21   award monetary relief to enforce compliance with non-FTC-related statutes "in the absence of a

22   clear and valid command" from Congress restricting such powers.[5]

23   _____

24   [3]   The FTC's campaign to expand the reach of Section 13(b) is detailed by a former FTC attorney, David M. FitzGerald, in "The Genesis of Consumer Protection Remedies Under Section 13(b) of the FTC Act," a copy of which is attached hereto as Exhibit "B."

25   [4]   *See* FTC Office of the General Counsel, "A Brief Overview of the Federal Trade Commission's Investigative and Law Enforcement Authority," FTC General Counsel (revised July 2008)

26   ("Overview of FTC Authority") (attached hereto as Exhibit "C" and available at

27   http://www.ftc.gov/ogc/brfovrvw.sthm).

28   [5]   *See, Porter v. Warner Holdings Co.*, 328 U.S. 395, 66 S.Ct. 1086 (1946) and *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332 (1960).

To unilaterally expand its powers, the FTC often selected cases involving unrepresented defendants[6] and/or selected cases involving egregiously deceptive and fraudulent conduct. Generally, the cases were brought against the direct perpetrators of those schemes where the consumer loss was directly equal to the defendants' gains. Consequently, the issues regarding statutory interpretation were often not raised at all or the courts were apparently dissuaded by the FTC from closely scrutinizing the agency's authority to obtain monetary relief based on Section 13(b). Had that careful statutory analysis been performed, the courts would have denied such relief based on: (1) the express language of Section 13(b) itself; (2) the legislative history of the FTC Act and the amendments that added Sections 13(b) and 19(b) in the mid-1970's; and (3) the decisions that first interpreted Section 13(b) after it was amended.

Significantly, the Supreme Court has subsequently refused to imply equitable remedies in statutes where Congress has established "elaborate enforcement provisions" similar to those in the FTC Act. The D.C. Circuit has also held that the implied equitable remedy of disgorgement is not available to address "forward-looking" injunctive provisions, such as those contained in the FTC Act. Finally, the FTC Chairman himself impliedly acknowledged that Section 13(b) does not authorize the recovery of monetary relief when he cited only to Section 19(b) to support his recent statement to Congress that the Commission "can only obtain monetary relief, including consumer redress and disgorgement of the ill-gotten gains."[7]

Read together, these sources demonstrate that Section 13(b) was intended to be limited to the plain meaning of its terms – providing the FTC with authority to seek, and the courts authority to grant, **temporary restraining orders, preliminary injunctions and, in appropriate cases, permanent injunctions**. In short, the purpose of Section 13(b) was to provide a mechanism to "halt" illegal conduct and maintain the status quo, allowing the FTC to bring administrative

---

[6]  *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009).

[7]  *See* Prepared Statement of the Federal Trade Commission on "Proposed Consumer Financial Protection Agency: Implications for Consumers and the Federal Trade Commission." Before the House Committee on Energy and Commerce, Subcommittee on Commerce, Trade and Consumer Protection, United States House of Representatives, July 8, 2009 (attached hereto as Exhibit "D" and available at http://www.ftc.gov/os/2009/07/090708Acfpatestimony.pdf).

6

1   proceedings and, if appropriate, seek the broader remedies that were made available under the

2   limited circumstances specified in Section 19(b).[8]

3           **2.**        **The Express Language of Section 13(b) Provides Only Injunctive, Not**

4                   **Equitable, Relief.**

5          On its face, Section 13(b) authorizes the FTC to seek three specific and limited injunctive

6   remedies: a temporary restraining order, a preliminary injunction and a permanent injunction.

7   These remedies are made available under an extremely broad set of circumstances: "[w]henever

8   the Commission **has reason to believe** (1) that any person, partnership, or corporation **is**

9   **violating, or is about to violate**, any provision of law enforced by the Federal Trade Commission,

10  and (2) that the enjoining thereof pending the issuance of a complaint by the Commission and

11  until such complaint is [resolved] would be in the interest of the public…"  15 U.S.C. § 52(b)

12  (emphasis added).

13         Nowhere in the terms of the statute, its legislative history or its historical background is

14  there any indication that Congress intended to authorize the FTC to use Section 13(b) to bring

15  civil actions seeking monetary relief from Section 5 defendants.  To the contrary, the enactment of

16  Section 19(b), which expressly provides for the very monetary relief sought herein, evidences

17  Congress' intent that Section 13(b) be limited strictly to providing for the issuance of temporary

18  restraining orders, preliminary injunctions and permanent injunctions pending the completion of,

19  and to protect the viability of, the authorized administrative remedy.

20

21

22

23

---

24  [8]   Defendants are not the first to recognize that "the Commission's general authority to employ §
25  13(b) beyond the right to seek injunctive relief remains poised on relatively narrow legal footing."
    *See* Spears, James M., "Comment For Federal Trade Commission," March 29, 2002, p. 6 (attached
26  hereto as Exhibit "E"); *see also*, "Written Testimony of Kevin Arquit Before The Antitrust
    Modernization Commission," December 1, 2005 Hearing on Government Civil Remedies, p. 13.
27  fn. 24 ("While at one time a better case could be made for 13(b) disgorgement authority, there is
    more recent precedent than *Porter v. Warner Holding Co.,* which casts some doubt on that
28  authority.") (citation omitted; citing *Meghrig* and *Phillip Morris*) (attached hereto as Exhibit "F").

### 3.   Congress Did Not Intend To Nor Did It Grant The Power To Obtain Monetary Relief In Section 13(b)

In 1973, when Congress enacted Section 13(b), it was responding to a specific enforcement problem that was being experienced by the FTC. Prior to 1973, nearly all FTC enforcement actions were (1) administrative proceedings or (2) judicial proceedings brought to enforce cease-and-desist orders issued at the conclusion of administrative proceedings.[9]  However, the agency had found that, without the power to enjoin respondents' conduct at the outset of the FTC's administrative enforcement process, alleged Section 5 violators could continue to engage in bad conduct and cause additional consumer injury before the agency could act.[10]

Congress granted the FTC the ability to obtain injunctive relief in Section 13(b) because it recognized that the agency needed to be able to stop a broad, non-specific range of "unfair or deceptive acts or practices" quickly.[11]  Congress balanced this expansive grant of authority to act

---

[9]  "To appreciate the development of Section 13(b) during this period, one must understand the Commission's enforcement authority as it stood in 1976. … The Commission's principal tool for enforcing Section 5 was administrative proceedings leading to cease and desist orders.  Penalties could be imposed only on those who violated cease and desist orders issued against them.  This 'one free bite' approach was deemed appropriate because the broad language of Section 5(a) was thought to give businesses little notice of the standards to which they would be held until the Commission applied Section 5 to specific conduct through a cease and desist order."  FitzGerald, *supra*. at 2-3.

[10]  Although much of legislative discussion of Section 13(b) was focused on its use in enforcing antitrust laws, the Fifth Circuit was one of the first cases to consider Congress' intent in a consumer protection case.  In *Southwest Sunsites*, the court said:

> "Nevertheless this discussion is revealing; Representative Smith noted that **substantial public injury can take place during the pendency of a Commission proceeding,** and that 'without injunctive powers the Federal Trade Commission frequently is left with having to impose remedies that are conspicuously inadequate .... The Commission may rule the conduct illegal but during this operation the patient may die .... **Without this injunction power consumers have no protection at all during the pendency of the suit** .... It is only good sense that where there is a probability that the act will eventually be found illegal and the perpetrator ordered to cease, **that some method be available to protect innocent third parties while the litigation winds its way through final decision.**'"

*Southwest Sunsites*, 665 F.2d at 719-20 (citing 119 Cong.Rec. 36608-9 (Nov. 12, 1973) (emphasis added).

[11]  "Both the Nader and ABA reports recommend that the Federal Trade Commission be empowered to obtain preliminary injunctions against unfair or deceptive acts or practices which are unfair or deceptive to consumers.  This authority was granted by Section 408 of the Alaskan

1   by limiting the relief obtainable under Section 13(b) to a temporary restraining order, a

2   preliminary injunction or a permanent injunction.  In other words, based on a very minimal

3   standard (the FTC's mere "reason to believe"), the agency was authorized to seek injunctive relief

4   to halt a broad variety of acts or practices that **the FTC viewed** as a violation of a law under its

5   purview.

6       The intent behind the Section 13(b) amendments was discussed in the Senate Report on the

7   Federal Trade Improvement Act, P.L. 93-637:

8       "The purpose of section 210 is to permit the Commission **to bring an immediate halt** to

9       unfair or deceptive acts or practices when to do so would be in the public interest. At the

10      present time such practices might continue for several years until agency action is

11      completed. Victimization of American consumers should not be so shielded.

12      Section 210 authorizes the granting of a temporary restraining order or a preliminary

13      injunction without bond pending the issuance of a complaint by the Commission under

14      section 5, and until such complaint is dismissed by the Commission or set aside by the

15      court on review, or until the order of the Commission made thereon has become final

16      within the meaning of section 5."

17  S. Rep. 93-151, 30-31. (Emphasis added.)

18      The Senate Report also addressed the purposes behind the amendment's provision for a

19  permanent injunction "in proper cases:"

20      "Provision is also made in section 210 for the Commission to seek and, after a hearing, for

21      a court to grant a permanent injunction. This will allow the Commission to seek a

22      permanent injunction when a court is reluctant to grant a temporary injunction because it

23      cannot be assured of a (sic) early hearing on the merits. Since a permanent injunction could

24      only be granted after such a hearing, this will assure the court of the ability to set a definite

25      hearing date. Furthermore, the Commission will have the ability, in the routine fraud case,

26

27  Pipeline Act, which authorized the Federal Trade Commission  to obtain temporary restraining
    orders and preliminary injunctions of violations or threatened violations of any provision of law
28  administered by the Commission."  House Report 93-1107, p. 7716.

1    to merely seek a permanent injunction in those situations in which it does not desire to

2    further expand upon the prohibitions of the Federal Trade Commission Act through the

3    issuance of a cease-and-desist order. Commission resources will be better utilized, and

4    cases can be disposed of more efficiently."

5  S.Rep. 93-151, 30-31.

6    The Senate Report makes clear that Congress enacted the permanent injunction provision

7  to ensure that courts could provide an early hearing on the merits in Section 13(b) actions and to

8  give the FTC the flexibility "to bring an immediate halt" to offending conduct in cases where the

9  agency elected not to make new policy or seek additional remedies (made available in Section 19,

10 discussed below) against the offender by issuing a cease and desist order through the

11 administrative process.  The FTC would be able to better utilize its resources by enjoining the

12 violative conduct and moving on to other matters.

13   Nowhere in the legislative history is there any indication that Congress intended to grant

14 the FTC (through the courts) the power to do more than "bring an immediate halt to unfair or

15 deceptive acts or practices when to do so would be in the public interest."  To the contrary, the

16 structure of Sections 13(b) and 19(b) establish Congress' intent that the FTC could not obtain the

17 same remedies in a Section 13(b) action that were expressly authorized under Section 19(b).

18   At the same time Section 13(b) was being enacted,[12] Congress was formulating Section

19 19,[13] which provided a broad set of remedies that are made available under a narrow set of

20

21 [12]   Section 13(b) and Section 19 were introduced together as part of the bill that became the
   "Trans-Alaska Pipeline Authorization Act," Pub.L. No. 93-153, 15 U.S.C. s 53(b) (1976).  The
22 proposed new Section 19 was eventually removed from the Trans-Alaska Pipeline Authorization
   Act and inserted into the Magnuson-Moss Warranty-Federal Trade Commission Improvement
23 Act, Pub.L. No. 93-637, 88 Stat. 2183, which was enacted in January 1975.
24 [13]   Section 19(a) and (b) provide in relevant part:
         (a) Suits by Commission against persons, partnerships, or corporations; jurisdiction; relief
25       for dishonest or fraudulent acts
         **(1)** If any person, partnership, or corporation **violates any rule** under this subchapter
26       respecting unfair or deceptive acts or practices …, then the Commission may commence a
         civil action against such person, partnership, or corporation for relief under subsection (b)
27       of this section in a United States district court or in any court of competent jurisdiction of a
         State.
28

1  circumstances: where a defendant has advance notice that his or her conduct violates the law,

2  either because the conduct is the subject of a rule previously issued by the agency, or because the

3  defendant himself is the subject of a cease-and-desist order previously issued by the agency.

4  Under these limited circumstances, Congress determined that it is appropriate that all of the

5  courts' remedies, including every form of legal and equitable relief, should be available to address

6  the wrongdoer's conduct and restore the consumer's losses to the fullest extent of the law.

7  Significantly, when Congress enacted Section 19(b) in 1975, two years after Section 13(b) had

8  been passed, the Senate Report specifically stated that it was "supplementing" the FTC's ability to

9  redress consumer injuries by adding the broad range of legal and equitable remedies, including

10  rescission and refunds of money and property.[14]

11      With the enactment of Sections 13(b) and 19, Congress created an "elaborate regulatory

12  scheme" for the enforcement of Section 5 violations, granting the courts authority to issue

---

**(2)** If any person, partnership, or corporation engages in any unfair or deceptive act or practice (within the meaning of section 45 (a)(1) of this title) **with respect to which the Commission has issued a final cease and desist order which is applicable to such person**, partnership, or corporation, **then** the Commission may commence a civil action against such person, partnership, or corporation in a United States district court or in any court of competent jurisdiction of a State. If the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which **a reasonable man would have known under the circumstances was dishonest or fraudulent**, the court may grant relief under subsection (b) of this section.

(b) Nature of relief available

The court in an action under subsection (a) of this section shall have **jurisdiction to grant such relief as the court finds necessary to redress injury to consumers** or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, **rescission or reformation of contracts, the refund of money or return of property, the payment of damages**, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages. (Emphasis added.)

[14]  "The authority of the Commission to seek consumer redress encompassed by the Conference substitute deals exclusively with civil actions brought by the Commission and relief granted by the courts in those actions. **The section is intended to supplement** the ability of the Commission to redress consumer and other injury resulting from violations of its rules or of section 5(a) of the Federal Trade Commission Act and is not intended to modify or limit any existing power the Commission may have to itself issue [administrative cease and desist] orders designed to remedying (sic) violations of the law." S.Rep. 93-1408, p. 7774 (emphasis added.).

1  restraining orders and injunctions to maintain the status quo under Section 13(b), and authorizing

2  the FTC to pursue a broad array of legal and equitable remedies under Section 19, including such

3  traditionally equitable remedies such as rescission, refunds (or "restitution") and return of property

4  (or "disgorgement").  This "statutory plan for the protection of the ... public,"[15] demonstrated that

5  Congress "knew how to provide for [monetary relief] when it wanted to do so."  *Meghrig v. KFC*

6  *Western, Inc.*, 516 U.S. 479, 485, 116 S.Ct. 1251 (1996).  There would have been no need for

7  Congress to enumerate this specific remedy in Section 19 if the power provided in Section 13(b)

8  already encompassed it."  As such, the FTC's methodical program of expansion of Section 13(b)

9  remedies through carefully orchestrated legal action is inconsistent with Congress' expressed

10  intent and is unsupported by either the FTC Act or the due process rights provided by the U.S.

11  Constitution.[16]

12              **4.      Congress' Intended Sections 13(b) and 19 To Work Together As A**

13                       **"Statutory Plan For The Protection Of The ... Public"**

14          When the history and language of Sections 13(b) and § 19 are considered, it is clear that

15  Congress had a specific statutory structure in mind.  It recognized that the prohibitions of Section

16

17  _____

[15]  *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711, 720 (5th Cir. 1982)

18  [16]  The FTC's improper attempt to expand Section 13(b), and in turn, its enforcement authority, is not without precedent.  In *American Bar Ass'n v. FTC*, 430 F.2d 457 (D.C. Cir. 2005), the

19  American Bar Association and the New York State Bar challenged the FTC's determination that attorneys engaged in the practice of law are subject to the Gram-Leach-Bliley Act (15 U.S.C. §

20  6801(a)) ("GLB Act") on the grounds that the agency exceeded its statutory authority and was therefore invalid as a matter of law.  The D.C. Circuit affirmed the district court's ruling that

21  Congress had not authorized the FTC to "extend its regulatory authority over attorneys engaged in the practice of law."  *American Bar Ass'n, supra.* at 468.  Responding to the FTC's argument that

22  the GLB Act did not **prohibit** the FTC's exercise of authority over attorneys, the court stated,

23  "[p]lainly, if we were to 'presume a delegation of **power**' from the absence of 'an express **withholding** of such power, agencies would enjoy virtually limitless hegemony..." *Id.* (citing *Ry.*

24  *Labor Exec. Assn. v. Nat'l Mediation Board*, 29 F.3d 655, 671 (D.C. Cir. 1994)) (emphasis same as original).

25    Most recently, the FTC announced its intention to apply its "Red Flags Rule" to attorneys.  On

26  October 30, 2009, the District Court for the District of Columbia granted the American Bar Association's motion for partial summary judgment, confirming once again that the FTC had

27  exceeded the authority granted to the agency by Congress.  *See* Order dated October 30, 2009, issued by Judge Reggie B. Walton in *American Bar Association v. Federal Trade Commission*,

28  Case No. 09-1636, attached hereto as Exhibit "G."

1   5, which ban all "unfair or deceptive acts or practices," are extremely broad, and arguably vague.

2   In that context, Congress created a statutory structure that was designed both to protect consumers

3   from "unfair or deceptive acts or practices" and, at the same time, protect individuals and

4   businesses from exposure to liability under circumstances where they had no means of knowing

5   that their conduct violated the law.

6        However, Congress recognized that halting an act or practice that may or may not be a

7   violation of the law is very different from granting affirmative consumer relief in connection with

8   that conduct.  The imposition of damages or other monetary relief under circumstances where a

9   defendant has no specific advance notice that his or her conduct might violate Section 5 would be

10   an unconstitutional violation of due process property rights.

11        **5.        Before the FTC Began Its Campaign To Expand The Available**

12              **Remedies Under § 13(b), The FTC Act Amendments Were Scrutinized**

13              **By The Fifth and District of Columbia Circuit Courts**

14        Shortly after Congress completed its revision of the FTC Act in the mid-70's, two Circuit

15   Courts considered the legislative intent behind those changes.  In *FTC v. Weyerhaeuser Company*,

16   665 F.2d 1072 (D.C. Cir. 1981), the District of Columbia Circuit considered the legislative history

17   of Section 13(b) in the context of a lumber industry antitrust action.  The FTC had sought a

18   preliminary injunction to block a proposed merger.  The district court denied the injunction,

19   ordering instead a "hold separate" order that allowed the merger to proceed but required that an

20   individual corrugated wood mill be maintained as a separate competitive entity from the rest of the

21   acquiring company.  The FTC appealed, arguing that the remedies granted by Section 13(b) were

22   limited to the issuance of temporary restraining orders and preliminary or permanent injunctions.[17]

23

24

25

26   [17]   Notably, within the following year, the FTC was taking the opposite position, arguing that
     Section 13(b) authorized the court to exercise **any** equitable remedy, including awarding monetary
27   relief as restitution, regardless of whether it was needed to restrain the defendant's conduct or
     maintain the status quo, as Congress had designed.  *See FTC v. H.N. Singer, Inc.*, 668 F.2d 1107
28   (9th Cir.1982).

1  The D.C. Circuit began its analysis of the issue by reviewing the legislative history of

2 Section 13(b) to determine the purpose of the then recent revisions.  Citing the House-Senate

3 Conference Report, the court stated:

4   …**§ 13(b) was not designed to innovate**. Rather, **Congress 'intended to codify the**

5   **decisional law.'**  The courts had evolved an approach to cases in which government

6   agencies, acting to enforce a federal statute, sought **interim relief**.

7 *Weyerhaeuser*, 665 F.2d at 1082 (emphasis added) (citing U.S. Code Cong. & Admin. News 1973,

8 p. 2533).

9  Responding to the FTC's argument that "hold separate orders" were not expressly

10 authorized by the statutory language of Section 13(b) and, at best, could only be justified as an

11 exercise of the court's "inherent equity powers," the D.C. Circuit noted that "hold separate orders"

12 had long been used by the courts before the 1970's amendments **to maintain the status quo** in

13 antitrust disputes.  The court said:

14   Section 13(b) confirms the equity power courts exercised prior to its enactment **to grant**

15   **interim relief in aid of the FTC's law enforcement authority**. Congress expressed a

16   plain purpose to codify decisional law, not to straitjacket it, and to recognize 'the duty of

17   the courts to exercise independent judgment.'"

18 *Id.* at 1084 (emphasis added).

19  Shortly after *Weyerhaeuser*, in *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711 (5th Cir.

20 1982), the Fifth Circuit considered whether Section 13(b) authorized the court to grant temporary,

21 ancillary relief to prevent the dissipation of assets that might eventually be awarded in a Section

22 19 administrative adjudication action.  The court paid careful attention to the legislative and

23 judicial history of the two statutes, recognizing its obligation to understand Congress' intended

24 statutory scheme and then utilize its equitable powers to give effect to that plan.

25  After reviewing the legislative histories of Sections 13(b) and 19, the court concluded that,

26 "We believe that through these various recent amendments to the Federal Trade Commission Act,

27 **Congress was evolving a statutory plan for the protection of the ... public**." *Id.* at 720

28 (emphasis added) (citation omitted).  The Court noted that Sections 13(b) and 19 had been

14

1   introduced together as part of the bill that became the Trans-Alaska Pipeline Authorization Act,

2   Pub.L. No. 93-153, 15 U.S.C. s 53(b) (1976).[18]  The court focused on Senator Jackson's statement

3   that the proposed legislation was "designed to enable the Commission to carry out its mandate to

4   protect the public interest through a prompt and aggressive enforcement of the laws it

5   administers." 119 Cong.Rec. 22979 (July 10, 1973).

6      The *Southwest Sunsites* court noted that the legislators' discussions of Section 13(b)

7   focused on the FTC's inability to preserve the status quo during the pendency of its administrative

8   enforcement proceedings.[19]  The court recognized that Congress' plan was to authorize the courts

9   to provide temporary, ancillary relief under Section 13(b) to maintain the status quo so that the

10  remedies provided in Section 19 could be implemented where appropriate:

11      The evident intent of these amendments was to add significant new weapons to the

12      Commission's enforcement arsenal in order to provide more meaningful and complete

13      consumer relief possible.  It seems to us that **not only is the use of preliminary relief a**

14      **desirable and effective method of implementing consumer redress under Section 19,**

15      **but that precluding such preliminary relief could entirely prevent the effectuation of**

16      **Section 19 in circumstances such as those alleged by the Commission in this case**.

17      The type of ancillary relief sought by the Commission in this case appears to be well

18      within the jurisdiction of the district court under Section 13(b), in order **to preserve the**

19      **status quo pendente lite and assure the possibility of complete relief following**

20      **administrative adjudication.**

21  *Id.* at 720 (emphasis added).

22      **6.      In The Early 1980's, The FTC Launches Its Campaign To Expand The**

23      **Remedies Available Under Section 13(b) In The Ninth Circuit.**

24      Thus, by the early 1980's, as a result of legislation enacted in 1973 and 1975, Congress

25  had given the FTC authority to enforce Section 5 violations by: 1) conducting administrative

---

26  [18]   The proposed new Section 19 was eventually removed from the Trans-Alaska Pipeline

27  Authorization Act and inserted into Magnuson-Moss Warranty-Federal Trade Commission

    Improvement Act, Pub.L. No. 93-637, 88 Stat. 2183, which was enacted in early 1975.

28  [19]  *See* footnote 9, *supra*.

DEFENDANTS' MOTION TO STRIKE AND
SUPPORTING MEMORANDUM OF POINTS
AND AUTHORITIES

1    hearings and issuing cease-and-desist orders pursuant to Section 5(b); 2) obtaining injunctive

2    relief pursuant to Section 13(b) to halt violations pending the completion of the administrative

3    adjudication proceedings; and 3) seeking a broad range of legal and equitable remedies pursuant to

4    Section 19 where a violation of a trade rule or an FTC administrative cease-and-desist order had

5    occurred.

6          However, despite the expanded arsenal of remedies provided by Congress, the FTC's role

7    in enforcing Section 5 violations was still limited primarily to bringing administrative proceedings

8    against alleged violators before the FTC could seek monetary relief, equitable or otherwise.

9    Generally, only after the FTC had conducted rulemaking and issued a trade rule, or had completed

10   an administrative hearing and issued a cease-and-desist order, could the agency go to court and

11   obtain an enforceable sanction against the wrongdoer.  The FTC staff found this process

12   cumbersome and unsatisfactory.[20]

13         From about 1980, the FTC began a concerted effort to expand the remedies available to

14   respond to alleged violations of Section 5(a).  After the *Weyerhaeuser* court had ruled against the

15   agency, FTC attorneys devised a strategy to adopt the *Weyerhaeuser* defendants' argument based

16   on the court's "inherent equity powers" in an effort to expand the agency's enforcement powers

17   and the remedies available in consumer protection cases.

18         In *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982), the FTC presented the opposite

19   argument from the one it made to the D.C. Circuit in *Weyerhaeuser*.  This time the agency argued

20   that Section 13(b) should be read very broadly.  Based on two U.S. Supreme Court cases,[21] the

---

[20]   The FTC acknowledges in "Overview of FTC Authority" that, "A suit under Section 13(b) is preferable to the adjudicatory process because, in such a suit, the court may award both prohibitory and monetary equitable relief in one step.  Moreover, a judicial injunction becomes effective immediately, while a Commission cease and desist order takes effect only 60 days after service." *Supra.* at fn.4.

[21]   The FTC relied on the U.S. Supreme Court's decisions in *Porter v Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089 (1946) and *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291-92, 80 S.Ct. 332, 334-35 (1960).  In *Porter*, the Administrator of the *Emergency Price Control Act of 1942*, 50 U.S.C.A.Appendix, sought an order to enjoin landlords from collecting excessive rents and to require reimbursement of tenants for monies paid as a result of past violations.  In *Mitchell*, the Secretary of Labor sought to enjoin employers that had terminated employees for pursuing Fair Labor Standards Act claims and to seek reimbursement of the employees' lost wages.

DEFENDANTS' MOTION TO STRIKE AND
SUPPORTING MEMORANDUM OF POINTS
AND AUTHORITIES

1   agency argued that the FTC Act authorized the federal court to utilize the full array of equitable

2   remedies at its disposal in Section 13(b) cases.  The FTC pressed the Ninth Circuit to rule (in

3   *dicta*) that the court's "inherent equity powers" authorized the award of monetary relief in the

4   form of equitable rescission for Section 5 violations.

5           Although the *Singer* decision paved the way for subsequent decisions that accepted the

6   argument that Section 13(b) authorized the courts to award monetary relief in Section 5 actions,

7   the new line of cases was flawed from the beginning as a result of several defects in the court's

8   analysis.

9           The only issues that were presented in *Singer* were the trial court's authority to enjoin the

10  defendants from committing further violations of the Franchise Trade Rule, to freeze their assets

11  and to require an accounting (all of which were consistent with legitimate Section 13(b) objectives

12  of preserving the status quo pending the completion of the FTC's administrative process).  There

13  was no need or reason for the Ninth Circuit to reach the question whether any equitable remedies

14  were available under Section 13(b) beyond the injunction, freeze order and accounting issues that

15  was presented.  The FTC had separately sought Section 19 relief, which provided for the remedies

16  of rescission, restitution and refund.  The court's determination that it had authority to maintain

17  the status quo by ordering the injunction, freeze and accounting based on the legislative intent of

18  _____

19          Finding that there had been no expression of contrary legislative intent, the Supreme Court
    held in *Porter* and *Mitchell* that the court's equitable remedies were available to support the
20  enforcement of the two statutes.  Where the federal court's equitable jurisdiction had been
    invoked, the Supreme Court stated:

21          Unless otherwise provided by statute, all the inherent equitable powers of the District
            Court are available for the proper and complete exercise of that jurisdiction. And since the
22          public interest is involved in a proceeding of this nature, those equitable powers assume an
            even broader and more flexible character than when only a private controversy is at stake.
23          … (T)he court may go beyond the matters immediately underlying its equitable
            jurisdiction … and give whatever other relief may be necessary under the circumstances.
24          … Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or
            limited in the absence of a clear and valid legislative command.  Unless a statute in so
25          many words, **or by a necessary and inescapable inference**, restricts the court's
            jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.
26          'The great principles of equity, securing complete justice, should not be yielded to light
            inferences, or doubtful construction.' *Brown v. Swann*, 10 Pet. 497, 503, 9 L.Ed. 508, 328
27          U.S. at 397-398, 66 S.Ct. at 1089."

28  *Singer*, 668 F.2d at 1112 (emphasis added).

1   Section 13(b) was all that was required where all of the other remedies that were sought by the

2   FTC were expressly provided by Section 19.

3           Finally, the *Singer* court reviewed enough of the legislative analysis to make the correct

4   determination that "The purpose of [Section 13(b)] is to permit the Commission **to bring an**

5   **immediate halt** to unfair or deceptive acts or practices when to do so would be in the public

6   interest." 668 F.2d at 1111 (quoting S.Rep. 93-151, p. 30-31)(emphasis added). But the court

7   then disregarded the clear legislative intent when it held that application of the court's equitable

8   powers, including rescission and restitution, was consistent with the stated purpose of the statute.

9   In reaching this decision, the Ninth Circuit failed to consider the more complete analyses of the

10  statutory history performed by the Fifth Circuit in *Southwest Sunsites* and by the D.C. Circuit in

11  *Weyerhaeuser*.

12          This same incomplete analysis has subsequently been relied on by other courts, both within

13  and outside of the Ninth Circuit, to conclude that Section 13(b) and the courts' "inherent equity

14  powers" authorized the award of monetary relief.  *See FTC v. Mylan Laboratories, Inc.* 62

15  F.Supp.2d 25, 37 (D.D.C. 1999) (citing *FTC v. Febre,* 128 F.3d 530, 534 (7th Cir.1997); *FTC v.*

16  *Gem Merchandising,* 87 F.3d 466, 470 (11th Cir.1996); *FTC v. Pantron,* 33 F.3d 1088, 1102 (9th

17  Cir.1994); *FTC v. Security Rare Coin,* 931 F.2d 1312 (8th Cir.1991); *FTC v. Southwest Sunsites,*

18  *Inc.,* 665 F.2d 711 (5th Cir.1982);[22] *see also Federal Trade Commission v. R.A. Walker & Assocs.,*

19  No. 83-2138, 1991 WL 185162, 1991 U.S. Dist. LEXIS 14114 (D.D.C. July 26, 1991)).

20          Similar to *Singer,* all of these cases relied on *Porter* and *Mitchell,* but (except for

21  *Southwest Sunsites*) failed to perform any detailed analysis of the legislative history and intent

22  behind Sections 13(b) and 19 to determine whether Congress' remedial scheme in the FTC Act

23

24  [22]  In *FTC v. Mylan*, the court incorrectly included the *Southwest Sunsites* case in a list of cases
        where it indicated that "five courts of appeals and numerous district courts have permitted the FTC
25      to pursue monetary relief under Section 13(b)." As the *Mylan* court acknowledged later in its
        opinion, the *Southwest Sunsites* court granted an "asset freeze pending further proceedings." As is
26      discussed in Section II.A.5. above, *infra.*, *Southwest Sunsite* affirmed the trial court's issuance of
        **nonmonetary** injunctive relief pending resolution of the FTC's Section 19 claims for monetary
27      relief, which the Fifth Circuit viewed, and Defendants view, as consistent with the legislative
        intent of the two statutes.
28

1    limited the court's authority to award equitable relief.  Moreover, none of these cases considered

2    the more thorough analyses that were performed by the Fifth and D.C. Circuits in 1981 before

3    *Singer.*

4         In short, the FTC's ability to obtain monetary relief under Section 13(b) is a house of

5    cards, built on *dicta* and an incomplete analysis of Congressional intent that has never been fully

6    analyzed by a court specifically addressing these issues.

7         **7.    Recent Decisions Have Articulated The Limits of *Porter* and *Mitchell.***

8                   **a.    In *Meghrig*, The Supreme Court Held That Equitable**

9                          **Remedies Cannot Be Implied Where Congress Has**

10                         **Provided "Elaborate Enforcement Provisions"**

11        In 1996, fourteen years after *Singer*, the U.S. Supreme Court expanded upon the *Porter*

12   and *Mitchell* analysis, elaborating on the nature of the statutory limitations that will "restrict the

13   court's [equitable] jurisdiction," as was first discussed in *Porter, supra.,* 328 U.S. at 398, 66 S.Ct.

14   at 1086.  In *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251 (1996), the Supreme

15   Court considered the entire statutory enforcement structure at issue in that case to determine

16   whether Congress intended to provide the courts with limited or expansive equitable powers.  The

17   Court concluded that "where Congress has provided 'elaborate enforcement provisions' for

18   remedying the violation of a federal statute, … 'it cannot be assumed that Congress intended to

19   authorize by implication additional judicial remedies…'"  *Meghrig, supra.,* 516 U.S. at 487, 116

20   S.Ct. at 1256.

21        *Meghrig* arose when a property owner sought to recover cleanup costs from a prior owner

22   based on the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972.  The Court

23   examined both the RCRA, which authorized district courts "to restrain any person who has

24   contributed or who is contributing to the … disposal of any solid or hazardous waste," *id.* at §

25   6972(a), and the Comprehensive Environmental Response, Compensation, and Liability Act of

26   1980 ("CERCLA"), 94 Stat. 2767, as amended, 42 U.S.C. § 9601 et. seq.  The Court noted that

27

28

1   CERCLA "was passed several years after RCRA went into effect, and … is designed to address

2   many of the same toxic waste problems that inspired the passage of RCRA." *Id.* at 485, 1255.[23]

3       Despite the similarities between the two statutes, the Court found that "CERCLA differs

4   markedly from RCRA, however, in the remedies it provides."  *Id.*  Similar to Section 19 of the

5   FTC Act, CERCLA provided a comprehensive set of remedies that includes: (1) citizen suits that

6   authorize the courts to "order such action as may be necessary to correct the violation;" (2)

7   government actions to recover "all costs of removal or remedial action;" (3) actions to recover any

8   "necessary costs of response incurred by any … person consistent with the national contingency

9   plan;" and (4) private actions for contribution from "any other person who is liable or potentially

10  liable" for these costs.

11      Contrasting the extensive remedies that are provided by CERCLA with the RCRA's bare

12  authorization of injunctive relief, similar to Section 13(b), the Supreme Court held that "Congress

13  thus demonstrated in CERCLA that it knew how to provide for the recovery of cleanup costs, and

14  that the language used to define the remedies under RCRA does not provide that remedy." *Id.* at

15  485, 1255.  As such, the Supreme Court refused to imply an equitable remedy that would allow

16  the courts to award the recovery of cleanup costs under RCRA that had been expressly provided

17  for in CERCLA.

18      The Supreme Court addressed and specifically rejected the property owner's argument that

19  the Court should use its "inherent authority," discussed in *Porter* and its progeny, to supply the

20  requested remedy, stating that "the limited [injunctive] remedies described in [the RCRA], along

21  with the stark differences between the language of that section and the cost recovery provisions of

22  CERCLA, amply demonstrate that Congress did not intend for a private citizen to be able to

23  undertake a cleanup and then proceed to recover its costs under RCRA…. **[W]here Congress has**

24  **provided elaborate enforcement provisions for remedying the violation of a federal statute,**

25  _____

26  [23]  Although CERCLA's § 6972(a)(1)(B) expressly permits citizen suits against persons
    responsible for "waste which may present an imminent and substantial endangerment to health or

27  the environment,"  it does not authorize a suit based on an allegation that the contaminated site
    posed such an endangerment at some time in the past.  As a result of this restriction, the

28  Defendants requested the Court to use its equitable powers to provide them with a remedy.

1    **as Congress has done with RCRA and CERCLA, it cannot be assumed that Congress**

2    **intended to authorize by implication additional judicial remedies for private citizens suing**

3    **under the statute.**  It is an elemental canon of statutory construction that where a statute expressly

4    provides a particular remedy or remedies, a court must be chary of reading others into it." *Id.* at

5    488, 1256 (quoting *Middlesex County Sewerage Authority v. National Sea Clammers Assn.*, 453

6    U.S., 14-15, 101 S.Ct. 2615, 2623 (1981) (emphasis added and internal quotes omitted).

7          In Section 19, similar to the CERCLA, Congress provided a comprehensive set of

8    remedies for FTC Act violations including, but not limited to, rescission, reformation of contracts,

9    refunds ("disgorgement"), return of property ("restitution"), the payment of damages and public

10    notification.  By enacting Section 19 shortly after Section 13, "Congress thus demonstrated ... that

11    it knew how to provide for [disgorgement and restitution], and that the language used to define the

12    remedies under [Section 13(b)] does not provide that remedy." *Meghrig, supra.*, at 485, 1255.

13    Moreover, "[w]here Congress has provided 'elaborate enforcement provisions' for remedying the

14    violation of a federal statute, ... 'it cannot be assumed that Congress intended to authorize by

15    implication additional judicial remedies...'" *Id.* at 487, 1256.

16          As the Supreme Court warned in *Meghrig*, the principle of *expressio unius est exclusio*

17    *alterius* should make the courts "chary" of reading the remedy of disgorgement into Section 13

18    where Congress has provided identical relief in Section 19, albeit with accompanying limitations

19    that the FTC finds to be "inconvenient."[24]

20                    **b.       Equitable Disgorgement Cannot Be Implied In Section**

21                             **13(b) Where The Statutory Remedies Provided By**

22                             **Congress Are "Forward-Looking."**

23          The District of Columbia Court of Appeal is the most recent court to apply *Porter* and its

24    progeny to the issue of whether the equitable remedy of disgorgement can be implied from a

25    _____

      [24]  *See* footnote 26 below.  In order to pursue the remedies provided in Section 19, the FTC must

26    establish that a defendant has (1) "violat[ed] a rule ... respecting unfair or deceptive practices" or
      (2) has engage[ed] in any unfair or deceptive act or practice with respect to which the Commission

27    has issued a final cease and desist order which is applicable to such [defendant]" ... **and** ... "the
      Commission satisfies the Court that the act or practice ... is one which a reasonable man would

28    have known under the circumstances was dishonest or fraudulent..." 15 U.S.C. § 57b(1)-(2).

1  statutory grant of power.  In *United States v. Phillip Morris*, 396 F.3d 1190 (D.C. Cir. 2005), the

2  Court held that the language of the Racketeer Influenced and Corrupt Organizations Act

3  ("RICO"), 18 U.S.C. 1964(a), made clear that **disgorgement was not included among the**

4  **equitable powers granted by Congress**.

5      The Court found that "the text and structure" of the RICO statute restricted the court's

6  equitable jurisdiction, preventing use of the remedy of disgorgement.[25]  *Id.*  The Court found that

7  the injunctive provisions of the RICO Act, which authorized courts to "prevent and restrain"

8  violations of the Act, were directed toward "preventing and restraining" future conduct as opposed

9  to providing a remedy for past conduct.  Where disgorgement is "a quintessentially backward-

10  looking remedy focused on remedying the effects of past conduct to restore the status quo," *id.* at

11  1198, the Court found that it is fundamentally different from the remedies provided by the RICO

12  Act, and therefore excluded from the district court's power.[26]

13      The Court rejected **the government's argument** that *Porter* and *Mitchell* compelled a

14  different result, finding that, even under the logic of those cases, the power to order disgorgement

15  "is not within the terms of [the RICO Act's] statutory grant [of equitable power], nor any

16  necessary implication of the language of the statute." *Id.* at 1199.[27]

17      The Court made clear that it understood why the Government was asking the Court to use

18  its equitable powers to imply the remedy of disgorgement: the requirements for obtaining

19  _____

20  [25]  The D.C. Court reached this conclusion after considering *Porter's* statement that "where a
statute grants general equitable jurisdiction to a court, all the inherent equitable powers ... are

21  available for the proper and complete exercise of that jurisdiction" unless the "statute in so many
words, or by a necessary and inescapable inference, restricts the court's jurisdiction." *Id.* at 1197,

22  461 (citing *Porter*, *supra.*, 328 U.S. at 398, 66 S.Ct. at 1086).

23  [26]  "The remedies explicitly granted in § 1964(a) are all directed toward future conduct and
separating the criminal from the RICO enterprise to prevent future violations.  Disgorgement is a

24  very different type of remedy aimed at separating the criminal from his prior ill-gotten gains and
thus may not be properly inferred from § 1964(a)." *Id.* at 1200.

25  [27]  "Federal courts are courts of limited jurisdiction.  They possess only that power authorized by
Constitution and statute, which is not to be expanded by judicial decree." *Id.* at 1197 (citing

26  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d
391 (1994)).  "Reading *Porter* in light of this limited jurisdiction we must not take it as a license

27  to arrogate to ourselves unlimited equitable power.  We will not expand upon our equitable
jurisdiction if, as here, we are restricted by the statutory language, but may only assume broad

28  equitable powers when the statutory or Constitutional grant of power is equally broad." *Id.*

1   essentially (if not exactly) the same remedy through the criminal forfeiture proceedings that were

2   authorized by RICO were substantially less convenient and certain.[28]

3       Similar to the RICO statute, the injunctive powers provided by Section 13(b) were clearly

4   intended as **forward-looking remedies** to prevent **present and future violations** of the FTC Act.

5   The statute grants courts authority to enjoin any person who **"is violating or is about to violate"**

6   the provisions of the Act.  As the Court held in *Phillip Morris*, the remedy of disgorgement, a

7   **backward-looking remedy** that is designed to respond to past violations, is inconsistent with the

8   express language and purpose of Section 13(b).

9       By contrast, in *Porter*, the Emergency Price Control Act (EPCA"), § 205(b)-(c), 56 Stat.

10  23, 33 (1942), specifically directed the courts to enjoin any person who **"has engaged in** or is

11  about to engage in [violations of the Act]." (Emphasis added.)  In addition, the EPCA gave courts

12  authority to issue an injunction "**or other order** … enforcing compliance with [the Act]."

13  (Emphasis added.)  As the D.C. Circuit concluded in *Phillip Morris*, "the Supreme Court [in

14  *Porter*] did not have to make much of a stretch" to reach the conclusion that the EPCA authorized

15  the district court to order the restitution of rents collected in excess of the statutory limits.[29]

16

17

---

18  [28]  "The disgorgement requested here is similar in effect to the relief mandated under the criminal
forfeiture provision, § 1963(a), without requiring the **inconvenience** of meeting additional

19  procedural safeguards that attend criminal charges, including a five-year statute of limitations,  18
U.S.C. § 3282, notice requirements, 18 U.S.C. § 1963(l), and general criminal procedural

20  protections including proof beyond a reasonable doubt.  Further, on the Government's view it can
collect sums paralleling-perhaps exactly-the damages available to individual victims under §

21  1964(c). Not only would the resulting overlap allow the Government to escape a statute of
limitations that would restrict private parties seeking essentially identical remedies, *see Agency*

22  *Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121

23  (1987), but it raises issues of duplicative recovery of exactly the sort that the Supreme Court said
in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 269, 112 S.Ct. 1311, 117 L.Ed.2d

24  532 (1992), constituted a basis for refusing to infer a cause of action not specified by the statute.
Permitting disgorgement under § 1964(a) would therefore thwart Congress' intent in creating

25  RICO's elaborate remedial scheme." *Id.* at 1200-01 (emphasis added).

26  [29]  In *Mitchell*, the D.C. Circuit noted that "[t]he [Supreme] Court reviewed the whole breadth of
[the] broad [Fair Labor Standards] Act [("FLSA"), 29 U.S.C. § 215, 52 Stat. 1060 (1938)] to

27  conclude that the available remedies included not only injunction against further discrimination
and mandatory injunctions of reinstatement, but also a 'make whole' reimbursement for lost

28  wages because of the discriminatory discharge." *Id.* at 1199.

1    The Court of Appeals also found that "[t]he structure of RICO … limits courts' ability to

2  fashion equitable remedies":

3      "Where a statute has a 'comprehensive and reticulated' remedial scheme, we are reluctant

4      to authorize additional remedies; Congress' care in formulating such a 'carefully crafted

5      and detailed enforcement scheme provides strong evidence that Congress did ***not*** intend to

6      authorize other remedies that it simply forgot to incorporate expressly.' *Great-West Life &*

7      *Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 209, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)."

8  *Id.* at 1200(internal quotations omitted) (emphasis in original).

9    Relying on *Meghrig v. KFC Western, Inc., supra.,* the D.C. Circuit also confirmed that the

10  existence of the "elaborate enforcement structure" provided in the RICO Act limited the equitable

11  remedies available to the Court.  *Phillip Morris, supra.,* at 1199-1200.[30]

12  **IV.    CONCLUSION**

13    For the reasons stated, Defendants request that the Court grant their motion to strike the

14  designated portions of the Complaint.

15  Dated:  December 2, 2009                    LOEB & LOEB LLP

16                                             By: _____/s/_____

17                                             Michael L. Mallow
                                               Michael A. Thurman

18                                             Attorneys for Defendants
                                               SWISH MARKETING, INC. AND
19                                             MATTHEW PATTERSON

20

21

22

23

24

25

26

27

28

[30]  The FTC may argue that *Meghrig* is not applicable to government actions, but *Phillip Morris*
establishes that *Meghrig* is not so limited.

1

2
   Dated:  December 1, 2009         NORTHRUP SCHLUETER, APLC

3
                                     By: _____/s/_____
                                     Linda Northrup

4
                                     Attorney for Defendant
                                     JASON STROBER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2       I, Martha Ortiz, the undersigned, declare that:

3       I am employed in the County of Los Angeles, State of California, over the age of 18, and

4  not a party to this cause.  My business address is 10100 Santa Monica Boulevard, Suite 2200, Los

5  Angeles, California 90067-4164.

6       I hereby certify that on December 2, 2009, a copy of the foregoing document(s) were filed

7  electronically.  Notice of this filing will be sent to all eligible parties by operation of the Court's

8  electronic filing system.

9       I further certify that on December 2, 2009 I caused a true copy of the foregoing

10  document(s) to be served on the parties in this case as follows:

11  **DEFENDANTS' MOTION TO STRIKE AND SUPPORTING MEMORANDUM OF
    POINTS AND AUTHORITIES;**

12

13  **Willard K. Tom, Esq.**                     **Daniel Bergeson, Esq.**
    **Lisa D. Rosenthal, Esq.**                  **Elizabeth Lear, Esq.**

14  **Kerry O'Brien, Esq.**                      **Donald Gagliardi, Esq.**
    **Evan Rose, Esq.**                          **Bergeson, LLP**

15  **Federal Trade Commission**                 **303 Almaden Blvd., Suite 500**
    **901 Market Street, Suite 570**             **San Jose, California 95110**

16  **San Francisco, California 94103**

17

18       I declare under penalty of perjury that the foregoing is true and correct.

19       Executed on December 2, 2009, at Los Angeles, California.

20                                          _____/s/_____

21                                          Martha Ortiz

22

23

24

25

26

27

28