\*E-Filed 06/28/2010\*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

MARK BENNING, et al.,

    Defendants.

_____/

No. C 09-03814 RS

**ORDER DENYING MOTION TO DISMISS**

## I. INTRODUCTION

Defendant Mark Benning moves to dismiss the Federal Trade Commission's ("FTC" or "Commission") First Amended Complaint ("FAC") pursuant to Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure. Benning also moves to strike from the FAC any reference to his compensation as chief executive officer of Swish Marketing ("Swish"), pursuant to Federal Rule of Civil Procedure 12(f).

Benning contends that the FTC's allegations against him as an individual "sound in fraud" and must therefore be pleaded with particularity as required by Rule 9(b). As in the prior Order relative to the FTC's section 5 misrepresentation averments against the corporate defendant, it is not necessary to reach the issue of Rule 9(b)'s applicability because the allegations against Benning would satisfy both that standard and, by definition, the lesser pleading requirements of Rule 8. To hold an individual officer liable for a violation of section 5, the FTC must first detail the

1

misrepresentation. Then, the FTC must show the individual's knowledge of and, at a minimum, authority to control the misconduct. Even assuming a section 5 misrepresentation claim "sounds" in fraud, it does not follow from such standard that the additional elements of knowledge or authority to control must be pleaded with similar particularity.

In the alternative, Benning claims that the FTC's pleadings do not comprise a "short and plain statement . . . showing the pleader is entitled to relief" as required by Rule 8(a)(2). As noted above, because the Commission's averments that Benning had knowledge of and authority to control Swish Marketing's material omissions and misrepresentations easily satisfy Rule 8(a)(2) (and would satisfy the heightened requirements of Rule 9(b)), Benning's motion to dismiss must be denied. Moreover, reference to Benning's salary is relevant to the overarching charges lodged against him and is not immaterial, impertinent or scandalous. Benning's motion to strike must therefore also be denied.

## II.  RELEVANT FACTS

As explained in this Court's order of February 22, 2010, the FTC alleges that Swish and three of its officers violated section 5 of the FTC Act, 15 U.S.C. § 45 (2006), in connection with the advertisement and sale of financial services over the Internet. Specifically, the Commission seeks to hold Benning individually liable for Swish's alleged misrepresentations and unfair business practices. Between at least September of 2006 and August of 2007, Swish operated websites that offered short-term, high-interest loans. The FTC describes how Swish failed to disclose to consumers that, when they applied for a loan advertised on one of Swish's websites, they sometimes also unwittingly agreed to purchase a pre-paid debit card[1] sold by a marketing affiliate, VirtualWorks, LLC. Apparently, the debit card "offer" was buried within the website's text. Consumers who "accepted" the offer often did so because the webpage treated acceptance as the default option. In other words, unless a consumer discovered the offer and, then, the declination

---

[1] According to the FAC, VirtualWorks sold two prepaid debit cards through Swish's websites. The first was called the Secret Cash Card, a MasterCard-brand debit card that sold for an enrollment fee ranging from $39.95 to $49.95. The FAC alleges that the Secret Cash Card was replaced in early 2007 with the Ever Private Card, which sold for an enrollment fee ranging from $49.95 to $54.95. (FAC ¶ 15.)

bubble and actively switched his or her response to "no," that consumer automatically purchased the debit card simply by submitting a loan application. On other websites, the offer was touted as a "bonus." All information relating to concomitant fees was included only on the bottom portion of the webpage, below the "submit" button. The FTC infers that these consumers were unlikely to realize that the offer was not a "bonus" at all.

As alleged in the FAC, Swish then transferred directly to VirtualWorks bank account information released by consumers to facilitate their loans. That entity used the information to deduct sufficient funds to "pay" for the debit card enrollment fee (ranging from $39.95 to $54.95). The FAC avers that "thousands" of consumers incurred the debit card enrollment fee through one of Swish's websites. (FAC ¶ 17.) The Commission also contends that thousands complained to VirtualWorks, police departments and law enforcement agencies, the Better Business Bureau, banks, payday lenders and directly to Swish.

The FTC insists that Swish and VirtualWorks collaborated in the debit card scheme: Swish hosted the websites that advertised the loans, had control over presentation and accessibility to the public, and earned between $13 and $15 each time a consumer accepted the debit card offer through one of Swish's websites. Swish admits it displayed the advertisements on its websites but counters that VirtualWorks prepared all text relating to the debit card offer. In the February 22 Order, this Court agreed with the FTC that it had adequately presented the factual circumstances demonstrating the alleged corporate misrepresentations under either Rule 8(a) or 9(b). It was instead the absence of any facts to demonstrate defendant Benning's knowledge and authority to control the corporate misconduct that drove the dismissal of the initial Complaint's allegations of individual liability.

In the FAC, the Commission adds substantial new factual material. It explains that Swish was a closely-held corporation with fewer than twenty-five employees, all of whom operated out of a single office. Benning and co-defendants Jason Strober and Matthew Patterson founded Swish in 2004 and acted as its sole directors. Each owned a 30 percent interest in the company. Benning represented himself variously as the chief executive officer, chairman, president, and treasurer. According to the FAC, Benning kept and maintained corporate financial records, controlled access

3

to corporate bank accounts and had check-signing authority.  The FAC further avers that funds that flowed from the debit card scheme to Swish functioned as one of Swish's greatest sources of revenue.  The Commission alleges that Benning understood this fact as it was his responsibility to track and prepare reports quantifying and comparing the company's revenue sources.  Moreover, the FAC points out that Benning earned roughly $1 million during the time period addressed in the FAC.  The Commission insists these facts "paint the picture of a small company actively controlled by its three founders."  (Pl.'s Opp'n at 5:22-23.)  Benning rejects the adequacy of those averments and further argues that the inclusion of his salary is irrelevant and, worse, inflammatory and impertinent.

      The Commission posits that Benning was aware as early as January of 2007 that Swish hosted the confusing, pre-clicked debit-card offer.  It also insists Benning was well-aware that upon discovering that they had "agreed" to a pre-paid debit card, thousands of consumers promptly complained.  For support, the Commission describes in the FAC various electronic communications authored or at least received by Benning related to the Ever Private card.  The FAC highlights, for example, an instant messaging conversation between Benning and Patterson in January of 2007.  In that conversation, the two discussed how the debit card was "defaulted to yes," that this fact was not obvious to the average consumer and, accordingly, that many consumers were unwittingly charged for the debit card.  Patterson then describes the customer response as "ballistic," to which Benning responded, "understandable."  The Commission also avers that Benning received and responded to several e-mails that also discussed the debit card and customer dissatisfaction.  In one e-mail sent in March of 2007, a payday lender affiliate described consumer complaints associated with the VirtualWorks debit card offer. In that e-mail, the affiliate wrote: "[T]he method by which these additional offers are being presented confuses the customer—namely they mistakenly sign up for these additional services when they did not intend to do so."  (FAC ¶ 35(e).)  In another e-mail sent that same month from a different payday lending affiliate, Benning allegedly received a URL link to a news story that quoted the Better Business Bureau as contending the mechanism employed to "sell" the Ever Private Card was "very worrisome" in that it risked "ripping off consumers without

their knowledge." (FAC ¶ 35(c).)

In his motion papers, Benning asks to submit evidence of a complete e-mail chain between Benning, Patterson and Strober that took place in August of 2007. In its allegations against Strober in particular, the Commission cites in the FAC to a portion of this e-mail exchange. In the segment cited, Strober apparently asserted that "if we immediately switch [the Ever Private Card default option] to 'no,' it will be tantamount to shutting down the company. All of the margin currently comes from this product." (FAC ¶ 53(b).) Relying on the incorporation by reference doctrine, Benning seeks to introduce the entire e-mail exchange where he eventually opined that Strober and Patterson should shut down the Ever Private Card offer on all Swish websites. Benning argues that the fact that his co-directors did not follow his instructions indicates as a matter of law that Benning did not have authority to control the corporate activity that gave rise to the section 5 claims.

## III.  LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) demands that a pleading include a "short and plain statement of the claim showing that the pleader is entitled to relief." This mandate does not require "detailed factual allegations," but "demands more than an unadorned, the-defendant-harmed-me accusation" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.* (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Accordingly, dismissal under Rule 12(b)(6) is appropriate where a complaint lacks "sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). When considering a motion to dismiss, a court accepts a plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). This tenet does not apply, however, to bare legal conclusions. *Twombly*, 550 U.S. at 555 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Even where the plaintiff alleges something more than a bare legal conclusion, *Twombly* requires a statement of a plausible claim for relief. *Id.* at 544. Weighing a claim's

plausibility is ordinarily a task well-suited to the district court but, where the well-pleaded facts do not permit the court to infer more than a mere *possibility* of misconduct, the complaint has not shown the pleader is entitled to relief. *Iqbal*, 129 S. Ct. at 1950.

Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy the rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). In other words, "the circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003). By contrast, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. Pro. 9(b). Where a complaint alleges corporate fraud but ascribes liability to individuals, "the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

In considering a Rule 12(b)(6) motion, a district court generally may not take into account material beyond the pleadings. *Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir. 1984). The exception is material properly submitted as part of the complaint. *Amfac Mtg. Corp. v. Arizona Mall of Tempe*, 583 F.2d 426, 429-30 (9th Cir. 1978). Where a complaint quotes a document only in part but does not attach the document to the complaint, the court may consider the full text of that document, assuming no party questions its authenticity. *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

III. DISCUSSION

As an initial matter, Swish asks the Court to establish definitively whether the Commission must plead with particularity its averments designed to prove that Benning may be held individually liable for the alleged corporate misrepresentations (as defined by section 5 of the FTC Act).[2] To the

---

[2] The FAC contends that the Ever Private Card offer entailed both misrepresentations and unfair business practices in violation of section 5. The "unfair" act or practice allegation is new. An act or

extent defendants suggest the Court did not previously decide the issue, they perhaps misread the February 22 Order. There, the Court did note that, insofar as the elements of a section 5 misrepresentation claim mirror a claim for fraud (with the exception of scienter), the "general applicability of Rule 9(b) to section 5 actions is a real prospect." That said, it was very clear that the Commission *did* effectively establish the "who, what, where and how" contemplated by Rule 9(b) with regard to the underlying corporate misrepresentations. It was only with respect to Benning's involvement as an individual that the Complaint lacked sufficient detail under even Rule 8(a)(2). While a section 5 misrepresentation claim "sounds in fraud," Rule 9(b)'s particularity requirement does not extend to the elements of knowledge and authority to control. These may be averred generally in a manner akin to Rule 8 requirements.

To establish individual liability under the Act, the FTC must prove: (1) misrepresentations or omissions; (2) of material fact; (3) of a kind usually relied upon by reasonably prudent persons; (4) that consumer injury resulted; and (5) that the individual participated directly in the acts or practices or had authority to control them. *Id.* at 1170; *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989). To recover restitution from an individual, the FTC must further prove "knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct." *Publishing Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997). More simply, the Commission must prove, first, corporate misrepresentations and, second, an officer's knowledge of and authority to control whatever acts led to the corporate misconduct. By its own terms, Rule 9(b) does not mandate that a plaintiff plead knowledge with particularity. Moreover, if the precise fraudulent acts and practices are outlined with particularity, pleading an individual's "authority to control" with "particularity" would not advance the notice purpose behind Rule 9(b). "Authority to control" does

---

practice is unfair where it: (1) causes or is likely to cause substantial injury to consumers; (2) which is not reasonably avoidable by consumers themselves; and (3) is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n). As the Commission points out, courts apply the same standard for determining individual liability for unfair corporate conduct as they do for deceptive corporate conduct. *See, e.g.*, *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1117 (S.D. Cal. 2008). Benning contends only that this claim must be dismissed against him because the Commission cannot show either his knowledge of corporate misconduct or authority to control it. Because the standard for individual liability is identical, there is no need to address the deception and unfair practices claims separately.

7

not necessarily contemplate participation in the underlying fraud and the notice pleading requirements of Rule 8(a)(2) adequately govern this element.[3]  *Accord Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (noting that where the complaint alleges corporate fraud but ascribes liability to individuals, "the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations").

A. <u>Knowledge</u>

To recover restitution from an individual, as the FTC seeks to do here, it must plead that Benning had some knowledge of the alleged section 5 misrepresentation or unfair practice.  As the Ninth Circuit has instructed, an individual had "knowledge" of a section 5 violation where he was actually aware of "material representations, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth."  *Publishing Clearing House*, 104 F.3d at 1171.  The FAC at *least* alleges Benning's actual awareness, from as early as January of 2007, of how the Ever Private offer operated.  In the FAC, the Commission points out that Benning was a co-founder and chief executive officer of a small company, that balancing and controlling the company's finances was one of his key responsibilities, and that he was well aware of not merely Swish's account with VirtualWorks but also with the revenue Swish received each time a user "accepted" the Ever Private card offer.  More specifically, the Commission avers he received and responded to various e-mails detailing, first, the confusing and possibly fraudulent nature of the Ever Private offer and, second, consumers' apoplectic responses to it.  While Benning raises factual arguments to dispute the contention that he ever read the e-mails or really understood the details of the Ever Private Card offer, these are not appropriately weighed on a motion to dismiss.  The Commission's factual allegations must be taken as true and all reasonable inferences applied in its favor.  Accordingly, the FTC has plausibly alleged Benning had knowledge of the corporate practices that make up the Commission's section 5 claims.

---

[3] At any rate, the FTC's pleadings do with great detail demonstrate Benning's authority to control.  These allegations are, then, actually pleaded with "particularity."

B. Authority to Control

The crux of Benning's motion to dismiss relies on his theory that the FAC does not plausibly allege his actual authority to control the operation of Swish's websites and, in particular, the Ever Card scheme. Specifically, Benning contends that one of the e-mail exchanges on which the Commission relies in the FAC conclusively proves (at least if read in its entirety) that he could control neither the actions of his co-defendants Patterson and Strober nor the operation of the websites that hosted the debit card offers. The argument is not persuasive.

In the FAC, the Commission relies on the e-mail chain to implicate Strober. The quotation employed in the FAC hails from a three-way e-mail exchange between the co-defendants in August of 2007. Relying on the incorporation by reference doctrine, Benning correctly asserts that the Court can consider the complete text and content of a document selectively cited to and relied upon in a complaint. *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996). The FTC does not question the authenticity of the e-mail chain. A perusal of the entire exchange reflects that several months after the program had been in operation, Benning explicitly instructed Patterson and Strober to switch the Ever Private default option to "no." In conjunction with that same message, Benning also observed: "I now believe as do a number of others at Swish, that you two are committing fraud by automatically opting people into the Secret Cash product." (Def.'s Mot. at 17:25-26.) He then states that, "as CEO of Swish, I expect you to follow my request on this." (Def.'s Mot. at 18:3-4.) The fact that Swish never actually switched the default option, Benning suggests, demonstrates that Patterson and Strober did not acquiesce. According to Benning, the e-mail chain "clearly shows that, when Benning finally did become knowledgeable about such activities in August 2007, Benning was *not* in fact able to control the alleged misconduct and his directives were flatly disobeyed." (Def.'s Mot. at 15:26-28.)

There are a number of flaws in Benning's argument. This e-mail exchange occurred in August of 2007 and does nothing to rebut the Commission's contention that Benning acted throughout the *entire* period cited in the FAC as Swish's president and was keenly aware of the debit-card offer and the way it operated from at least January of 2007. Moreover, the e-mail

9

1    exchange clearly demonstrates that even Benning believed he had complete authority over Swish's
2    operations. The fact that the default option was never changed might also be explained, as it is by
3    the Commission (FAC ¶ 38), by the fact that VirtualWorks contemporaneously halted its operations.
4    While Benning disputes that he had authority to control his co-founders' activities as a matter of
5    fact, he has not shown that the FAC fails as a matter of law to state a claim for relief. Accordingly,
6    Benning's motion to dismiss must be denied.

   C.  Motion to Strike

   Finally, Benning moves to strike from the FAC as "impertinent," "immaterial," or "scandalous" any mention of the compensation he received during the time period covered there (roughly September of 2006 to August of 2007). *See* F. R. Civ. P. 12(f). The FAC avers he earned approximately $1 million during that period. Benning insists the figure is completely irrelevant to the section 5 claims and is designed instead to "curry populist antipathy from the factfinders." (Def.'s Reply at 2:21-22.) The Commission responds by proposing several reasons why Benning's salary is squarely relevant: (1) a high salary indicates Benning was actively involved in the corporation's activities and was not merely a figurehead with nominal participation or responsibility; and (2) as Swish allegedly received the bulk of its revenue from its account with VirtualWorks, it does at least plausibly follow that some of this salary was intimately connected to the Ever Private card operation. The Commission has the better argument: the fact that Benning was handsomely paid does have at least some relevance to an explanation of his role at the company and his knowledge of its practices. Benning's motion to strike is therefore denied.

## III. CONCLUSION

The FTC's amended complaint adequately depicts the nexus between Benning and the corporate defendant's alleged misrepresentations, omissions and unfair business practices. The Commission has stated a plausible claim for relief and Benning's motion to dismiss is therefore denied. The reference in the FAC to Benning's salary is not immaterial, impertinent or scandalous and the motion to strike must also be denied.

IT IS SO ORDERED.

Dated: 06/28/2010

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE