BRIAN M. GROSSMAN (SBN 166681)
TESSER & RUTTENBERG
12100 Wilshire Blvd., Suite 220
Los Angeles, California 90025
Tel: (310) 207-4022
Fax: (310) 207-4033
Email: bgrossman@tesser-ruttenberg.com

Attorneys for Defendants
SWISH MARKETING, INC., and
MATTHEW PATTERSON

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

FEDERAL TRADE COMMISSION,

Plaintiffs,

vs.

SWISH MARKETING, INC., a corporation, MARK BENNING, individually and as an officer of SWISH MARKETING, INC., MATTHEW PATTERSON, individually and as an officer of SWISH MARKETING, INC., and JASON STROBER, individually and as an officer of SWISH MARKETING, INC.,

Defendants.

Case No.: C09 03814 RS

[Hon. Richard Seeborg]

**DEFENDANTS SWISH MARKETING AND MATTHEW PATTERSON'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF CONSUMER LOSSES IN EXCESS OF AMOUNTS RECEIVED BY DEFENDANTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MATTHEW PATTERSON IN SUPPORT**

Date: October 7, 2010
Time: 1:30 p.m.
Place: U.S. Courthouse
450 Golden Gate Avenue
Courtroom 3, 17th Floor
San Francisco, CA 94102

Complaint Filed: August 19, 2009

Trial Date: None Set

PLEASE TAKE NOTICE that, on October 7, 2010, at 1:30 p.m. in Courtroom 3 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, or as soon thereafter as the matter may be heard, defendants Swish Marketing, Inc. ("Swish") and

Matthew Paterson ("Patterson") shall and hereby do move for an order *in limine* excluding any mention or evidence of funds paid by consumers relating to the purchase of an EverPrivate Card or Secret Cash Card beyond those amounts that were paid to, received by and/or are otherwise directly traceable into the hands of Swish.

This motion (the "Motion") is made on the ground that the FTC Act allows for equitable relief only (as opposed to legal damages), and under well-accepted principles of equity Swish's pecuniary liability is limited to (1) monies that can be traced to Swish and identified specifically, or (2) disgorgement of the profits Swish made from VirtualWorks' sale of the debit cards at issue herein, and without regard to total payments by consumers to VirtualWorks. Here, the plaintiff has stated an intention to seek a monetary award based not on profits made by Swish, but rather on the total sum of monies received by VirtualWorks. Accordingly, a motion *in limine* is appropriate at this juncture to determine the methodology for computing a monetary award, which in turn will provide the parties with parameters for discovery and, perhaps, a possible settlement.

This Motion is based upon the Notice of Motion and Motion, the attached Memorandum of Points and Authorities and Declaration of Matthew Patterson, all the pleadings, papers and records on file in the matter herein, and upon such argument and further evidence as may be presented at the hearing thereon.

DATED: August 31, 2010

TESSER & RUTTENBERG
BRIAN M. GROSSMAN

/s/ Brian M. Grossman
BRIAN M. GROSSMAN
Attorney for Defendants
SWISH MARKETING, INC., and
MATTHEW PATTERSON

## MEMORANDUM OF POINTS AND AUTHORITIES

## I

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this case, plaintiff alleges that Swish violated the FTC Act, 15 U.S.C. § 45 *et seq.*, by hosting certain Internet advertisements by a company called VirtualWorks for the sale of debit cards.[1] The VirtualWorks' advertisements contained a pre-checked "Yes" box which, if not affirmatively changed to "No" by the consumer, resulted in VirtualWorks' ability to debit consumers' bank accounts for the price of the debit card, which ranged from $39.95 to $54.95. Although each advertisement included a notification to consumers that they were authorizing VirtualWorks to charge them for a debit card, plaintiff contends that the notification was inadequate, and that the advertisements constituted a "deceptive act or practice" in violation of the FTC Act.

In addition to injunctive relief, plaintiff seeks "between $6 and $7 million" in equitable restitution from Swish and its principals, which amount "represents estimated gross sales of the prepaid debit card from Defendants' websites in 2006 and 2007, less refunds." [Dkt. #70 (Joint Case Management Statement), p. 12, lines 1-8]. The amount of "gross sales of the prepaid debit card from Defendants' websites," however, is much greater than the amounts actually paid to Swish, because VirtualWorks – not Swish – was the entity selling the debit cards and receiving 100% of the proceeds therefrom. VirtualWorks then paid Swish only between $13 and $15 for each consumer whose information was transmitted to (and accepted by) VirtualWorks. [Dkt. #82 (First Amended Complaint), p. 5, ¶ 21]. As such, plaintiff's requested monetary relief is **millions** of dollars more than the total gross proceeds Swish received from its association with VirtualWorks' debit card offer, let alone its net profits.

This Court has previously held that, under *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) "and the subsequent reliance on *Singer* ... by myriad courts," the plaintiff is entitled to seek and recover restitution as "ancillary" to the equitable injunctive relief expressly provided for under

---

[1] VirtualWorks was one of about 20 companies for which Swish hosted advertisements. [Declaration of Matthew Patterson, ¶ 3].

the FTC Act, 15 U.S.C. § 53(b). [Dkt. #60 (Order Granting Motion to Dismiss and Denying Motion to Strike), pp. 8-15]. Such restitution, however, must be **equitable** restitution because the Court's power to award relief under the FTC Act lies only in equity. As held by the U.S. Supreme Court, equitable restitution is limited to "money or property identified as belonging in good conscience to the plaintiff [which] could clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). Consequently, a defendant's pecuniary liability under the FTC Act is generally limited to what it received, as opposed to what consumers lost. *See, e.g., FTC v. Verity Intern., Ltd.*, 443 F.3d 48, 67 (2nd Cir. 2006) ("The district court measured the appropriate amount of restitution as 'the full amount lost by consumers.' **This was error.** The appropriate measure for restitution is the benefit unjustly received by the defendants.") (Emphasis supplied).

Notwithstanding the forgoing authorities, plaintiff seeks restitution measured by consumer loss rather than Swish's receipts, which is wholly inconsistent with the holdings of both *Great-West* and *Verity*. Moreover, the plaintiff's request for between $6 and $7 million in restitution more than doubles the amount in controversy in this action, which in turn places a substantial impediment upon settlement negotiations (*i.e.*, the plaintiff believes that this case is worth millions more than the defendants), and greatly complicates discovery concerning the monies that VirtualWorks and Swish received. For each of these reasons, the defendants believe that a motion *in limine* is appropriate at this juncture so that the parties may determine the measure of monetary relief in this case.

## II

## ARGUMENT

### A. The Court Is Empowered To Consider A Pre-Trial Motion *In Limine*

The District Court has the discretion to consider pre-trial motions *in limine*. *See In re Japanese Elec. Products Antitrust Litigation*, 723 F.2d 238, 260 (3rd Cir. 1983), *rev'd on other grounds*, 475 U.S. 574 (1986) ("[I]n limine ruling on evidence is a procedure which should, in a trial court's discretion, be used in appropriate cases. .... [I]n limine procedure permitted more thorough briefing and argument than would have been likely had the rulings been deferred."). Moreover, such

motions need not be made only on the eve of trial. *See U.S. v. Cook*, 608 F.2d 1175, 1186 (9th Cir. 1979) ("There is no need ... to decide when, during pretrial proceedings or the trial, a motion In limine should be made, or when it should be ruled upon. The matter should be left to the discretion of the trial court with a reminder that advance planning helps both parties and the court."); *Kassim v. City of Schenectady*, 415 F.3d 246, 250 (2nd Cir. 2005) (court properly granted motion *in limine* limiting the type and scope of recoverable damages).

Here, the plaintiff intends to introduce evidence of the "gross sales of the prepaid debit card from Defendants' websites in 2006 and 2007, less refunds." [Dkt. #70 (Joint Case Management Statement), p. 12, lines 1-8]. Such sales, plaintiff contends, represent the amount of equitable restitution for which the Defendants are liable. Defendants, on the other hand (and based upon the authorities cited above), contend that evidence of "gross sales" is irrelevant because equitable restitution is limited by the Defendants' **receipts**, as opposed to VirtualWorks' gross sales. Accordingly, Defendants submit that a motion *in limine* is the proper vehicle to adjudicate whether or not plaintiff's evidence of **VitualWorks'** gross sales is relevant to the question of monetary relief. If this fundamental issue can be resolved at this juncture, it will facilitate not only settlement negotiations but also the scope of discovery necessary to prepare for trial.

**B. Evidence Of VirtualWorks' Gross Sales Of The Debit Card Is Irrelevant To The Measurement Of An Equitable Restitution Award Against Swish**

The Second Circuit in *Verity* made clear that the doctrine of equitable restitution prohibits the FTC from recovering more than the amount that can "clearly be traced" from consumers into the hands of defendants in an action based on a violation of Section 5(a) of the FTC Act. In *Verity*, several companies participated in a complex operation whereby Internet users agreed to pay long-distance telephone charges (to Madagascar) in return for Internet access to pornography sites. Receipts from these long-distance telephone charges were effectively split between the participating companies, which included the long-distance carriers (AT&T and later Sprint), the pornography web sites, the telecommunications carrier for Madagascar, the company that sold the long-distance dialer program, and the companies that coordinated billing (*i.e.*, the defendants). *Verity*, 443 F.3d at 52-54.

The FTC sued the billing coordinators for violation of the FTC Act, alleging that the aforementioned billing system was a deceptive act or practice because it allowed a telephone line subscriber to be charged long-distance telephone charges without his knowledge or consent (assuming the Internet user who visited the pornography sites and agreed to pay the long-distance telephone charges was not also the telephone line subscriber). *Verity*, 443 F.3d at 54-55. Notwithstanding the fact that the billing coordinators received only a fraction of the long-distance telephone charges that consumers paid, the FTC sought (and received from the District Court) an award of monetary relief equal to the total consumer loss, *i.e.*, the total amount of the long-distance telephone charges. *Id.* at 67.[2]

The Second Circuit reversed the District Court's methodology for calculating monetary relief under the FTC Act, and held that "the proper measure for [monetary relief under the FTC Act] is the benefit unjustly received by the defendants." *Verity*, 443 F.3d at 67. The Court held that the historical limitations on equitable remedies restrict the courts to provide only "equitable restitution" as opposed to "legal restitution" based on Section 13(b)'s equitable nature. The court explained that "equitable restitution" provides that only money or property that can "clearly be traced" into the hands of the alleged wrongdoer can be ordered disgorged. "Legal restitution, on the other hand, was awarded where the plaintiff was unable to trace the funds into the defendant's hands but 'nevertheless had some basis for recovering for some benefit that the defendant wrongly received from the plaintiff.'" *Verity*, 443 F.3d at 66-67 (quoting Justice Scalia in *Great-West, supra*, 534 U.S. at 213).

The Second Circuit concluded that "because the availability of restitution under Section 13(b) of the FTC Act, to the extent it exists, derives from the district court's equitable jurisdiction, it follows that the district court may award only equitable restitution." *Verity*, 443 F.3d at 67. *Verity* makes clear that "equitable restitution" pursuant to Section 13(b) means only those consumer losses

---

[2] Presumably, the FTC sought "the full amount lost by consumers" from the billing coordinators because the FTC Act does not apply to "common carriers" like AT&T and Sprint. 15 U.S.C. § 45(a)(2).

that can "clearly be traced" into the defendants' hands.[3] Additional consumer losses paid to other parties that are not traceable into the hands of the defendants are not recoverable under Section 13(b). *Id.; see also* Restatement (Third) of *Restitution,* § 2 (Discussion Draft 2000) ("Liability in restitution is based on and measured by the receipt of a benefit ...."); Douglas Laycock, *The Scope and Significance of Restitution*, 67 Tex. L.Rev. 1277, 1279 (1989) ("[R]estitution measures recovery by defendant's gain rather than plaintiff's loss").

*Verity*'s analysis, and its conclusion that the amount of monetary relief under Section 13(b) of the FTC Act cannot exceed the defendant's actual receipts, has been followed in *FTC v. Bronson Partners, LLC,* 674 F.Supp.2d 373, 379-380 (D.Conn. 2009) (Monetary relief under the FTC Act "is restitutionary in nature and does not alter the core principle that restitution is measured by a defendant's unjust gain."). Moreover, other Circuits, including the Third, Fourth and Eleventh, have reached the same conclusion as *Verity* in applying equitable remedies in non-FTC cases. *See CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 76-79 (3d Cir. 1993) (Commodity Exchange Act's equitable monetary remedy is limited to "disgorgement of ill-gotten gains"; an award of "damages" "falls outside that remedy's recognized parameters."); *Ellet Bros., Inc. v. U.S. Fidelity & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001) ("Restitution and disgorgement require payment of the defendant's ill-gotten gain, not compensation of the plaintiff's loss."); *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008) (citation omitted) ("The equitable remedy of restitution does not take into consideration the plaintiff's losses, but only focuses on the defendant's unjust enrichment.").

In discussions throughout this litigation, the FTC has taken the position that the Ninth Circuit (unlike the Second) does not limit the FTC's recovery to equitable restitution, *i.e.*, money actually received by the defendant, and instead permits the recovery of traditional damages, *i.e.*, total consumer losses. The FTC will presumably rely upon *FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009). In *Stefanchik*, the FTC sued John Stefanchik, the creator of a "program purporting to teach

---

[3] The *Verity* Court did not address the separate remedy of disgorgement, which may be available under Section 13(b). Any calculation of disgorgement, however, would necessarily be based on Swish's actual receipts, not VirtualWorks' receipts.

purchasers how to become wealthy by buying and selling privately held mortgages." *Id.* at 926. The FTC alleged that, contrary to Mr. Stefanchik's representations, "it was in fact very difficult for individuals to amass wealth using the Stefanchik method," and that therefore Stefanchik's claims were deceptive and misleading, in violation of the FTC Act. *Id.* at 927. In addition to naming Stefanchik as a defendant, the FTC also sued Beringer Corporation ("Beringer"), the wholly-owned corporation to which Stefanchik had assigned the copyrights to the "Stefanchik Method," as well as a company called Atlas Marketing, Inc. ("Atlas"), whose "sole business was to sell products and services for Stefanchik and Beringer under the name 'The Stefanchik Organization.'" *Id.* at 926. Atlas "promoted the Stefanchik Program through direct mail, telemarketing, and a website, and it paid Stefanchik and Beringer a royalty of 15% to 22% of the sales." *Id.*

The District Court entered summary judgment against Stefanchik and Beringer, and awarded over $17 million in damages, which figure was derived from Atlas's net sales of Stefanchik products, as opposed to Stefanchik's and/or Beringer's actual receipts, which were but a fraction thereof. *Stefanchik*, 559 F.3d at 931. In affirming the District Court's measure of monetary relief, the Ninth Circuit relied on the following critical facts: (1) Stefanchik retained authority to review and approve all of Atlas's marketing materials and made the decision as to what products were sold by Atlas (*see id.* at 931-32 ("Stefanchik and Beringer were the driving force behind [Atlas's] marketing scheme for the Stefanchik Program, with authority to control its key components ....")); (2) Atlas used the name "The Stefanchik Organization" to advertise and sell Stefanchik products, which was Atlas's sole business; and (3) "[t]he lines between Atlas and Beringer were blurred to such an extent that Atlas's conduct and representations had at least the apparent imprimatur of Beringer." *Id.* at 930-31. Based upon these facts, the Ninth Circuit agreed with the District Court's finding that Atlas was Beringer's agent. *Id.* at 930. In effect, Stefanchik was the prime mover who sold his product through Atlas.

Defendants submit that *Stefanchik* is not in any way a departure from the holdings of *Verity*, *Great-West* and the myriad of cases that have followed them. Rather, *Stefanchik* merely followed well-established case law that a principal is liable for its agents acts. Because the undisputed facts in *Stefanchik* amply demonstrated that Atlas was essentially working for Stefanchik and Beringer,

Atlas's liability under principles of equitable restitution (*i.e.*, $17 million) could be imputed to Stefanchik and Beringer, as Atlas's principals. There is no indication that the *Stefanchik* court intended to create liability beyond the parameters of equitable restitution discussed by the Supreme Court in *Great-West* and followed by the Second Circuit in *Verity*. Indeed, the *Stefanchick* Court does not even discuss those precedents.

Here, there is no evidence that VirtualWorks was Swish's agent, or vice-versa. The Atlas-Beringer relationship differs from the VirtualWorks-Swish relationship in several key respects: (1) Swish and VirtualWorks had many business relationships besides each other, whereas Atlas's only business relationship was with Beringer; (2) Swish did not utilize VirtualWorks' name or the names of its products in Swish's business operations, whereas Atlas provided its services under the name "The Stefanchik Organization"; and (3) Swish did not design the content of VirtualWorks' advertisements, whereas Stefanchik and Beringer had complete control over Atlas's marketing materials and strategies. [Declaration of Matthew Patterson, ¶¶ 3-8]. Unlike the fact pattern in *Stefanchik*, there is no evidence in this case to support an agency relationship between VirtualWorks and Swish, through which VirtualWorks' liability under principles of equitable restitution could or should be imputed to Swish. To declare that this case is factually distinguishable from *Stefanchik* is an understatement.

The monetary award affirmed in *Stefanchik* makes sense precisely because "[t]he lines between Atlas and Beringer were blurred to such an extent that Atlas's conduct and representations had at least the apparent imprimatur of Beringer." *Stefanchik*, at 930-31. Beringer and Stefanchik were held responsible for Atlas's receipts not because that was the "total consumer loss," but rather because: (a) Atlas's liability was properly measured by **its** sales of the (deceptive) Stefanchik Program; and (b) Atlas and Beringer/Stefanchik had an agent/principal (if not alter ego) relationship. To suggest that *Stefanchik* stands for the proposition that "total consumer loss" irrespective of the defendant's actual receipts is now the "new and improved" measurement of monetary relief flies in the face of equity, which is what the FTC Act is expressly designed to achieve. Here, the FTC is seeking "total consumer loss" in an amount that is roughly three times what Swish was actually paid. Swish would argue that such relief is not only unauthorized under the FTC Act, but also patently

inequitable. Moreover, a "total consumer loss" theory taken to its logical conclusion would allow the FTC to pursue Swish for between $6 and $7 million even if Swish received 50 cents per lead, or roughly **one percent** of VirtuaWorks' revenue.

Based upon the foregoing, the Defendants respectfully submit that *Stefanchick* does not and indeed cannot hold that total consumer loss, irrespective of the defendant's actual receipts, is an appropriate monetary remedy under Section 13(b) of the FTC Act. Such an interpretation of *Stefanchik* is unrealistic and wholly contrary to the principles of equity that the FTC Act is designed to enforce. Moreover, and as set forth above, the Defendants herein have little in common with Stefanchik or even the billing coordinators in *Verity* (who were key players in the design and implementation of the Madagascar long-distance telephone charge scheme). Unlike those defendants, Swish played no conceptual or "design" role in the allegedly-deceptive practice. If Swish is ultimately held responsible for participating in a deceptive business practice, principles of equity mandate that its liability be limited by its actual receipts. There is no basis under *Stefanchik* to allow the FTC to impute VirtualWorks' liability (*i.e.*, its receipts) to the Defendants herein.

## III

## CONCLUSION

This action will involve convoluted discovery without a serious chance to settle until the proper measurement of monetary relief is resolved, which is why the Defendants seek such clarification now through this Motion *in Limine*. Consequently, and based upon the foregoing, Swish and Patterson respectfully request that the Court enter an order *in limine* excluding any mention or evidence of funds paid by consumers relating to the purchase of an EverPrivate Card or

///

///

///

///

///

///

Secret Cash Card beyond those amounts that were paid to, received by and/or are otherwise directly traceable into the hands of Swish.

DATED: August 31, 2010

TESSER & RUTTENBERG
BRIAN M. GROSSMAN

/s/ Brian M. Grossman
BRIAN M. GROSSMAN
Attorney for Defendants
SWISH MARKETING, INC., and
MATTHEW PATTERSON

**DECLARATION OF MATTHEW PATTERSON**

I, MATTHEW PATTERSON, Declare as follows:

1. I am the chief executive officer of defendant Swish Marketing, Inc. ("Swish"). At all times relevant hereto, I was a director, officer and shareholder of Swish, and familiar with its day-to-day operations. I make this Declaration in support of the foregoing Motion *in Limine*. I have personal knowledge of each of the following facts, and would and could competently testify thereto if called upon to do so as a witness.

2. Swish is an online lead generation company, founded in 2004. "Lead generation" means that we sell potential customer names and information to buyers who then try to sell products to those customers. For example, Swish operated several web-sites where consumers could submit information in furtherance of obtaining a short-term "payday" loan. Swish would then forward the consumers' information to one or more payday lenders, and if the lender accepted the consumer as a potential borrower, it would pay Swish a fee for that "lead."

3. In or around the Fall of 2006, Jerry Klein ("Klein") on behalf of his company VirtualWorks approached Swish to purchase leads for his product called SecretCashCard. Klein's product as he described it was a suite of software products combined with a prepaid debit card that allowed people to surf the web and purchase products anonymously. At that time, Swish was looking for additional clients/promotions to place on its web sites, and therefore agreed to place VirtualWorks' advertisements (along with about 20 other advertisers) on some of Swish's web pages.

4. VirtualWorks designed its advertisement, gave us the specific wording and approved the ad before we placed it on our web pages. The VirtualWorks advertisements were presented along with the advertisements of three other businesses that had "yes" and "no" buttons. An example of these advertisements appears at Exhibit "B" to the First Amended Complaint (the "FAC") filed in this action.

5. After we launched the promotion, Josh Finer of VirtualWorks asked me to please precheck the "yes" button rather than "no," in order to "get volume up."

6. VirtualWorks was supposed to pay Swish a flat fee of either $13 or $15 each time Virtual Works accepted a lead forwarded by Swish. According to Paragraph 15 of the FAC, VirtualWorks charged consumers anywhere between $40 and S55 for the debit cards it sold based upon leads forwarded by Swish.

7. Swish was not involved in charging any consumers and received no payments from consumers. Swish had no direct relationship or communications with consumers. Apart from Swish's agreement to forward leads to VirtualWorks, and VirtualWorks' agreement to pay Swish the flat fee for each lead that was accepted, Swish and Virtual Works had no other business or financial connection or relationship. Swish had no control over when and how VirtualWorks processed charges for the consumers whose information Swish forwarded to VirtualWorks. Neither Swish nor any of its past or present officers or directors have ever held any position with, or ownership interest in VirtualWorks.

8. At the height of Swish's business, it had over 100 clients. VirtualWorks was less than 10% of Swish's total revenue for 2007. Conversely, Swish was just one among many lead generators used by VirtualWorks to post advertisements for VirtualWorks' debit cards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on August 31st, 2010, at Redwood City, California.

MATTHEW PATTERSON