# EXHIBIT A

**United States District Court**
For the Northern District of California

1

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

FEDERAL TRADE COMMISSION,                    No. C 10-00022 WHA

10              Plaintiff,

11    v.                                           **ORDER ON CROSS-MOTIONS**
                                                   **FOR SUMMARY JUDGMENT**
12  INC21.COM CORPORATION, JUMPAGE
    SOLUTIONS, INC., GST U.S.A., INC.,
13  ROY YU LIN, individually and as an officer
    and director of the corporate defendants;
14  JOHN YU LIN, individually and on behalf of
    the corporate defendants,
15
16              Defendants,

17  and SHENG LIN,

18              Relief Defendant.
    _____/
19

20                          **INTRODUCTION**

21          In this enforcement action involving millions of dollars in unauthorized charges tacked

22  onto thousands of telephone bills, the Federal Trade Commission moves for summary judgment

23  against corporate defendants Inc21.com Corporation, JumPage Solutions, Inc., and GST U.S.A.,

24  Inc., and individual defendants Roy Yu Lin and John Yu Lin for violations of Section 5 of the

25  Federal Trade Commission Act, 15 U.S.C. 45, and the Telemarketing Sales Rule, 16 C.F.R.

26  Part 310.  The FTC also moves for summary judgment against relief defendant Sheng Lin — the

27  father of defendants Roy and John Lin — to disgorge $434,000 in financial benefits he received

28  from defendants' unlawful practices.

United States District Court

For the Northern District of California

Defendants also seek summary judgment on a subset of these claims — specifically, the claims asserted by the FTC under the Telemarketing Sales Rule. According to defendants, because the Telemarketing Sales Rule (or TSR for short) expressly exempts business-to-business solicitations, it is inapplicable to the telemarketing activities targeted in this dispute.

As explained herein, the FTC has produced overwhelming evidence that defendants' practice of billing tens of thousands of businesses and consumers via their telephone bills — a fraud-friendly practice called "LEC billing" — was both deceptive and unfair under Section 5 of the FTC Act. The most compelling proof of these violations is a comprehensive expert survey of 1,087 of defendants' so-called "customers." This survey revealed, with a 95 percent confidence level, that nearly 97 percent of defendants' "customers" had *not* agreed to purchase defendants' products. Even more egregious, only five percent of them were even aware that they had been billed. The record also demonstrates that individual defendants Roy and John Lin knew that most of their "customers" were unaware that they were customers. Specifically, the Lin brothers received an avalanche of warnings from telephone companies, business partners, and even their own employees that most (if not all) of their customers had been fraudulently acquired and were being billed without authorization. Indeed, anticipating being sued themselves, defendants filed two preemptive lawsuits *in this very court* against their own marketers for fraudulently manufacturing tens of thousands of invalid sales. Despite their awareness of rampant fraud, both Roy and John Lin took every effort to continue reaping the benefits of LEC billing. Indeed, over a five-year span from 2004 through 2009, defendants successfully extracted over $37 million in unauthorized payments from the telephone bills of unsuspecting businesses and consumers.

As for defendants' telemarketing activities, the FTC's evidence is equally compelling. While defendants correctly argue that the TSR exempts business-to-business solicitations, the undisputed record demonstrates that defendants' telemarketers called and "sold" their products to numerous non-business consumers. Additionally, in making these phone calls to non-business consumers, the unrebutted evidence demonstrates that the conduct of defendants' telemarketers violated at least three separate requirements of the TSR. Taken together, the FTC has easily met its burden of demonstrating that the TSR has been violated.

EXHIBIT A
Page 2 of 48

United States District Court

For the Northern District of California

1   Finally, the FTC has provided clear and unrebutted evidence that relief defendant Sheng

2   Lin received at least $434,000 in salary and cash bonuses from defendants' unlawful practices,

3   despite having no involvement in defendants' LEC-billing scheme.  Indeed, Sheng Lin's own

4   admissions at his deposition confirm these allegations.  Since relief defendant Sheng Lin has no

5   legal title to these funds, disgorgement of these funds is warranted.

6   In their opposition brief, defendants put forth no affirmative evidence rebutting any of the

7   material evidence confirming their liability.  Whatever quibbles that defendants have raised over

8   peripheral facts in the record are small compared to the sweeping themes established by the FTC.

9   In short, the defense presented by defendants is like disagreeing over the size of the iceberg while

10  ignoring the monumental fact that the Titanic sank.

11  For these reasons, the FTC's motion for summary judgment is **GRANTED**.  Defendants'

12  motion for summary judgment is **DENIED**.  Defendants' unlawful LEC-billing and telemarketing

13  practices will be permanently enjoined and restitution ordered in the amount of $37,970,929.57.

14                                **STATEMENT**

15  **1.    DEFENDANTS ROY AND JOHN LIN**

16  The story of Inc21.com Corporation and its sister companies sued herein begins with

17  defendant Roy Lin.  After moving with his family to the United States from Taiwan, Roy Lin

18  completed his education and accepted a position at MCI Communications in 1996 selling

19  international long-distance services (R. Lin Dep. 14–15, 23, 32–33).  After a year with MCI, Roy

20  Lin continued his work in the long-distance industry as an independent sales contractor using his

21  parents' business entity, GST U.S.A., Inc. (*id.* at 34–36).  GST U.S.A. — a defendant in this

22  action — was originally incorporated by Roy Lin in 1995 for his parents' business ventures,

23  which included a tandem of Bay Area restaurants (*id.* at 36–42).

24  In 1999, Roy Lin joined True America Communications, an international long-distance

25  reseller.  It was at True America that Roy Lin first learned about local exchange carrier billing,

26  also known as "LEC billing" (*id.* at 33, 47–49).  As will soon be explained in greater detail, LEC

27  billing enables third-party vendors to charge their customers for products and services by tacking

28  charges onto their local telephone bills (*id.* at 34; Walch Dep. 36–37).  At True America, Roy Lin

**EXHIBIT A**

**Page 3 of 48**

1   took the lead in setting up the company's entire LEC-billing operation. Much of Roy Lin's

2   knowledge about the "ins and outs" of LEC billing was acquired during this time (R. Lin Dep.

3   50–55). After spending only one year at True America, Roy Lin left the company and started

4   Inc21 (*id*. at 59).

5         Inc21.com Corporation was incorporated in California on November 17, 1999 (*ibid.*). At

6   the time of incorporation, Roy Lin was Inc21's only officer — his brother, defendant John Lin,

7   did not become involved with the company until January 2003 (*id*. at 60). Roy was (and remains)

8   the sole owner of Inc21 (J. Lin Dep. 90). The company never assembled a formal board of

9   directors (R. Lin Dep. 64). When Inc21 first opened its doors in January 2000, it provided "web

10  design" services for small businesses. These businesses would pay Inc21 the traditional way —

11  by checks and credit cards (*id*. at 71–77). Designing websites was not a profitable enterprise.

12        In January 2003, after struggling to keep his business afloat, Roy Lin shifted Inc21

13  towards a more familiar line of work — reselling long-distance services (*id.* at 78). Part of this

14  shift was a change in the company's billing approach. Instead of accepting payment via checks

15  and credit cards, 95 percent of Inc21's long-distance customers were billed via LEC billing (*id.* at

16  82). It was around this time that Roy Lin's brother, defendant John Lin, became involved with

17  Inc21's operations. John Lin immediately began contributing his time and money to the business,

18  lending the company approximately $50,000 and becoming both an officer and director of Inc21

19  (*id.* at 60, 64, 83). Despite their collaborative efforts, however, the long-distance reselling

20  business proved to be even more unprofitable than designing websites.

21        In December 2003, Roy and John Lin changed the course of Inc21 yet again. Instead of

22  reselling long-distance services, Inc21 began selling an "Internet advertising" product called

23  "GlobalYP," which Roy Lin described at his deposition as "online yellow pages" (*id.* at 82–83,

24  111; Walch Dep. 17). These online yellow pages consisted of a website and a searchable online

25  directory, and were supposed to help businesses "get extra exposure on the Internet" (R. Lin Dep.

26  111; Tran Dep. 13–14; Yakubova Dep. 12–13). Critically, the Lin brothers elected to retain a

27  central aspect of their former long-distance reselling business when implementing this new

28  business model: *they continued to bill their customers using LEC billing* (Walch Dep. 36–37).

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    While this maneuver by the Lin brothers proved to be lucrative, it also put defendants on a

2    collision course with this litigation.

3         **2.    THE CORPORATE DEFENDANTS & THEIR PRODUCTS**

4         Inc21's GlobalYP product was only one of a handful of products "sold" by defendants

5    after December 2003.  In addition to GlobalYP, the Lin brothers — through the various corporate

6    entities sued herein — billed consumers for a slew of other Internet-based products and services.

7    These corporate entities and product offerings are set forth below.

8         **A.    Inc21.com Corporation, GST U.S.A., Inc, and JumPage Solutions, Inc.**

9         As stated, defendant Inc21.com Corporation was incorporated by Roy Lin in November

10   1999.  Defendant GST U.S.A, Inc. was incorporated in 1995.  Both entities are California

11   corporations, with the former owned entirely by Roy Lin and the latter purportedly owned by

12   relief defendant Sheng Lin (J. Lin Dep. 90–91).  The third corporate defendant, JumPage

13   Solutions, Inc., was incorporated in 2006 (R. Lin Dep. 140).  John Lin is the sole owner of

14   JumPage Solutions (J. Lin Dep. 91).  A fourth corporation started by the Lin brothers —

15   GoFaxer.com Corporation — is also mentioned in the record but was not named as a defendant in

16   this action (Walch Dep. 29; Dkt. No. 1).

17        While these corporate entities maintained separate bank accounts, they did not operate as

18   separate entities.  Indeed, there were no employees at Inc21's offices in San Francisco who

19   worked exclusively for any one company (J. Lin Dep. 68–69; Walch. Dep. 27–28).  Rather, all

20   corporate defendants (as well as GoFaxer.com Corporation) were operated out of the same

21   offices, and both Roy and John Lin managed them collectively as if they were a single entity.

22        **B.    GlobalYP, MetroYP, and NetOpus**

23        In addition to GlobalYP, the Lin brothers sold two other "online yellow pages" products:

24   MetroYP and NetOpus.  Both GlobalYP and NetOpus were products offered by Inc21 (R. Lin

25   Dep. 348).  MetroYP, however, was sold through GST U.S.A. (J. Lin Dep. 90–91; Walch Dep.

26   28–29; R. Lin Dep. 333).  Like GlobalYP, the MetroYP and NetOpus products were supposedly

27   geared towards helping businesses receive extra exposure on the Internet (R. Lin Dep. 129).  All

28   three products were exactly the same (Tran Dep. 13–14; Nelson Dep. 22).  The only differences

United States District Court

For the Northern District of California

1    between them was which corporate entity "sold" them and where the revenue for each product

2    flowed.  All revenue generated by GlobalYP and NetOpus sales went into Inc21's checking

3    account, while MetroYP revenue flowed directly into GST U.S.A's checking account (Walch

4    Dep. 28).

5         Since these three "online yellow pages" products shared the same underpinnings, they also

6    suffered from the same flaws.  For example, all customers that "purchased" these products from

7    defendants were randomly assigned a website template from a selection of twenty different

8    designs (Nelson Dep. 36–39).  As an illustration, a customer like Omni Hotels Los Angeles (an

9    actual GlobalYP "customer") might be assigned a default website template that was intended for

10   use by a restaurant or an auto repair shop (*id.* at 39).  While businesses were supposed to be able

11   to customize their websites to remedy these inconsistencies, it was impossible for defendants'

12   "customers" to do so due to a "bug" in the underlying source code (*id.* at 46–47, 50–51).  Instead,

13   "customers" of GlobalYP, MetroYP, and NetOpus would have to call Inc21 customer support and

14   open a "support ticket" just to update their default website information (*id.* at 40–41).

15        The Inc21 employee who was responsible for responding to these "support tickets" for

16   GlobalYP, MetroYP, and NetOpus customers between July 2006 and March 2010 was Michael

17   Nelson, Inc21's former systems administrator.  According to Mr. Nelson's deposition testimony,

18   he informed John Lin on "numerous, numerous occasions" of this "bug" in the source code that

19   made it "impossible" for customers to make updates to their websites (*id.* at 43).  Tellingly,

20   despite this major product flaw, Mr. Nelson testified that very few of defendants' "customers"

21   submitted support tickets.  Indeed, between July 2006 and March 2010, Mr. Nelson received a

22   total of only ten to twenty requests from customers seeking to update their websites (*id.* at 8, 19,

23   42).  This staggeringly low number was consistent with an *internal* analysis performed by

24   defendants in 2007 that revealed that only around two to five percent of GlobalYP, MetroYP, and

25   NetOpus "customers" had ever attempted to modify their websites (*id.* at 48–50).[1]

26

27        _____

28        [1] As part of their opposition to the FTC's motion, defendants submitted the declaration of another
Inc21 employee who stated that the "online yellow pages" products were not as "broken" as Mr. Nelson claimed
(Chien Decl. ¶¶ 8–10).  Even if true, this does not create a material factual dispute for trial.  Regardless of
whether defendants' products "worked," the evidence is overwhelming that "customers" never bought them.

6

United States District Court

For the Northern District of California

In sum, defendants' online yellow pages products were plagued with technical gremlins and, in the words of Mr. Nelson, were "very, very, very broken" (*id.* at 61). Despite being put on notice of these problems on numerous occasions by their systems administrator, the Lin brothers — according to Mr. Nelson — "weren't particularly interested that this stuff was broken" (*ibid.*).

**C.    JumPage Solutions**

Defendant JumPage Solutions provided "search-engine marketing" services to businesses beginning in late 2007 or early 2008. These services involved the placement of advertisements next to Google search results using Google's "Google AdWords" advertising service (R. Lin Dep. 124, 140–41). For example, if a person in San Francisco used Google's search engine to search for the word "florist," Google Adwords could be used to display advertising for Bay Area florists next to the search results (Yakubova Dep. 13). JumPage Solutions basically acted as a "reseller" of the Google Adwords advertising service, purportedly spending over $350,000 on behalf of its "customers" to place targeted search-engine advertisements for their businesses (R. Lin Dep. 128; J. Lin Decl. ¶ 6). Revenue generated by these services was deposited directly into JumPage Solutions' checking account (Walch Dep. 28).

**D.    GoFaxer**

The final product sold by defendants was called "GoFaxer," which provided Internet-based faxing services (*e.g.*, sending and receiving faxes via email) as well as web-based data storage (R. Lin Dep. 128–29). Revenue generated by the GoFaxer product was deposited into GoFaxer.com Corporation's checking account (Walch Dep. 28).

**E.    Monthly Pricing**

Each of these products and services carried different monthly prices. For example, both GlobalYP and NetOpus were priced at $34.99 per month (R. Lin Dep. 138–39). MetroYP, despite being an identical product, was priced "for a long, long time" at $29.99 per month (*id.* at 139). The JumPage "search-engine marketing" service was initially priced at $49.99 per month, but was quickly reduced to $39.99 per month where it remained ever since (*id.* at 141). Finally, the GoFaxer product carried three different prices: $12.95 per month for LEC billing, $9.95 per month for credit-card billing, and $24.95 per month for the "business package" (*id.* at 142–43).

United States District Court

For the Northern District of California

Roy Lin was solely responsible for conjuring up these prices (*ibid.*).  To determine the proper pricing, he supposedly spoke with numerous LEC-billing aggregators (*i.e.*, companies that handled LEC billing and collections for third-party vendors).  These billing aggregators educated Roy Lin about the "pros and cons" of different pricing levels (*id.* at 143, 150).  In particular, they told him that "$29.99 has always been the most commonly sold price in the [LEC-billing] industry," but $34.95 per month is "still acceptable" (*id.* at 150–51).

This, however, was not the only guidance provided to Roy Lin with respect to setting prices.  During the execution of a search warrant on Inc21's offices, a document was found in Roy Lin's drawer entitled "Rules to LEC Billing Programs" (*id.* at 166–67).[2]  This document stated (Wolfe Decl. Att. BB, FTC Exh. 18) (emphasis added):

> Never bill more than 29.95 per month.  *The average small business sees this as phone charges and does not review for five months*.

While Roy Lin insisted at his deposition that he received this document from a "competitor" and never read it, its contents are at least indicative of the type of "guidance" that was being provided to him with respect to the LEC-billing practices discussed herein (*id.* at 171).

### 3.    DEFENDANTS' SALES PRACTICES

Defendants' products were marketed and sold to customers through two different practices:  telemarketing and Internet marketing (*id.* at 172).  Specifically, GlobalYP, MetroYP, NetOpus, and the services provided by JumPage Solutions (called the "JumPage product" herein) were all *exclusively* marketed and sold to consumers via telemarketing (Tran Dep. 18).  By contrast, defendants' GoFaxer product was marketed and sold to customers via Internet marketing — specifically, through a special type of Internet marketing called "co-registration" (R. Lin Dep. 173–74).  Both sales practices are described in detail below.

### A.    Defendants' Telemarketing Practices

As its name implies, telemarketing is the marketing or selling of products by telephone (*i.e.,* sales by cold-calling).  To telemarket its products, defendants contracted with and leveraged

---

[2]  The search was performed in connection with a related civil forfeiture action — *United States of America v. Approximately $2,822,224.75 in Funds Seized From Eight Bank Accounts, et al.* (CV 09-03119 WHA) — also pending before the undersigned judge.

8

around twenty different independent call centers to generate sales of GlobalYP, MetroYP, NetOpus, and the JumPage product (Yakubova Dep. 19; J. Lin Dep. 139–40). Most of these call centers were obtained through brokers, who would collect sales commissions for each "sale" manufactured through the referral (Yakubova Dep. 19; Tran Dep. 19–20). All but one of these call centers were located overseas in either India or the Philippines (Yakubova Dep. 19–20; J. Lin Dep. 140).

These call centers were tasked with cold-calling potential customers (called "prospects") and producing sales of defendants' products. Call centers, however, were not authorized to call prospects at random. Rather, defendants would provide the call centers with an approved list of "leads" (Tran Dep. 21; J. Lin Dep. 140). These leads were supposedly pre-filtered by defendants to include only small to mid-sized businesses (J. Lin Dep. 131). "Agents" at the call centers would then contact these leads over the telephone and follow a scripted telemarketing sales pitch specific to the product that was being sold (Tran Dep. 23–24). These scripts — which local exchange carriers and billing aggregators had to "approve" prior to being used in phone calls — were provided to the call centers by defendants (*id.* at 24–25). Defendants, however, neither monitored the calls made by agents nor recorded them in their entirety to ensure that their scripts were being followed (*id.* at 26; R. Lin Dep. 55; Yakubova Dep. 28–29). Rather, only a small portion of each phone call was recorded to enable a third-party entity to "verify" that a legitimate sale had been made (Tran Dep. 26–27; Yakubova Dep. 26).

As the record shows, however, each of these supposed safeguards — the filtering of leads, the scripted sales pitches, and the third-party verification of each supposed "sale" — was infected with fraud and disregarded by defendants.

### i. The "Filtered" Business Leads

In his declaration filed in January 2010 in opposition to the FTC's motion for a temporary restraining order, defendant John Lin explained — under oath — the lead-generation process used by defendants for its telemarketing campaigns (Dkt. No. 18, Att. 4):

> The process begins by Inc21 purchasing North American business listing data. This data is then filtered to exclude government agencies, schools, banks, and franchises. Additional examination is made into any business name that has more than 10 listings and,

9

United States District Court

For the Northern District of California

1    if the business is deemed to be a franchise, it is removed from the
2    list. Because Inc21's marketing practices are limited to
     businesses, national Do-Not-Call registry compliance is not
3    required. Inc21 performs an internal Do-Not-Call analysis and
     strikes all such numbers from the lists provided to the call centers.

4    This filtering of business listing data was supposedly performed *before* the leads were sent to call

5    centers because defendants were "targeting small to midsized businesses" who would be more

6    likely to have a need for an "online yellow pages" website and other business products provided

7    by defendants (J. Lin Dep. 130–31).

8        Despite this representation, the list of "current customers" produced by defendants in

9    January 2010 (shortly after the temporary restraining order was issued in this action) included

10   numerous schools, banks, and franchises among the entities being billed (J. Lin Dep. 137–38;

11   Wolfe Decl Att. S, FTC Exh. 4). For example, the list of "current customers" that defendants had

12   been billing — at least up until January 2010 — included multiple Starbucks locations, a Ralph's

13   grocery store, a Blockbuster Video store, and a McDonald's restaurant. In addition to these

14   obvious franchises, the list included several national banks and schools ( J. Lin Dep. 132–38;

15   Wolfe Decl Att. S, FTC Exh. 4).

16       When asked at his deposition why these particular "customers" had not been filtered out,

17   defendant John Lin blamed spelling errors in the business-listing data (*e.g.*, "Mc-donalds" rather

18   than "McDonalds") for entities that "got through the crack," and asserted that defendants' policy

19   was to "always exclude them." Despite this assertion, the excerpt from the customer list shown to

20   John Lin at his deposition contained even more obvious franchises than those mentioned above.

21   Specifically, various Best Western, Food 4 Less, 7-Eleven, and Sizzler locations were being

22   billed by defendants as "customers." Additionally, large entities with no need for defendants'

23   services, including Trader Joe's, Wet Seal, Pepsico, and Black & Decker, were listed among

24   defendants' "current customers." The lack of filtering in defendants' customer list is even more

25   egregious with respect to schools. The same list of "current customers" shown to John Lin at his

26   deposition included at least 15 different (and obvious) schools (Wolfe Decl Att. S, FTC Exh. 4).

27   Given that each of these entries was *correctly spelled*, the record directly contradicts John Lin's

28

10

United States District Court

For the Northern District of California

1   bald and uncorroborated assertion that defendants' policy was to "always exclude" government

2   agencies, schools, banks, and franchises from their telemarketing activities.

3          As further proof of this failure, in February 2010, defendants provided the FTC with an

4   updated list of "current customers" showing the specific product that each customer had

5   supposedly "purchased" (Wolfe Decl. ¶ 9, Att. HH).[3]  The updated list showed that defendants

6   had taken the initiative of "cancelling" the accounts for numerous "government agencies, schools,

7   banks, and franchises" that they had been previously billing.  For example, the first twelve pages

8   of the February 2010 list revealed that defendants had been billing numerous locations of Office

9   Max, the Gap, Autozone, and other franchises, as well U.S. Bank and Wachovia branches for its

10  GlobalYP "online yellow pages" service.  These targeted cancellations confirm that these entities

11  *could have been filtered out before-the-fact* had defendants attempted to do so.  Clearly, no such

12  filtering had in fact occurred.

13         The only reasonable conclusion a jury could draw from this evidence is that, contrary to

14  John Lin's bald and uncorroborated testimony, defendants did *not* perform any substantial

15  filtering of the "business leads" that were distributed to its call centers.  This resulted in many of

16  defendants' "customers" being billed for services for which they had no use (J. Lin Dep. 132).[4]

17              **ii.      The "Scripted" Sales Pitches**

18         Once these unfiltered leads were sent to defendants' call centers, the call-center agents

19  would begin cold-calling prospective customers (Tran Dep. 25–26).  When making these calls,

20  the agents were supposedly required to follow pre-approved telemarketing sales scripts (Du Dep.

21  61–62).  Agents supposedly could not edit the scripts and were barred from deviating from them.

22  Call centers, however, were allowed to suggest changes to the scripts if they had a "more

23  effective way of selling" defendants' products (*id*. at 62–63).  While these proposed changes had

24  to be "approved" by Roy Lin before being implemented by call-center agents, many changes that

25
         [3]  The initial list produced by defendants in January 2010 did *not* specify the name of the product each
26  customer had purportedly "purchased."

27         [4]  The declarations submitted by former customers Ballard, Haney, Urso (Dkt. No. 36-50), and Weber
    (Dkt. No. 36-51) confirm that businesses that had no need for defendants' products were nonetheless magically
28  "signed up" by defendants and billed.  Additionally, Inc21's systems administrator testified at his deposition
    that he would routinely see large franchises being billed for defendants' products (Nelson Dep. 71–74).

United States District Court

For the Northern District of California

1    were approved by defendants were not actually integrated into the telemarketing sales scripts (*id.*

2    at 63). Thus, the sales scripts did not reflect what many call-center agents were saying to

3    prospective customers.

4          The importance of call centers "sticking to the script" was directly tied to defendants'

5    ability to use LEC billing for its telemarketed products. As an illustration, in May 2007, one of

6    the billing aggregators used by defendants to place MetroYP charges on telephone bills expressly

7    warned Inc21 via email that "any changes to your script to mention yourself as Metro Yellow

8    Pages . . . would need to be sent to us and the LEC" (R. Lin Dep. 253; Wolfe Decl. Att. BB).

9    This warning was provided because the billing aggregator got word that defendants had been

10   calling themselves "Metro Yellow Pages" in telemarketing calls, and this was not an approved

11   name for their product. Additionally, the aggregator explained to defendants that "any mention of

12   Yellow Pages" would be "running the risk of being suspended in one or more LECs" (*ibid.*). This

13   is just one example of how LECs and billing aggregators kept a close watch over third-party

14   vendors that used LEC billing.[5] Venders who abused the privilege of LEC billing would be

15   warned and/or suspended when customer complaints exceeded an acceptable threshold (R. Lin

16   Dep. 263–64; J. Lin Dep. 185–86).

17         Despite the importance of strict adherence to telemarketing sales scripts, the call centers

18   used by defendants would frequently deviate from them. In addition to undocumented changes to

19   sales scripts mentioned above, call centers selling the MetroYP product would refer to the product

20   using the term "yellow pages," which the script (and LECs) barred them from using (R. Lin Dep.

21   255). Additionally, as discussed in greater detail in the next section, call-center agents routinely

22   strayed from their scripts to misrepresent the terms of defendants' 15-day "free" trial offer (Wolfe

23   Decl. Att. EE, FTC Exhs. 76, 79, 80, 87). Finally, at least one of the sales scripts used by

24   defendants expressly contained the term "yellow page" — the very term that defendants had been

25   warned by LECs and billing aggregators not to use (Dkt. No. 35, Gross Decl. Exh A. Part 6).

26

27   _____

28         [5] This is because billing aggregators and local exchange carriers were required to deal directly with
     customer complaints and, if appropriate, issue refunds on behalf of third-party vendors. As such, it was in their
     financial interests to ensure that customers did not complain (R. Lin Dep. 314–16; Walch Dep. 48, 53, 55–57).

United States District Court
For the Northern District of California

1    In sum, not only did call-center agents deviate from telemarketing sales scripts, the scripts

2    themselves were not always updated and contained terms that defendants *knew* were improper.

3                    **iii.    Third-Party Verification**

4    While telemarketing calls were not recorded in their entirety, portions of each phone call

5    were supposedly recorded by defendants' call centers to enable third parties to verify that sales

6    were valid (Tran Dep. 26). The portion of the phone call recorded for this purpose was at the tail

7    end of the conversation where the customer "actually agreed to purchase or to try out the service"

8    (Yakubova Dep. 26–29). These audio snippets — called TPV recordings — were reviewed by

9    separate entities that were supposedly independent of both defendants and their call centers.

10   After the TPV company reviewed these recordings, it would compile a list that would

11   indicate whether each purported sale "passed" or "failed" (*id.* at 30). Whether a particular TPV

12   recording would "fail" depended upon various rules set forth by defendants, such as whether the

13   person on the phone was a minor, whether answers were inaudible, or whether the recording was

14   "clearly manipulated with" — meaning, whether the audio recording had been "spliced" so that

15   "yes" answers would be provided to questions when no such answers were actually given

16   (Yakubova Dep. 30–31, 49–50; Lutich Dep. 90). Other factors could also result in a TPV

17   recording being "failed" (Lutich Dep. 91; Wolfe Decl. Att. EE, FTC Exh. 77). Whatever the

18   reason, the TPV company would describe why each particular recording "failed" in daily reports

19   provided to defendants (Wolfe Decl. Att. EE, FTC Exh. 76). Even for those TPV recordings that

20   "passed," however, it was impossible for TPV reviewers to authenticate whether the voice on

21   each recording corresponded to the customer being billed (Tran Dep. 84; Lutich Dep. 95–96).

22   Defendants employed "quite a few" TPV companies, some based in the United States and

23   others overseas (Yakubova Dep. 27; Tran Dep. 27–29). From 2005 until around April 2007,

24   defendants would allow their call centers to create TPV recordings on their own (Tran. Dep. 27).

25   This made it easy for call centers to fabricate such recordings. As one former Inc21 employee

26   recounted at her deposition when asked "on how many occasions" would "the TPVs that [she]

27   listened to appear[] to have been manipulated," she responded: "50 percent of TPVs that I

28

13

personally listened to" (Yakubova Dep. 31). The same employee provided a vivid example of one of the ways in which TPV recordings were manipulated by call centers (*id.* at 49–50):

> There was one way which I remember very well, and I was listening to a TPV and there was a — as you mentioned before, a series of questions and — and it did request at some point of time kind of like personal information to ensure that it was a customer who was indeed giving a consent, like, for example, last digits of — I don't know — Social Security number, for example. And I found that a lot of times it coincided with four numbers from, say, an address from that business. So I had reason to believe that it was just the same digits that were cut out of that address and placed into that recording somehow.

The splicing of TPV recordings did not stop in April 2007, however, when defendants supposedly switched call centers and began having separate companies record the TPV portion of telemarketing calls. Daily reports produced by QCI, the TPV company used by defendants since 2007, indicated that many TPV recordings throughout 2008 and 2009 had also been spliced or otherwise falsified (Lutich Dep. 75–77, 104–11, 169–77; Wolfe Decl. Att. EE, FTC Exhs. 76, 79, 80, 87). For example, the reports mentioned numerous "failed" TPV recordings in 2008 and 2009 that bore the following indicia of "splicing":

- the bdate is not the customer / bdate is a different voice
- this is a cropped audio
- different voices on this recording
- this is a rep imitating a cust
- automated yes
- bdate is automated

In addition to these reports, the record also contains numerous declarations from defendants' "customers" who — after being allowed to listen to their TPV recordings — stated that the recordings were inaccurate and had been manipulated.[6]

In addition to these audio manipulations, the same reports sent to defendants from QCI indicated that a staggering number of TPV recordings included misrepresentations to customers

---

[6] These declarations were submitted by customers Gold (Dkt. No. 36-33), Hartig (Dkt. No. 36-36), Koval (Dkt. No. 36-39), Morris-Meyer (Dkt. No. 36-43), Smerud (Dkt. No. 36-46), Weber (Dkt. No. 36-51), Winn (Dkt. No. 36-52, and Witt (Dkt. No. 36-53).

United States District Court
For the Northern District of California

that the 15-day "free" trial was "no obligation" or that customers may incur "changes" rather than "charges" after the period expired (Wolfe Decl. Att. EE, FTC Exhs. 76, 79, 80, 87). The record also includes numerous declarations from defendants' "customers" confirming that call-center agents used these and other deceptive sales tactics on them.[7] Adding to this evidence, defendant Roy Lin was personally warned by a billing aggregator as early as 2006 that call centers had been completing "sales" with individuals who lacked appropriate titles of authority (R. Lin Dep. 256–57; Wolfe Decl. Att. BB, FTC Exh. 20). Indeed, the record contains numerous declarations from defendants' "customers" where the supposed "authorization" for their purchases came from individuals who either lacked authority or *did not exist*.[8]

Defendants were well aware of the sweeping nature of this fraud. Indeed, in July 2009, anticipating being sued themselves, defendants filed a preemptive lawsuit *in this very court* against their own call centers in the Philippines, alleging that call-center agents had been fraudulently reporting tens of thousands of "sales" when no valid sales had occurred. Even more disturbing, defendants acknowledged that the TPV process failed to contain the fraud. The complaint in that action — *Inc21.com v. Flora, et al.* — alleged (Dkt. No. 9, CV 09-2967 WHA):

> 29. Through its investigation, Inc21 learned that the call centers employed fraudulent techniques, including, but not limited to, using digitized and recorded responses to the questions posed by the TPV. Inc21 learned that, in most instances, no customer was actually on the telephone line during the TPV process. Instead, the call center would connect to the TPV and simply play the digitized or recorded responses in such a way that the TPV review would classify the call as a valid sale.

> 30. The use of "doctored" audio was extremely difficult for Inc21 to detect, particularly in light of the fact that the sales were deemed valid by the TPV review provider.

Inc21 eventually obtained a default judgment in *Inc21.com v. Flora*, but not after filing a sworn declaration detailing widespread fraud committed by its call centers (Dkt. Nos. 19, 29, CV 09-

---

[7] These declarations were submitted by customers Cronk (Dkt. No. 36-26), Fogel (Dkt. No. 36-28), Gerber (Dkt. No. 36-31), Gold (Dkt. No. 36-33), Groppe (Dkt. No. 36-34), Koval (Dkt. No. 36-39), Machen (Dkt. No. 36-41), Sommerfeld (Dkt. No. 36-47), and Weber (Dkt. No. 36-51).

[8] These declarations were submitted by customers Abbate (Dkt. No. 36-19), Cillian (Dkt. No. 36-25), Davis (Dkt. No. 36-27), Groppe (Dkt. No. 36-34), Knight (Dkt. No. 36-38), Morris-Meyer (Dkt. No. 36-43), Sommerfeld (Dkt. No. 36-47), Urso (Dkt. No. 36-50), and Weber (Dkt. No. 36-51).

15

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

2967 WHA). Despite full knowledge of this fraud, however, defendant John Lin admitted at his deposition that defendants did *not* refund customers signed up by these call centers unless customers actually filed a complaint and requested a refund (J. Lin Dep. 174–77).

Even after defendants changed call centers in mid-2007, they continued to receive repeated warnings from their TPV provider that call centers were manipulating recordings and misrepresenting the 15-day "free" trial offer (Lutich Dep. 76–77; Wolfe Decl. Att. EE, FTC Exhs. 76, 79, 80, 87). Specifically, the 2008 and 2009 reports mentioned above were emailed to defendants by QCI every business day, and defendants were also given notice in verbal communications that their call centers were splicing tapes. At least one of these reports provided to defendants from QCI indicated that 100 percent of TPV recordings for "sales" of their products had "failed" — a perfect failure rate that QCI admitted was highly unusual (Lutich Dep. 99–102; Wolfe Decl. Att. EE, FTC Exh. 76).

Defendants' customer service personnel were also aware of the suspect veracity of TPV recordings. When investigating customer complaints, these employees would routinely listen to TPV recordings to determine if they sounded "good" (Tran Dep. 83–90). Even for those TPV recordings that sounded "good," however, the customer would "[m]ost of the time" dispute that they had given authorization (*id.* at 88). Specifically, customers would tell Inc21 employees that the TPV recording did not reflect what they had said in the telemarketing call, that the recording had been altered, and/or that the person who supposedly "authorized" the purchase did not work for their company (*ibid.*). Indeed, the record contains numerous declarations from defendants' "customers" who stated that they expressly *rejected* the telemarketing sales offer made to them, but ended up being billed anyway.[9]

The final layer of evidence demonstrating the ineffectiveness of the TPV process in separating "invalid" sales from "valid" sales is the fact that in January 2010, defendants asked QCI to re-examine the TPV recordings of 10,434 of their existing customers who had supposedly already been screened and "passed." QCI concluded that 4,616 of the recordings actually "failed"

---

[9] These declarations were submitted by customers Bryan (Dkt. No. 36-23), Cronk (Dkt. No. 36-26), Fogel (Dkt. No. 36-28), Rumphol (Dkt. No. 36-45), Winn (Dkt. No. 36-52), and Pesoat (Dkt. No. 52-1).

16

1  (Dkt. No. 74, Att. 1, Gross Decl. ¶¶ 2–4). How these 4,616 customers "passed" the TPV process

2  in the first place is never explained. What is certain, however, is that defendants had been billing

3  these customers on a monthly basis and would have continued to bill them if not for this lawsuit.[10]

4        In short, the record contains mountains of undisputed evidence showing fraud at every

5  step of defendants' telemarketing process — defendants failed to screen the "leads" they provided

6  to their call centers, telemarketing sales scripts were not adhered to (or used improper language),

7  and a significant number of TPV recordings were either falsified, contained clear evidence of

8  misrepresentations, or improperly "passed" when they should not have been.

9        These failures allowed a staggering amount of unauthorized charges to be placed on the

10  telephone bills of businesses, schools, government entities, and individual consumers. In

11  preparation for its motion for summary judgment, the FTC retained expert Howard Marylander to

12  quantify the impact of defendants' telemarketing practices on consumers (Marylander Decl. ¶¶

13  1–9). Expert Marylander devised a study where customers of defendants' products were

14  contacted over the phone by a live person and interviewed using a pre-written script. Customers

15  were asked, specific to the product that they had supposedly purchased: "Did you or your

16  company agree to purchase any Internet services from (PRODUCT NAME)?" (*id.* at ¶ 31, Exh.

17  C).[11] The results were astounding. For GlobalYP, 97.7 percent of the 300 customers contacted

18  through the survey stated that they had *not* agreed to purchase the product. For MetroYP, 96

19  percent of the 300 customers contacted through the survey stated that they had *not* agreed to

20  purchase the product. For NetOpus, 95.5 percent of the 201 customers contacted through the

21  survey stated that they had *not* agreed to purchase the product. Finally, for the JumPage product,

22  97.5 percent of the 200 customers contacted through the survey stated that they had *not* agreed to

23  _____

24        [10] During the same period that QCI performed this "re-validation" of defendants' TPV recordings, the
undersigned judge ordered defendants to mail a verification letter to each of their current customers asking them

25  whether they had agreed to purchase defendants' products and warning them that failure to respond might result
in a discontinuation of their services. Out of 10,924 letters mailed to defendants' "customers," only 36 of them

26  returned the mailing and indicated that they had agreed to purchase defendants' products (FTC's Br. 24).

27        [11] The study, which carried a 95 percent confidence level, avoided any references to the instant
litigation (Marylander Decl. ¶ 26). The script began: "Hello, I'm [surveyer's name] with CSRS an independent

28  survey firm, calling on behalf of the Federal Trade Commission. The Federal Trade Commission is a U.S.
government agency and periodically conducts consumer surveys. In this case, the FTC is obtaining information
about the purchase of Internet services by small businesses" (*id.* at ¶ 19).

17

United States District Court
For the Northern District of California

1    purchase the product.  On average, only 3.3 percent of defendants' "customers" for their four

2    telemarketed products had actually agreed to purchase defendants' products.

3         **B.      Defendants' Internet Marketing Practices**

4         Unlike GlobalYP, MetroYP, NetOpus, and the JumPage product, the GoFaxer product

5    was sold exclusively through a specific type of Internet marketing called co-registration (R. Lin

6    Dep. 142–43, 174).  Co-registration generates leads and sales via the Internet, often with the help

7    of outside companies that specialize in such marketing (*id*. at 172).  As described by former Inc21

8    employee Michael Nelson (and corroborated by Roy Lin himself), co-registration worked as

9    follows (Nelson Dep. 27–28; *see also* R. Lin Dep. 177–78):

10            [Y]ou'd be surfing the web, and a pop-up will appear and says,
              "You've just won a 42-inch HDTV.  Click here to claim your
11            prize."  And that takes you to a page where they give you the
              opportunity to sample different products. . . . There'd be maybe 15
12            on one page.  If you didn't choose any of them, it wouldn't let you
              go on.  It would say, "In order to get the TV, you have to choose at
13            least so many of these," and it would go on for pages and pages.
              And somewhere along there, there would be a listing for a free trial
14            of the GoFaxer product.

15   Defendants contracted with a third-party marketing company called Delicate Data to perform

16   co-registration services for GoFaxer.  Delicate Data supposedly promised defendants up to 2,000

17   "sales" per day, a figure that Mr. Nelson told the Lin brothers was "too good to be true" (Nelson

18   Dep. 66–67).  Mr. Nelson's concerns proved to be correct.

19        While co-registration marketing differed from telemarketing in its means for generating

20   sales, the "sales" it generated of GoFaxer — like "sales" of defendants' telemarketed products —

21   were almost all illegitimate.  Mirroring the preemptive lawsuit they filed against their own call

22   centers in the Philippines, defendants filed a separate lawsuit against Delicate Data in April 2009

23   for fraudulently generating over 78,000 sales of GoFaxer through co-registration.  That litigation

24   — *Inc21.com v. Delicate Data, et al.* — was also assigned to the undersigned judge.  The

25   complaint in that action alleged (Dkt. No. 1 at ¶ 11, CV 09-1924 WHA):

26            Shortly after [Inc21] began receiving customer sign-ups from
              [Delicate Data], [Inc21] began receiving complaints from its
27            customers.  The complaints from customers ranged and included,
              but were not limited to, stating that they had never even heard of
28            the GoFaxer product and never signed up for any service with
              GoFaxer on the [I]nternet, that they . . . did not even have Internet

United States District Court

For the Northern District of California

access, [and] . . . they never agreed or authorized to be charged for any GoFaxer service.

The complaint further alleged that Inc21 had "paid [Delicate Data] for commissions on 78,071 customers sign-ups" and was "aware that approximately seventy percent (70%) of these customer sign-ups were invalid." Additionally, the complaint stated that due to the volume of cancellation requests, Inc21 believed that "less than 1 percent of the customer sign-ups [from Delicate Data] actually used or accessed the GoFaxer.com service online" (*id.* at ¶ 12). The *Delicate Data* action was dismissed pursuant to stipulation in March 2010.

Expert Marylander's survey of GoFaxer "customers" confirmed the allegations in the *Delicate Data* complaint. Nearly all of defendants' GoFaxer sales had been fraudulently obtained. *First*, Expert Marylander noted that of the GoFaxer "customers" that surveyors attempted to contact, only eight percent were successfully interviewed. This was because 58 percent of the billed phone numbers had been disconnected — a figure that Expert Marylander stated was among the highest (or the highest) that he had ever seen in such a survey (Marylander Decl. ¶ 18). *Second*, of the GoFaxer "customers" that were successfully contacted by surveyors, 97.7 percent stated that they had *not* agreed to purchase the GoFaxer product (*id.* at ¶ 31).

In sum, just as with their telemarketed products, the vast majority of GoFaxer customers had never agreed to purchase the product in the first place.

### 4. DEFENDANTS' BILLING PRACTICES

The sales tactics described above resulted in a staggering amount of billing activity. For example, according to former Inc21 customer service manager Selena Tran, defendants billed, on average, around 20,000 GlobalYP "customers" per month (Tran Dep. 17–18). While defendants utilized two different marketing approaches to procure customers, all of defendants' products shared a common billing method: LEC billing.[12]

A detailed history of the LEC-billing industry was already set forth in a prior order. *See FTC v. Inc21.com Corp.*, 688 F. Supp. 2d 927, 929 (N.D. Cal. 2010). How it works in practice

---

[12] As stated, some GoFaxer customers were billed via credit card (J. Lin Dep. 66). All GoFaxer customers obtained through "co-registration," however, were billed via LEC billing (R. Lin Dep. 176). The small number of GoFaxer customers billed via credit card are *not* targeted in the instant action.

United States District Court

For the Northern District of California

1   will be briefly recapped.  Four entities are typically involved in the LEC-billing process: (1) local

2   exchange carriers (or "LECs"), (2) billing aggregators (also called "clearinghouses"), (3) third-

3   party vendors (like defendants), and (4) customers.  In exchange for fees, LECs allow pre-

4   approved third-party vendors to place charges for their products and services onto their

5   customers' telephone bills.  Although charges from third-party vendors are listed separately on

6   these telephone bills from LEC-related charges, the "total amount due" presented to customers

7   *includes* third-party vendor charges (*see* Dkt. Nos. 7-3, 36-31, 36-35).  Billing aggregators act

8   like "middle men" in this process.  They contract directly with third-party vendors to facilitate the

9   placement of their charges onto customer telephone bills.  They also aid in the collection of these

10  charges from LECs (Lavino Dep. 16–17).[13]  Customers pay third-party vendor charges directly to

11  the LECs by simply paying the "total amount due" on their phone bills.  After subtracting fees,

12  the LECs then pass the payments along to the billing aggregators.  The billing aggregators then

13  pass the payments along to the appropriate third-party vendors, minus their own service fees.

14          As described below, defendants took full advantage of the weaknesses in this billing

15  system to reap the benefits of the unauthorized sales generated by their marketers.

16      **A.      The 15-Day "Free" Trial**

17          Customers who purportedly "agreed" to purchase defendants' products were provided

18  with a 15-day "free" trial.  If the customer did not cancel within the trial period, billing would

19  immediately ensue (Tran Dep. 35–39).[14]  Written notification of this 15-day "free" trial period

20  was provided via a welcome letter or postcard that would be mailed to customers after their sales

21  were "passed" by a TPV provider (*id.* at 35–36; Yakubova Dep. 39).  This letter would tell

22  customers about the product that they had "purchased," and would warn customers that failure to

23  cancel within 15 days would result in immediate billing (Tran Dep. 37).  If a welcome letter was

24  returned as "undeliverable," Inc21 employees would attempt to locate a new mailing address

25  using various third-party search services.  If a new address was located, a second welcome letter

26

27          [13] Defendants contracted with the following billing aggregators:  Integretel, PaymentOne, The Billing Resource, BSG Clearing Solutions, and ILD (J. Lin Dep. 86–87, 160–61).

28          [14] According to defendant John Lin, defendants gave customers an additional five-day grace period to cancel.  Thus, "customers" actually had 20 days to cancel their "purchases" (J. Lin Decl. ¶ 8).

20

1   would be sent.  This second mailing would *not*, however, reset the trial period.  Rather, the trial

2   period would always begin running from the date of the telemarketing call (*id.* at 38–39).

3        The volume of "undeliverable" welcome letters — at its peak — reached between 100 to

4   200 per week (Yakubova Dep. 39–40).  This was equaled by welcome letters that were mailed

5   back to defendants with notes from customers stating "[p]lease cancel this" and "I did not sign up

6   for this" (*id.* at 40–41).  For customers where no welcome letter was ever successfully delivered,

7   however, defendants would *still* bill those customers unless they complained or requested a

8   refund (Tran Dep. 81–83).  Of course, reaching defendants and obtaining refunds proved difficult

9   for many of these "customers."

10       **B.    Complaints and Refunds**

11       When Michael Nelson, the former systems administrator for Inc21, first set foot in

12   defendants' offices in 2005, he "noticed right away that a lot of phones were ringing on the

13   desks" and "there were people sitting there, but nobody was picking up the phones" (Nelson Dep.

14   74).  When Mr. Nelson asked defendant John Lin, "Why doesn't anybody answer any of those

15   phones?," John Lin replied, "Oh, they're just customers who need assistance.  We never answer

16   those phones" (*id.* at 75).  Then, according to Mr. Nelson, John Lin *laughed*.

17       Customers, however, were not amused.  When defendants chose to answer phones,

18   complaining customers faced an uphill battle in obtaining refunds.  According to Selena Tran,

19   who handled customer service for defendants' various business entities and products, defendants

20   fielded an average of 90 complaints per week for unauthorized billing (Tran Dep. 91).  To

21   respond to these complaints, customer service representatives would listen to the TPV recordings

22   of the complaining customers.  If a recording sounded "bad," a full refund would be issued.  If,

23   however, the TPV recording sounded "good," defendants would then use the recording as

24   ammunition against the customer, offering no refunds or only partial refunds even if the customer

25   asserted that the recording had been falsified (*id.* at 88–91; Yakubova Dep. 60–61).  Only if the

26   customer threatened to contact the Better Business Bureau or the Attorney General's office would

27

28

United States District Court
For the Northern District of California

John Lin authorize a large or complete refund (Yakubova Dep. 60–63).[15]  Even in these situations, however, customer service agents were instructed to try and "settle" with customers for less than a full refund amount (*id.* at 62–63).  On this point, the record contains numerous unrebutted declarations from "customers" who were either unable to reach defendants *at all* or had reached customer support personnel but were unable to cancel or obtain refunds.[16]

### C.    Customer Awareness of Monthly Billing

The inherently deceptive nature of LEC billing has been acknowledged by the Federal Communications Commission on numerous occasions.[17]  The survey conducted by Expert Marylander confirmed this deception in the instant case.  According to the survey, only *five percent* of defendants' tens of thousands of "customers" were even aware that charges for GlobalYP, MetroYP, NetOpus, the JumPage product, or GoFaxer had appeared on their telephone bills (Marylander Decl. ¶ 33).  Breaking this down by product, only 5.7 percent of GlobalYP customers, 2.7 percent of MetroYP customers, 7.5 percent of NetOpus customers, 5.5 percent of JumPage customers, and 3.5 percent of GoFaxer customers knew that they had been LEC-billed for their respective products.  The remaining "customers" either did not know, did not remember, or declined to answer (*ibid.*).

By contrast, both Roy and John Lin were well aware (or were recklessly indifferent to mountains of evidence) that most of their customers were being billed without their knowledge.  In addition to knowing about the fraudulent sales practices set forth in detail above, the Lin brothers were repeatedly put on notice by their own systems administrator, Michael Nelson, that customers had no idea that they were being billed (Nelson Dep. 60) (emphasis added):

---

[15]  Many customers nevertheless lodged complaints with the Better Business Bureau and law enforcement agencies.  These complaints were then communicated to defendants (Yakubova Dep. 34).

[16]  These declarations were submitted by customers Abbate (Dkt. No. 36-19), Ballard, Bloom (Dkt. No. 36-21), Brown (Dkt. No. 36-22), Bryan (Dkt. No. 36-23), Beusing (Dkt. No. 36-24), Cronk (Dkt. No. 36-26), Gerber (Dkt. No. 36-31), Groppe (Dkt. No. 36-34), Hammond (Dkt. No. 36-35), Henningsen, Maklari (Dkt. No. 36-42), O'Neil (Dkt. No. 36-44), Rumphol (Dkt. No. 36-45), Smerud (Dkt. No. 36-46), Strickland, Thompson (Dkt. No. 36-49), Van Diest, Webster, and West.

[17]  *See, e.g.,* Press Release, Federal Communications Commission, *FCC and Industry Announce Best Practices Guidelines to Protect Consumers from Cramming*, 1998 WL 406058 (July 22, 1998).  "Cramming" is the practice of placing unauthorized, misleading, or deceptive charges on a consumer's telephone bill.

22

1   I told them that I was — I was very uncomfortable with the fact
    that almost none of our customers knew that they were our
2   customers. And I believe at one point, I described the business
    model as "Gee, I hope we don't get caught." And they thought
3   that was funny. *They laughed.*

4   According to Mr. Nelson, based upon the monthly amount that was being billed to customers for

5   the GlobalYP, MetroYP, and NetOpus products, the fact that only ten to twenty customers ever

6   attempted to modify their websites over a four year period, and the fact that the products did not

7   even work properly, it was obvious to him that almost none of Inc21's customers knew that they

8   were customers (*id.* at 61–62).

9       The survey conducted by Expert Marylander confirmed this suspicion. According to the

10  survey, 95.9 percent of defendants' "customers" stated that they had not received any services

11  from the product they had supposedly purchased (Marylander Decl. ¶ 32). Only *three* customers

12  interviewed as part of Expert Marylander's survey (out of 1,087 surveyed) said that they received

13  any services from the product they had purchased. Of these three customers, only one accurately

14  described the product for which he had been billed (*ibid.*).

15      **D.    Obtaining LEC-Billing Authorization**

16      Before third-party vendors are allowed to place charges on a particular local exchange

17  carrier's telephone bills, they must first obtain authorization from both the LEC and an associated

18  billing aggregator. For defendants, this involved filling out numerous LEC-billing applications

19  for each of their products in various markets nationwide (R. Lin Dep. 328). Once authorization

20  was given, LECs and billing aggregators would keep a close watch over whether a third-party

21  vendor received more than an acceptable threshold of complaints from customers (J. Lin Dep.

22  188–89; Lavino Dep. 22–23). Vendors would then be warned and/or suspended if too many

23  customers complained about unauthorized charges.

24      In this connection, defendants were warned and/or suspended on numerous occasions by

25  LECs and billing aggregators for excessive unauthorized billing:

26      •    In July 2005, Verizon (a local exchange carrier) suspended
             defendants' authorization to use LEC billing for GlobalYP
27           (J. Lin Dep. 191–92).

28      •    In March 2007, AT&T (a local exchange carrier) warned
             defendants about unacceptably high unauthorized charges

23

United States District Court
For the Northern District of California

for their GlobalYP and NetOpus products (Tran Dep. 125–27; Wolfe Decl. Att. BB, FTC Exh. 23).

- In June 2008, Qwest (a local exchange carrier) terminated defendants' authorization to use LEC billing for the JumPage product (Lavino Dep. 60–63; Wolfe Decl. Att. GG, FTC Exhs. 142–43).

- In November 2008, Verizon warned defendants about unacceptably high unauthorized charges associated with their JumPage product (J. Lin Dep. 185–89; Wolfe Decl. Att. Z, FTC Exh. 12).

- In May 2009, after defendants failed to reduce customer complaints, Verizon suspended defendants' ability to use LEC billing for the JumPage product (J. Lin Dep. 185–88; Wolfe Decl. Att. Y, FTC Exh. 11).

- In May 2009, PaymentOne (a billing aggregator) asked defendants to provide it with its entire GoFaxer customer base so that it could attempt to filter out thousands of unauthorized accounts from being billed (J. Lin Dep. 197–200; Wolfe Decl. Att. A, FTC Exhs. 15, 17).

These warnings and suspensions, however, did not deter defendants from finding unscrupulous ways to exploit the weaknesses of the LEC-billing system.

*First*, the record shows that defendants signed numerous false affidavits when applying for LEC-billing privileges. For example, in defendants' LEC-billing application for its NetOpus product, for which defendant Roy Lin signed an affidavit attesting to the accuracy of its contents (R. Lin Dep. 353–62; Wolfe Decl. Att. V, Gov. Exh. 9):

- Roy Lin admitted at his deposition to using a false business address in Hacienda Heights, despite it being a residence where no business operations were performed.

- Roy Lin admitted at his deposition to naming his mother, Sherry Yu, as the president and principal of NetOpus, despite the fact that she was not involved in the business.

- Roy Lin admitted at his deposition to falsely excluding any mention of himself or his brother, defendant John Lin, as principals or officers of NetOpus.

- Roy Lin admitted at his deposition to falsely excluding any mention of Inc21, GlobalYP, MetroYP, and other affiliated businesses from the NetOpus application.

- Roy Lin admitted at his deposition to falsely excluding any mention that GlobalYP had been suspended by Verizon in July 2005.

24

1    Similarly, Roy Lin also admitted at his deposition to submitting a falsified LEC-billing

2  application for GlobalYP, despite signing an affidavit as to its truthfulness (R. Lin Dep. 346–53;

3  Wolfe Decl. Att. U, Gov. Exh. 8). Material omissions also plagued defendants' LEC-billing

4  application for MetroYP, which Roy Lin again admitted contained false information (R. Lin Dep.

5  329–46; Wolfe Decl. Att. S, Gov. Exh. 4). In fact, Roy Lin plainly admitted at his deposition that

6  he sought to "re-apply" to Verizon for LEC-billing privileges using "a different principal"

7  because he wanted Verizon to believe that the application was from someone other than himself

8  (R. Lin Dep. 301–06; Wolfe Decl. Att. BB, FTC. Exh. 25). All of these misrepresentations were

9  aimed at circumventing safeguards designed to prevent known fraudsters from re-entering the

10  LEC-billing industry using "new" products and business entities.

11    *Second*, the Lin brothers improperly used their parents identities to further their deceptive

12  sales and billing practices. As stated, Sherry Yu Lin — the mother of the Lin brothers — was

13  named as "president" of NetOpus. Additionally, relief defendant Sheng Lin — the father of the

14  Lin brothers — was named as "president" of GoFaxer. Neither parent participated in any

15  meaningful way in defendants' business operations (R. Lin Dep. 286–87, 291, 294–95). With

16  respect to Sherry Yu Lin, not only was her signature misleadingly used on LEC-billing

17  applications for NetOpus, defendant Roy Lin continued to sign her name as the president of

18  NetOpus even after she had died. Indeed, her signature was forged by Roy Lin on a Wisconsin

19  telemarketing application dated August 6, 2007, which was more than half a year after she had

20  passed away (J. Lin Dep. 148–49; Wolfe Decl. Att. Y, FTC. Exh. 8). As for Sheng Lin, his name

21  and signature also appeared on numerous GoFaxer applications, despite the fact that he performed

22  no duties for GoFaxer and could not speak English (R. Lin Dep. 294–95).

23    *Third,* defendants lied to LECs and billing aggregators regarding "action plans" they

24  pledged to implement to reduce unauthorized billing of customers. Specifically, Roy Lin

25  admitted at his deposition that he made false representations to Verizon in 2005 about

26  implementing a new customer "verification process" to minimize cramming complaints

27  surrounding GlobalYP (*id.* at 271–76, 281–83; Wolfe Decl. Att. BB, FTC Exh. 22). No such

28  verification process was ever implemented. Meanwhile, customers continued to be billed.

United States District Court

For the Northern District of California

25

Case5:09-cv-03814-RS

*Fourth*, even in regions where defendants lacked authorization to use LEC billing (either because they had been suspended or had not yet been approved), defendants found ways to get their products onto telephone bills.  Specifically, defendant Roy Lin conspired with another vendor, Jeff Lavino, who had access to the LEC-billing industry in regions where defendants did not.  Through a contractual arrangement, defendants "sold" its GlobalYP, MetroYP, and JumPage customers to Mr. Lavino so that he could use his LEC-billing privileges to charge them on their telephone bills (Lavino Dep. 19–21, 23–24).[18]  The net collections were then split 50/50 between Mr. Lavino's business and defendants, with defendants' cut of the action funneled directly into GST U.S.A.'s checking account (*id.* at 33–35).

**E.    Over $37 Million in Net Collections**

From January 2004 to January 2010, billing records indicate that defendants collected $37,442,602.89 from customers through LEC billing (Wolfe Decl. Atts. M–Q; FTC's Reply 11).[19] Additionally, defendants also received at least $331,346.54 from Mr. Lavino's various business entities — AJAL Partners, Best Web U.S.A., EZ Webmasters, National Connect, and Website on Demand — who LEC-billed consumers on defendants' behalf (Sihota Decl. ¶ 11, Att. B).[20]

**5.    RELIEF DEFENDANT SHENG LIN**

As stated, relief defendant Sheng Lin — the father of defendants Roy and John Lin — was the "president" of GoFaxer in name only.  He was not involved in any of defendants' business operations (R. Lin Dep. 287; J. Lin Dep. 90–91).  Nevertheless, Sheng Lin drew a regular salary of $7,000 per month from Inc21 was well as periodic bonuses as high as $300,000 (S. Lin Dep. 13–14; Walch Dep. 111–14, 116).  In total, he received at least $434,000 in wages and bonuses

---

[18]  The "sale" of customers to Mr. Lavino occurred on three occasions: (1) in 2005, after Verizon terminated GlobalYP's LEC-billing authorization (Lavino Dep. 22–24, 31–35; Wolfe Decl. Att. GG, FTC Exh. 133), (2) in 2008, after Qwest suspended billing for JumPage Solutions (Lavino Dep. 60–62; Wolfe Decl. Att. GG, FTC Exh. 142), and (3) when defendants had yet to receive LEC-billing authorization in regions where "customers" had already been acquired (Lavino Dep. 45–47).

[19]  In its opening brief, the FTC stated that this figure was $43,824,970.45 (FTC's Br. 16).  This was revised downward after the FTC acknowledged that its initial calculations contained an error (FTC's Reply 11). Defendants did not challenge any of the calculations performed by the FTC.

[20]  In its opening brief, the FTC stated that defendants received at least $324,856.15 from Mr. Lavino, citing the declaration of David Sihota to support this amount (FTC's Br. 16).  Mr. Sihota's declaration, however, expressly states that defendants received $331,346.54 from Mr. Lavino's business entities.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  from defendants, not including the benefits he received from medical insurance, business loans,

2  and the use of a GoFaxer credit card for his personal expenses (Walch Dep. 122–23, 126–30).

3                    *                    *                    *

4       The FTC instituted this enforcement action on January 5, 2010 (Dkt. No. 1).  This order

5  follows the issuance of a temporary restraining order on January 19, a preliminary injunction on

6  February 19, and an accelerated discovery schedule (granted at defendants' request) (Dkt. Nos.

7  28, 57–58).  A hearing on the instant summary judgment motions was held on September 15.

8                              **ANALYSIS**

9       Summary judgment may be granted if the pleadings and supporting documents, viewed in

10  the light most favorable to the non-moving party, show that there are no genuine issues of

11  material fact and the moving party is entitled to judgment as a matter of law.  FRCP 56(c).  For a

12  genuine issue of fact to be material, the evidence must be such that a reasonable jury could return

13  a verdict for the non-moving party.  A declarant's bald, uncorroborated, and conclusory assertions

14  need not be credited to defeat summary judgment.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

15  1054, 1061 (9th Cir. 2002); *see also FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

16       In the instant cross-motions for summary judgment, two sets of claims are in the spotlight:

17  (1) claims brought under Section 5 of the Federal Trade Commission Act, and (2) claims brought

18  under the Telemarketing Sales Rule (or TSR).  Each set of claims will be addressed in turn.

19       **1.    THE FEDERAL TRADE COMMISSION ACT**

20       The FTC has broad powers under the Federal Trade Commission Act to prevent

21  businesses from engaging in unfair or deceptive practices.  15 U.S.C. 41–58.  Section 5 of the

22  FTC Act, which is at issue here, empowers the FTC to prevent the use of "unfair methods of

23  competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting

24  commerce[.]"  15 U.S.C. 45(a).  Both businesses and individuals who perpetrate such acts are

25  subject to injunctive and equitable liability.

26       **A.    Claim One:  Deceptive Billing Practices**

27       The FTC's first claim for relief is that defendants engaged in deceptive billing practices in

28  violation of Section 5 of the FTC Act by placing unauthorized charges on the telephone bills of

consumers.  "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).

The undisputed record establishes that all three elements have been proven with respect to defendants' LEC-billing practices.  *First*, the FTC has produced an avalanche of unrebutted evidence that defendants placed monthly charges for all five of their products on the telephone bills of consumers and collected over $37 million from this practice.  This is true for both their telemarketed products (GlobalYP, MetroYP, NetOpus, and the JumPage product) and GoFaxer, which was "sold" exclusively through co-registration.  The placement of these charges on consumer telephone bills (and the inclusion of those charges in the "total amount due" shown on these bills) constituted an affirmative representation by defendants that the consumer had *in fact* authorized the purchase and owed payment to defendants.

*Second*, the consumer survey conducted by Expert Marylander, an expert with qualifications that defendants did not challenge, revealed that — on average — nearly 97 percent of defendants' "customers" had not agreed to purchase the products for which they had been billed, 96 percent of these "customers" had not received any services from defendants, and only five percent of these "customers" were even aware that charges for defendants' products had been placed on their telephone bills.  This survey, which carried a 95 percent confidence level and was conducted pursuant to what this order finds was a reliable methodology, provides compelling and unrebutted evidence in support of the FTC's argument that the placement of unauthorized charges on consumer telephone bills was deceptive, false, and likely to mislead almost any consumer acting reasonably under the circumstances.  *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (affirming the district court's conclusion that the placement of adult entertainment charges on phone bills "capitaliz[ed] on the common and well-founded perception held by consumers that they must pay their telephone bills"); *see also Kemp v. AT&T*, 393 F.3d 1354, 1360 (11th Cir. 2004) (affirming the district court's conclusion that customers foreseeably believe that all phone bill charges have to be paid in order to maintain phone service).  The deposition testimony of

EXHIBIT A
Page 28 of 48

United States District Court

For the Northern District of California

defendants' own employees, the multiple lawsuits filed by defendants alleging unauthorized sales of their own products, and the declarations filed by over forty of defendants' "customers" confirm that consumers were *in fact* misled by the deceptive charges placed on their telephone bills.

*Third*, the representation that consumers owed defendants monthly payments for products that they had never agreed to purchase was material. A representation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (citation omitted). Here, the representation at issue was the inclusion of fraudulent charges on the telephone bills of tens of thousands of unsuspecting consumers. These unauthorized charges resulted in over $37 million being funneled directly to defendants' pockets via LEC billing, despite compelling evidence that nearly 97 percent of these customers never agreed to purchase defendants' products. This demonstrates that the inclusion of these unauthorized charges on consumer telephone bills undoubtedly affected the conduct of defendants' "customers" — they paid defendants for products that they had never purchased. Given this backdrop, defendants' representations were undoubtedly material.

In their defense, defendants provide no rebuttal evidence or expert testimony to create a genuine issue of material fact on any of these elements. For example, defendants failed to depose Expert Marylander regarding the merits of his survey, did not conduct a rebuttal survey, and did not depose any of the forty-plus customers who submitted declarations. The only arguments presented by defendants in their opposition brief and at the September 15 hearing were that: (1) Expert Marylander's survey methodology was flawed, (2) defendants subjectively believed that consumers owed the charges that they were billed, (3) customers were given ample warning of the 15-day "free" trial period, and (4) the charges that appeared on consumer telephone bills complied with FCC disclosure requirements.[21] None of these arguments is persuasive.

---

[21] A fifth argument was raised at the hearing pertaining to affidavits prepared by Postal Inspector Andrew Wong. The Wong affidavits were relied upon by the FTC during the initial stages of this litigation to obtain a temporary restraining order. These affidavits, however, were *not* relied upon or even cited in the FTC's motion for summary judgment. As such, this argument by defense counsel is rejected.

United States District Court
For the Northern District of California

1

### i. The Reliability of the Marylander Survey

2      Defendants' criticisms of Expert Marylander's survey do not create any genuine issues of

3  material fact for trial.  In *FTC v. Stefanchik*, the United States Court of Appeals for the Ninth

4  Circuit affirmed the district court's summary judgment order in an enforcement action involving

5  deceptive marketing claims.  Just like the instant case, the FTC in *Stefanchik* provided a

6  collection of declarations from deceived consumers as well as survey evidence showing that 92

7  percent of Stefanchik's customers made no money from the mortgage-flipping scheme that he had

8  marketed.  To challenge the FTC's survey results, the defendants in *Stefanchik* produced two

9  expert opinions criticizing the methodology of the survey.  The Ninth Circuit affirmed the district

10 court's conclusion that these expert criticisms did not create a genuine issue of material fact for

11 trial, but were instead directed towards the *admissibility* of the FTC's survey evidence:

12          Stefanchik and Beringer contest the methodology of the FTC's
            survey and assert that issues of fact exist, but they do not contest
13          the truth or validity of the individual responses reported in the
            survey.  They offered no competent affirmative evidence of their
14          own, either in the form of survey results, contrary consumer
            declarations, sworn affidavits, or testimony, to identify consumers
15          who were able to make substantial amounts of money using the
            Stefanchik method as claimed in the marketing materials.
16

*Stefanchik*, 559 F.3d at 929.  After confirming that no factual dispute existed, the Ninth Circuit

17 went on to explain that "[t]he FTC is not required to show that all consumers were deceived[.]"

18 *Ibid.*  Rather, the FTC's evidence that Stefanchik's practices were deceptive and misleading to an

19 overwhelming number of consumers was more than sufficient to warrant summary judgment.

20      So too here.  As in *Stefanchik*, the FTC has put forth numerous declarations from

21 defrauded customers illustrating the deceptive nature of defendants' billing practices.  The FTC

22 also conducted an expert survey showing that almost all of defendants' "customers" had been

23 deceived by these practices.  Unlike in *Stefanchik*, however, defendants in the instant case have

24 provided no expert opinions challenging the reliability of Expert Marylander's survey.  Instead,

25 defendants rely upon pure attorney argument to criticize the reliability of his survey results.  All

26 of these criticisms fail.  For example, contrary to defense counsel's assertions, Expert

27 Marylander's survey was not "automated" and lacking in a "human element."  Rather, the survey

28 was conducted by trained, *live* interviewers (Marylander Decl. ¶¶ 21, 25).  Another failed

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    argument made by defense counsel is that the Marylander survey did not account for "customers"

2    who might have forgotten whether they had purchased defendants' products or had been billed by

3    defendants. This is wrong. Expert Marylander's survey expressly allowed customers to answer

4    "I don't know" and "I don't remember" to questions asked by interviewers (*id.* at ¶¶ 25, 28, 33).

5    Tellingly, despite the availability of this option, nearly 97 percent of "customers" still stated that

6    they had not agreed to purchase defendants' products.

7         Defense counsel's best argument is directed at the use of the phrase "Internet services" in

8    the Marylander survey. According to defense counsel, the phrase "Internet services" may have

9    given interviewees the impression that defendants were selling Internet *access* services. While

10   this order agrees that different language could have been chosen by Expert Marylander, it is

11   undisputed that the survey questions presented to interviewees also stated the name of the specific

12   product supposedly purchased by each customer (*id.* at ¶ 31). For example, GoFaxer customers

13   were asked: "Did you or your company agree to purchase any Internet services from GoFaxer?"

14   The specific mentioning of defendants' products disarms any criticisms directed at the phrase

15   "Internet services." In any event, defendants produced no evidence that any interviewees were

16   confused or misled by the questions presented in Expert Marylander's survey. Even if they did,

17   such evidence would likely go to the *admissibility* of the survey evidence, and would not create a

18   genuine issue of material fact for trial. Absent any affirmative evidence showing that customers

19   were *not* deceived by their billing practices, defendants cannot rebut the FTC's survey evidence.

20              **ii.        The Subjective Belief of Defendants**

21        Defense counsel's second argument is that both Roy and John Lin subjectively believed

22   that their "customers" had actually authorized being billed. This also fails. As stated, liability for

23   deceptive practices under Section 5 of the FTC Act is measured solely by whether a reasonable

24   consumer was likely to have been misled. *See Gill*, 265 F.3d at 950; *see also FTC v. Publ'g*

25   *Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997). As such, it is immaterial to liability

26   whether the Lin brothers subjectively believed that the charges placed on consumer telephone

27   bills were valid.

28

EXHIBIT A
Page 31 of 48

iii.     The "Free" Trial and FCC Compliance

The two remaining arguments raised by defense counsel — that consumers were given fair warning of the 15-day "free" trial period and that all LEC-billed charges complied with FCC disclosure rules — miss the point for exactly the same reason. Even if true, these arguments do not rebut the FTC's showing that reasonable consumers were likely to have been misled (and were *in fact* misled) by defendants' LEC-billing practices. Given the compelling evidence of deception set forth in Expert Marylander's unrebutted survey, it is immaterial to liability whether consumers who never bought defendants' products in the first place were given a warning in the mail that they would be billed once their 15-day "free" trial expired. It is also immaterial to liability whether defendants' charges — *97 percent of which were unauthorized to begin with* — were properly displayed on consumer telephone bills pursuant to FCC rules. What defense counsel is essentially arguing is that fraudulent sales and unauthorized charges can somehow be cleansed of impropriety through post-hoc disclosures. This order rejects such an argument.

Since there are no genuine issues of material fact as to whether defendants' billing practices were deceptive in violation of Section 5 of the FTC Act, the FTC's motion for summary judgment on this claim is **GRANTED**.

**B.     Claim Two: Unfair Billing Practices**

Under Section 5 of the FTC Act, an unfair practice or act is one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. 45(n). It is not a bar to liability if a violation is caused by more than one perpetrator. Rather, liability under the Act may be found if a business facilitated or provided substantial assistance to a deceptive scheme resulting in substantial injury to customers. *FTC v. Neovi, Inc.*, --- F.3d ----, 2010 WL 2365956, at *4 (9th Cir. 2010) (citation omitted).

As with the prior claim, the FTC has more than met its burden of proving each of these elements. *First*, while losses incurred by individual customers may have been relatively small, an act or practice can cause "substantial injury" by doing a "small harm to a large number of people[.]" *Id.* at *6 (citation omitted). Given that nearly 97 percent of defendants' tens of

32

United States District Court

For the Northern District of California

1    thousands of "customers" did not agree to purchase defendants' products and over $37 million in

2    largely unauthorized charges flowed directly to defendants through LEC billing, a "substantial

3    injury to consumers" has been proven.

4         *Second*, given the evidence that nearly 97 percent of defendants' "customers" never

5    agreed to purchase defendants' products in the first place, it follows that these "customers" had

6    no reason to scrutinize their telephone bills for defendants' fraudulent charges.  Indeed, only five

7    percent of defendants' "customers" ever noticed these charges appearing on their telephone bills.

8    This unrebutted evidence supports a finding that the harm suffered by consumers was not

9    reasonably avoidable.  In their defense, defendants argue that their LEC-billing activities were

10   compliant with FCC disclosure requirements and that customers could have reasonably avoided

11   unauthorized charges by either disputing them or not paying them.  This order declines to allow

12   defendants to blame unsuspecting consumers for failing to detect and dispute unauthorized billing

13   activity.  As other courts have wisely concluded, the burden should not be placed on defrauded

14   customers to avoid charges that were never authorized to begin with.  *See, e.g., FTC v. Kennedy*,

15   574 F. Supp. 2d 714, 720–21 (S.D. Tex. 2008); *FTC v. The Crescent Publishing Group, Inc.*, 129

16   F. Supp. 2d 311, 322 (S.D.N.Y. 2001).  In sum, the FTC has met its burden of proving that these

17   unauthorized charges were not reasonably avoidable by consumers.

18        *Third*, the record demonstrates that nearly all of defendants' "customers" received no

19   countervailing benefits from defendants' billing practices.  At the September 15 hearing, defense

20   counsel argued that defendants invested heavily in providing benefits for their customers, such as

21   spending over $350,000 in search-engine marketing fees for JumPage customers.  This argument

22   ignores, however, the unrebutted fact that nearly 97 percent of defendants' "customers" never

23   wanted these "benefits" in the first place.  Moreover, 96 percent of defendants' "customers"

24   stated that they received *no services* from defendants or their products.  Given this evidence, it

25   cannot be said that defendants' "customers" benefitted at all from services that they never agreed

26   to purchase, didn't know were being provided to them, and never wanted in the first place.  In any

27   event, the $350,000 spent by defendants on its "customers" is far outweighed by the $37 million

28   in unauthorized payments extracted from them.  For these reasons, the FTC has sufficiently

EXHIBIT A
Page 33 of 48

United States District Court

For the Northern District of California

1    shown that the injuries caused by defendants' billing practices were *not* outweighed by

2    countervailing benefits to consumers or competition.

3         As with the prior claim, defendants have not shown that any genuine issues of material

4    fact exist for trial. Defendants' best argument raised in their opposition brief is that the injuries

5    suffered by consumers were reasonably avoidable because consumers could have mitigated their

6    harm by cancelling and obtaining a refund once unauthorized charges were detected. This

7    argument is rejected. In *FTC v. Neovi*, the United States Court of Appeals for the Ninth Circuit

8    affirmed the district court's summary judgment order in an enforcement action involving

9    fraudulent checks. In so holding, the Ninth Circuit agreed with the district court that it was

10   "likely" that consumers never noticed the unauthorized activity on their accounts. Moreover,

11   even if they did, the Ninth Circuit recognized that the hassle of obtaining reimbursements

12   required substantial investments of time, trouble, aggravation, and money, especially since the

13   defendants in *Neovi* were uncooperative in providing remedies to consumers. As such, the Ninth

14   Circuit agreed with the district court's conclusion that consumers suffered unavoidable injuries

15   that could not be fully mitigated. *Neovi*, 2010 WL 2365956, at *6–7.

16        The same rationale applies here. The undisputed record in the instant action shows that

17   only five percent of defendants' "customers" were aware that they had been billed for defendants'

18   products. For those customers that noticed the unauthorized charges on their telephone bills, the

19   evidence also shows that defendants' approach towards "customer service" involved letting

20   telephone calls go unanswered and making it difficult for complaining customers to obtain a

21   complete refund. As in *Neovi*, the time, trouble, aggravation, and money lost by such consumers

22   were unavoidable injuries that could not have been fully mitigated.

23        For these reasons, the FTC's motion for summary judgment that defendants engaged in

24   unfair billing practices in violation of Section 5 of the FTC Act is **GRANTED**.

25        **C.    Individual Liability**

26        To establish individual liability for equitable restitution under the FTC Act, an individual

27   must have "participated directly in the deceptive acts or had the authority to control them" and

28   "had *knowledge* that the corporation or one of its agents engaged in dishonest or fraudulent

34

1   conduct, that the misrepresentations were the type upon which a reasonable and prudent person

2   would rely, and that consumer injury resulted." *FTC v. Network Servs. Depot, Inc.*, --- F.3d ----,

3   2010 WL 3211724, at *7 (9th Cir. 2010) (emphasis in original); *see also Stefanchik*, 559 F.3d at

4   931 (citation omitted). The FTC may establish knowledge by showing that an individual "had

5   actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity

6   of a misrepresentation, or had an awareness of a high probability of fraud along with an

7   intentional avoidance of the truth." *Id.* (citation omitted). The FTC need not prove that an

8   individual actually intended to defraud consumers. *Publ'g Clearing House*, 104 F.3d at 1171.

9       The record demonstrates that individual defendants Roy and John Lin can be held liable

10   for equitable restitution. *First*, the evidence is overwhelming that both Roy and John Lin were

11   officers and principals of the defendant corporations and had the authority to control all aspects of

12   their business operations. *Second*, this order has already concluded that the misrepresentations

13   made by defendants — namely, the placement of unauthorized charges on telephone bills — were

14   the type upon which a reasonable and prudent person would rely, and that consumer injury

15   resulted. *Third,* the record demonstrates that both Roy and John Lin had actual knowledge that a

16   massive number of their "customers" were being billed without authorization, or — at the very

17   least — were recklessly indifferent as to whether the tens of thousands of customers being billed

18   were legitimate. The evidence to support this knowledge — covered in exacting detail herein —

19   includes the numerous warnings and suspensions that defendants received from LECs and billing

20   aggregators regarding unauthorized sales, their knowledge that their best-selling products were

21   "very, very, very broken" and that only two to five percent of customers were using them, and

22   repeated communications from at least one Inc21 employee who said he was "very uncomfortable

23   with the fact that almost none of our customers knew that they were our customers."

24       In addition to this evidence, the Lin brothers clearly had knowledge that their customers

25   were being billed without authorization based upon the two lawsuits they filed against their own

26   marketers. Even after filing these lawsuits, however, the Lin brothers made the conscious choice

27   to continue billing customers acquired by the very entities they had sued. This demonstrates that

28   both Roy and John Lin were aware of a high probability of fraud with respect to customers being

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  acquired and billed, but intentionally avoided uncovering the truth.[22]  Finally, even after being

2  suspended by various LECs for placing excessive unauthorized charges on consumer telephone

3  bills, the Lin brothers found ways to exploit the weaknesses in the LEC-billing industry.  They

4  falsified LEC-billing applications and sold their "customers" to a third-party vendor so that LEC

5  billing could continue *ad infinitum*.  The Lin brothers knew exactly what they were doing.

6        Because overwhelming, unrebutted evidence shows that both Roy and John Lin

7  participated directly in the deceptive acts, had the authority to control them, and — at a minimum

8  — were well aware of a high probability of fraud surrounding the "customers" that they were

9  billing, this order finds that they can and are hereby held individually liable for equitable

10  restitution under the FTC Act.

11        **2.    THE TELEMARKETING SALES RULE**

12        Turning to the FTC's second set of claims, the Telemarketing Sales Rule was enacted due

13  to a directive from Congress to "prescribe rules prohibiting deceptive telemarketing acts or

14  practices and other abusive telemarketing acts or practices."  15 U.S.C. 1602(a)(1).  The TSR

15  prohibits "any seller or telemarketer" from misrepresenting "[a]ny material aspect of the

16  performance, efficacy, nature, or central characteristics of goods or services that are the subject of

17  a sales offer." 16 C.F.R. 310.3(a)(2)(iii).  It further prohibits both sellers and telemarketers from

18  "[m]aking a false or misleading statement to induce any person to pay for goods or services[.]"

19  16 C.F.R. 310.3(a)(4).  Any violation of the TSR constitutes an unfair and deceptive practice in

20  violation of Section 5 of the FTC Act.  15 U.S.C. 57a(d)(3), 6102(c)(b).  The TSR, however,

21  includes an important exemption relevant to the instant motions:  it exempts "[t]elephone calls

22  between a telemarketer and any business, except calls to induce the retail sale of nondurable

23  office or cleaning supplies." 16 C.F.R. 310.6(b)(7).  Curiously, while the TSR defines the terms

24  "seller," "telemarketer," and "customers," it does not define the term "business."

25

26

27        [22] This order rejects defense counsel's argument — raised at the September 15 hearing — that holding Roy and John Lin liable herein will discourage businesses from suing their own contractors for fraud.  The Lin

28  brothers undoubtedly had the power to cancel and issue refunds for each and every "sale" obtained by the marketers they sued.  That would have been proper.  Instead, they chose a different path.  They chose to embrace many of these "sales" despite knowing that the process of acquiring them was laced with fraud.

36

United States District Court

For the Northern District of California

1      The complaint alleged three distinct TSR violations: (1) failure to disclose the negative

2  option feature of defendants' sales offer, (2) use of "preacquired account information" to charge

3  customers without their "express informed consent," and (3) failure to obtain "express verifiable

4  authorization" before placing charges on consumers' telephone bills. Due to the "business-to-

5  business" exemption in the TSR, however, the FTC has limited its motion to telemarketing calls

6  made to non-businesses.

7      Defendants have also moved for summary judgment with respect to the FTC's claims

8  under the TSR. As defense counsel argued at the hearing, the products that were telemarketed by

9  defendants — GlobalYP, MetroYP, NetOpus, and the JumPage product — were each intended to

10  be sold exclusively to businesses. As such, defendants contend that they are entitled to summary

11  judgment on all claims brought under the TSR because their telemarketing practices fall within

12  the "business-to-business" exemption. All of these arguments are addressed below.

13      **A.      Claim Three:  Failure to Disclose the Negative Option Feature**

14      The TSR states that it is a deceptive telemarketing act to fail to disclose truthfully, and in

15  a clear and conspicuous manner, all material terms of the negative option feature of an offer,

16  including: (1) the fact that the customer will be charged unless affirmative steps are taken to

17  avoid it, (2) the date(s) charges will be submitted for payment, and (3) the specific steps the

18  customer must take to avoid being charged. *See* 16 C.F.R. 310.3(a)(1)(vii). A "negative option"

19  is a provision in an offer or agreement under which a customer's failure to take an affirmative

20  step to cancel is interpreted by the seller as an acceptance of the offer. 16 C.F.R. 310(t).

21      According to the FTC, there are no genuine issues of material fact regarding defendants'

22  failure to inform non-business consumers about the negative option feature of defendants' 15-day

23  "free" trial offer during telemarketing calls. As evidence of this claim, the FTC focuses on two

24  customer declarations — one from an individual consumer, Roger Gerber, and one from an

25  employee of a non-profit entity, Diane Haney (*See* Declarations of Gerber and Haney). Both Mr.

26  Gerber and Ms. Haney stated in their declarations that no "material terms" or "offers" were ever

27  mentioned to them during the telemarketing calls they received from defendants. Beyond these

28  two declarations, the FTC provides no direct evidence in support of this claim except a list of

1    defendants' "current customers" where individuals, public and government entities (*e.g.*, schools,

2    libraries, police departments), and churches have been marked.  There is no survey evidence

3    regarding the number of non-business "customers" that received telemarketing calls for

4    defendants' products where the negative option feature was inadequately disclosed.

5          In their filings, defendants focus their challenge on the TSR's "business-to-business"

6    exemption.  Specifically, defendants argue that the "business-to-business" exemption must extend

7    to any telemarketing call *intended* to be made to a business.  Under this construction, defendants

8    contend that all of their telemarketing calls fall under this exemption because defendants'

9    "indisputably" intended to sell their telemarketed products solely to businesses.  As a separate

10   argument, defendants assert that a *di minimus* exemption also applies to TSR violations, and that

11   the FTC's limited proof on its TSR claims should be rejected.

12         Both of defendants' arguments fail.  *First*, the plain language of the TSR clearly and

13   unambiguously states that the "business-to-business" exemption applies solely to "telephone

14   calls" between telemarketers and businesses.  Nowhere in this language are the subjective

15   intentions of telemarketers referenced.  *Second*, there is no *di minimus* exemption to violations of

16   the TSR.  Indeed, the FTC considered such an exemption prior to formally adopting the rule.  *See*

17   Notice of Proposed Rulemaking, 60 Fed. Reg. 8313, 8332 (Feb. 14, 1995) (proposing to exempt

18   "solicitation of sales by any person who engages in fewer than ten (10) sales each year through

19   the use of the telephone").  This proposal was rejected.  *See* Revised Notice of Proposed

20   Rulemaking, 60 Fed. Reg. 30406, 30423 (June 8, 1995) (deleting the proposed *de minimus*

21   exemption).  For these reasons, defendants' motion for summary judgment that the TSR is

22   inapplicable to defendants' telemarketing activities *in toto* is **DENIED**.

23         Since defendants have produced no affirmative evidence rebutting the declarations

24   submitted by Mr. Gerber and Ms. Haney, and because the FTC has produced clear evidence that

25   defendants' telemarketers failed to disclose the negative option feature of their 15-day "free" trial

26   offer to at least two of defendants' non-business "customers," the FTC's motion for summary

27   judgment on this claim is **GRANTED**.

28

**United States District Court**
For the Northern District of California

38

United States District Court

For the Northern District of California

**B.     Claim Four:  Use of Preacquired Account Information to Charge Consumers**

Under the TSR, when sellers seek to impose charges on consumers using "preacquired account information" after the expiration of a free trial offer, the seller is *required* to obtain the express informed consent of the consumer before billing.  As defined by the TSR, "preacquired account information" means "any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer."  16 C.F.R. 310.2(w); *see also* 68 Fed. Reg. 4580, 4616–23 (January 29, 2003) (explaining that express consent is required because consumers do not expect to be billed via account sources not traditionally used to pay for purchases).  For such transactions, telemarketers must: (1) obtain from the customer at least the last four digits of the account number being charged, (2) obtain the customer's express agreement to be charged for the services and to be charged using that account, and (3) *make and maintain an audio recording of the entire marketing transaction*.  16 C.F.R. 310.4(a)(6)(i) (emphasis added).

In the instant action, defendants indisputably used "preacquired account information" to impose charges on customer accounts after the expiration of a free trial period.  This is because in the context of LEC billing, the only "account information" required by a seller to bill a customer is the customer's telephone number.  This is information that defendants obviously acquired prior to cold-calling customers.  Additionally, the unrebutted record shows that defendants failed to "make and maintain an audio recording of the entire marketing transaction" for any of their telemarketing phone calls.  Indeed, Roy Lin admitted as much at his deposition (R. Lin Dep. 55).

Given the numerous non-business entities found within defendants' list of "current customers" and the unrebutted declarations of Mr. Gerber and Ms. Haney confirming that at least two non-businesses were called by defendants' telemarketers, the FTC's motion for summary judgment on this claim is **GRANTED**.

**C.     Claim Five:  Failure to Obtain Express Authorization Before LEC Billing**

Finally, the TSR requires that telemarketers obtain "express verifiable authorization" if they intend to use payment methods such as LEC billing.  To satisfy this requirement for the types of sales offers made by defendants herein, an audio recording of the transaction must clearly

United States District Court

For the Northern District of California

1    evidence the customer's authorization of payment for the services, as well as the customer's

2    receipt of all the following information:  (1) the number if charges (if more than one) to be

3    submitted for payment, (2) the dates the charges will be submitted for payment, (3) the amount of

4    the charges, (4) the customer's name, (5) the customer's billing information identified with

5    sufficient specificity that the customer understands what account will be used to collect payment,

6    (6) a telephone number for customer inquires that is answered during normal business hours, and

7    (7) the date of the customer's oral authorization.  16 C.F.R. 310.3(a)(3)(ii)–(iii).

8         Like its claim targeting defendants' failure to disclose the negative option feature of their

9    telemarketing offers, the FTC has provided clear evidence through the unrebutted declarations of

10   Mr. Gerber and Ms. Haney that non-businesses were contacted by defendants' telemarketers and

11   "express verifiable authorization" was not obtained.  Accordingly, the FTC's motion for summary

12   judgment on this claim is **GRANTED**.

13        **3.    RELIEF DEFENDANT SHENG LIN**

14        The disgorgement of funds received as a result of deceptive, unfair, or abusive practices is

15   proper where "it is established that the relief defendant possesses property or profits illegally

16   obtained and the relief defendant has no legitimate claim to them."  *FTC v. Think Achievement*

17   *Corp.*, 144 F. Supp. 2d 1013, 1020 (N.D. Ind. 2000); *see also FTC v. Transnet Wireless Corp.*,

18   506 F. Supp. 2d 1247, 1273 (S.D. Fla. 2007); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998).

19   In the instant case, the undisputed record shows that relief defendant Sheng Lin drew a substantial

20   salary and large bonuses in excess of $434,000, despite having no involvement in defendants'

21   business operations.  The record also shows that these payments were derived directly from

22   defendants' deceptive and unfair billing practices.  For these reasons, the FTC has proven that

23   relief defendant Sheng Lin has no legitimate claim to these funds — rather, they belong to the

24   many consumers who were harmed by defendants' unlawful billing practices.  As such, the FTC's

25   motion for summary judgment on its claim against relief defendant Sheng Lin is **GRANTED**.

26                    **SCOPE OF RELIEF**

27        Under Section 13(b) of the FTC Act, "the Commission may seek and after proof, the court

28   may issue, a permanent injunction."  15 U.S.C. 53(b).  This grant of permanent injunctive power

**United States District Court**
For the Northern District of California

also gives courts broad equitable authority to "grant any ancillary relief necessary to accomplish complete justice," including ordering monetary judgment for restitution. *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994). In the instant action, the FTC seeks both a permanent injunction and monetary restitution. Each will be addressed below.

### 1. INJUNCTIVE RELIEF

The undisputed record provides compelling proof that defendants not only abused the privileges of LEC billing, but falsified information on LEC-billing applications, lied to LECs and billing aggregators regarding "action plans" to reduce unauthorized billing, and even went so far as to circumvent suspensions and the application process altogether by LEC-billing customers through an intermediary. Additionally, the FTC has produced mountains of evidence that defendants' telemarketing activities were laced with fraud. Telemarketers hired by defendants did not truthfully, clearly, and conspicuously disclose all material terms of the negative option feature of their sales offers, did not maintain recordings of entire sales transactions, and did not obtain express verifiable authorization for each and every phone call made to consumers. Defendants knew that these and other violations were occurring and knew that thousands of defrauded customers were being LEC-billed without authorization.

Given this record, the following permanent injunctive relief is **ORDERED**:

1. Defendants are permanently enjoined from billing customers, either directly or through an intermediary, by placing any charges on any telephone bill. This injunction also runs against any business or operation defendants Roy Lin and John Lin currently own or operate as well as any future endeavors.

2. Defendants are permanently enjoined from telemarketing any product or service to any consumers, including businesses, unless and until a plan of operation is approved by the Court. Any plan of operation must set forth a procedure that will ensure, with reasonable certainty, that the requirements of the TSR

41

United States District Court

For the Northern District of California

are met for *all* telemarketing phone calls made by defendants and/or their telemarketers.  Additionally, any plan of operation must allow for the FTC and/or the Court to verify compliance with the plan (*i.e.*, there must be an audit trail).  Any proposed plan of operation must be provided to the FTC at least 30 calendar days before being submitted to the Court for approval.  If defendants and the FTC are unable to stipulate to such a plan, the Court will allow briefing and notice a hearing on the matter if necessary.

3.      All LECs and billing aggregators who have collected payments on behalf of defendants and have held those payments in escrow shall issue direct refunds to customers from whom the funds were collected.  *No fees may be deducted from these refunds*.  All refunds shall be accompanied by a written explanation that the Court has ordered the refund and suspended any further LEC billing with respect to defendants' products and services.  The notice should advise that if the customer desires to continue receiving defendants' services, then the customer should contact defendants and make direct-pay billing arrangements.  Once these refunds have been issued, the LEC or billing aggregator must file a declaration with the Court (under seal if necessary) setting forth the dollar amounts of each refund and the recipient of each refund.  These declarations must also be served on defendants and the FTC to ensure that these customers are not provided with excessive refunds.  Any amounts held in escrow that, for whatever reason, cannot be refunded directly (perhaps because the customer cannot be located) shall be paid to the FTC and applied against the restitution amount awarded herein.

**United States District Court**
For the Northern District of California

4.      The freeze on defendants' bank accounts as set forth in the preliminary injunction shall remain in place until the full restitution amount has been paid.[23]  The funds in these frozen accounts may only be withdrawn by defendants to satisfy the judgment of restitution herein.  In other words, the financial institutions with control over these frozen accounts are authorized to facilitate the payment of frozen funds directly to the FTC to satisfy the judgment in this dispute.  Under no circumstances shall defendants be allowed to withdraw or transfer funds from these frozen accounts for any other purposes.

5.      Individual defendants Roy and John Lin shall no longer be entitled to monthly stipends for living expenses from the funds deposited in the Court's registry.  Such funds shall be applied against the restitution ordered in this action.  The FTC shall submit a proposed order by October 7, 2010, directing the transfer of these funds from the Court's registry to the FTC in satisfaction of the judgment.

6.      Defendants shall certify under oath, by October 7, 2010, that they have complied with the terms of this injunction pertaining to their LEC-billing and telemarketing activities.

7.      All LECs and billing aggregators subject to this injunction shall certify under oath, by October 29, 2010, that they have complied with the terms of this injunction pertaining to direct refunds of any funds held in escrow.  This certification shall be

---

[23]  These bank accounts include account numbers XXXXX01178 and XXXXX00093 in the name of Inc21.com at Far East National Bank, account numbers XXXXX07292 and XXXXX81306 in the name of GoFaxer.com at Chase, account numbers XXXXX08166 and XXXXX63560 in the name of Roy Lin at Chase, account number XXXX724039 in the name of John Lin at Chase, account number XXXX411-1 in the name of John Lin at HSBC, and account number XXXXXX4889 in the name of John Lin at Bank of America.

43

1      submitted at the same time as the declaration detailing refunds

2      issued to defendants' customers.

3               *                *              *

4    **2.**    **MONETARY RESTITUTION**

5         The FTC Act was designed to protect consumers from economic injuries.  As such, courts

6    have often awarded restitution in the full amount of funds lost by consumers rather than limiting

7    restitution solely to a defendant's profits.  *See Stefanchik*, 559 F.3d at 931 (citing *FTC v. Febre*,

8    128 F.3d 530, 536 (7th Cir. 1997)).  This is because equity may require a defendant to restore his

9    victims to the *status quo*, even where the loss suffered by consumers exceeds the defendant's

10   unjust enrichment.  *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606–07 (9th Cir. 1993).

11        The FTC, however, is not required to prove that every individual consumer was injured to

12   justify such an award.  *See Stefanchik*, 559 F.3d at 929 n.12 (citation omitted).  To require such

13   individualized proof "would thwart effective prosecutions of large consumer redress actions and

14   frustrate the statutory goals of [Section 13(b) of the FTC Act]."  *Figgie Int'l*, 994 F.2d at 605

15   (citations omitted).  As such, it is sufficient for the FTC to prove that misrepresentations were

16   widely disseminated (or impacted an overwhelming number of consumers) and caused actual

17   consumer injury.  Importantly, the existence of some satisfied customers does *not* constitute a bar

18   to liability or an award of restitution.  *Stefanchik*, 559 F.3d at 929 n.12 (citation omitted).  If the

19   FTC can meet this burden, it must then "show that its calculations reasonably approximated the

20   amount of customers' net losses[.]"  Then, "the burden shifts to the defendants to show that those

21   figures [are] inaccurate."  *Febre*, 128 F.3d at 535.

22        The undisputed record shows that defendants' deceptive and unfair billing practices

23   impacted an overwhelming number of consumers.  Indeed, thousands of unauthorized charges

24   were tacked onto telephone bills nationwide.  The evidence also shows that consumers *paid* these

25   unauthorized charges to defendants, despite the fact that nearly 97 percent of them never agreed

26   to purchase defendants' products in the first place.  This is sufficient, if not compelling, proof of

27   actual consumer injury suffered by almost every "customer" acquired by defendants.  Given this

28   record, the FTC has proven its entitlement to an award of restitution in the full amount of funds

44

United States District Court

For the Northern District of California

1    lost by consumers.  The inquiry now turns to calculating the amount that consumers paid to

2    defendants as a result of the unlawful conduct.  See *Gill*, 265 F.3d at 958.

3         The full amount that consumers paid to defendants as a result of the deceptive and unfair

4    billing practices detailed herein may be measured from declarations and billing records submitted

5    by the billing aggregators who funneled LEC-billing revenue to defendants.  According to these

6    billing records, defendants received $37,442,602.89 in net collections through LEC billing its

7    "customers" from 2004 through 2009 (Wolfe Decl. Atts. M–Q).  Importantly, these net

8    collections account for refunds paid directly to consumers by the LECs and billing aggregators

9    (R. Lin Dep. 314–16; Walch Dep. 48, 53, 55–57).

10        Defendants also received at least $331,346.54 from consumers through its "customer-

11   sharing" agreement with Jeff Lavino (Sihota Decl. ¶ 11, Att. B).  In collaboration with

12   Mr. Lavino, defendants LEC-billed consumers in regions where their LEC-billing privileges had

13   either been suspended or had not yet been authorized.  Since the evidence shows that Mr. Lavino

14   took a 50 percent "cut" of the net collections before depositing the remaining funds into GST

15   U.S.A.'s checking account, the net losses suffered by the consumers billed through Mr. Lavino

16   was at least double the amount that defendants received from this arrangement.  In other words, a

17   reasonable calculation of the harm to customers attributable to defendants' relationship with

18   Mr. Lavino is $662,693.08.  Adding this amount to the $37,442,602.89 that defendants received

19   from their billing aggregators, a reasonable calculation of the total harm suffered by consumers is

20   $38,105,295.97 (Wolfe Reply Decl. Att A).

21        While the burden falls squarely on *defendants* to show that these calculations are

22   inaccurate, the FTC nevertheless acknowledges that the record contains some evidence that a

23   handful of defendants' customers agreed to purchase their products.  As stated, 36 customers

24   returned the court-ordered notification form (mailed during the preliminary injunction stage of

25   this litigation) indicating that they had authorized defendants' LEC-billing charges (FTC's Br.

26   24).  Additionally, defendants' former systems administrator, Michael Nelson, testified that he

27   had responded to as many as twenty requests from customers to update their website information

28   between July 2006 and March 2010.  Assuming that these twenty requests came from legitimate

United States District Court

For the Northern District of California

1    Inc21 customers, this translates to a total of 56 valid customers from 2004 through 2009.

2    Assuming that these 56 customers paid the maximum monthly fee charged by defendants between

3    2004 and 2009 (namely, $39.99 per month) for the entire 60-month period between 2004 and

4    2009, the FTC proposes that $134,366.40 be deducted from the restitution award to reasonably

5    account for these "valid" sales.[24]  Thus, according to the FTC, an award of $37,970,929.57 in

6    restitution is reasonable and justified.

7         Defendants attack this calculation from three different angles.  *First*, defendants argue that

8    a three-year statutory limit on damages applies to the FTC's claims.  *Second*, defendants assert

9    that the FTC's estimation wrongly assumes that all customers are entitled to a refund.  *Third*,

10   defendants contend that restitution must be limited to net receipts.  All of these arguments fail.

11        Starting with defendants' first argument, it is true — as defendants point out — that

12   Section 19 of the FTC Act contains a three-year limitations period.  *See* 15 U.S.C. 57b(d).  That

13   said, subsection (e) of Section 19 clearly states that "[n]othing in this section shall be construed to

14   affect any authority of the Commission under any other provision of law."  15 U.S.C. 57b(e).

15   Since the claims asserted by the FTC against defendants in the instant case were expressly

16   brought under Section 13(b) of the Act (and *not* Section 19), the three-year limitations period

17   does *not* apply to these claims.  *See* 15 U.S.C. 53(b)**;** *see also FTC v. H. N. Singer, Inc.*, 668 F.2d

18   1107, 1109–12 (9th Cir. 1982) (discussing Sections 13 and 19 as separate and independent bases

19   for the FTC to seek equitable relief under the Act).

20        As for defendants' second argument, since the FTC has sufficiently justified a restitution

21   award of net consumer losses, "the burden shifts to the defendants" to show that the FTC's

22   calculations are inaccurate.  *Febre*, 128 F.3d at 535.  While defendants argue in their opposition

23   brief that many defrauded customers have already received refunds, they have not put forth any

24   competent evidence or alternative calculations establishing the amounts that have been refunded,

25

26

27

28

---

[24]  56 customers x $39.99 per month x 60 months = $134,336.40.

46

United States District Court

For the Northern District of California

1   the customers who received them, or an alternative measure of restitution.[25]  In other words, they

2   have not met their burden of showing that the FTC's calculations are inaccurate.  Additionally,

3   defendants cannot blame the LEC-billing industry for failing to keep clear records of whether

4   customers paid their bills or received refunds.  This order declines to allow defendants to use the

5   bookkeeping deficiencies of the very system they exploited as a shield to awarding restitution.

6       Finally, defendants' argument that restitution must be limited to net receipts is based

7   entirely upon non-binding case law and a misreading of the Ninth Circuit's decision in *Neovi* (*see*

8   D's Opp. 23).  In *Stefanchik*, the Ninth Circuit expressly authorized awards of "the full amount

9   lost by consumers[.]"  *Stefanchik*, 559 F.3d at 931 (citation omitted).  The facts of the instant case

10  warrant such relief.

11      For these reasons, restitution is hereby ordered in the amount of $37,970,929.57.  All

12  defendants shall be held jointly and severally liable for this entire amount.  Up to $434,000 in

13  funds improperly received by relief defendant Sheng Lin may be disgorged by the FTC and

14  applied against the restitution owed by defendants.  This includes funds held in the $100,000

15  certificate of deposit bearing Sheng Lin's name at Bank of America.

16      Counsel shall meet and confer and submit a plan of notice and distribution of these funds

17  to defendants' current and former customers by October 7, 2010.  As stated at the hearing,

18  refunds must be limited to customers who acknowledge, under penalty of perjury, that they were

19  billed without authorization by defendants and are entitled to the refund amount presented to

20  them.  Any claim form mailed to customers must clearly set forth — based upon billing records

21  obtained from LECs, billing aggregators, and defendants — the total amount that the customer

22  was supposedly charged, the total amount that the customer supposedly paid to defendants, the

23  total amount of refunds (if any) that have already been issued to the customer, and the total

24  amount of restitution to which the customer is entitled.  Any undistributed amounts shall be

25  distributed as per future court order.

26

27

28      [25]  The spreadsheets attached to the reply declarations submitted by defendants Roy and John Lin supposedly evidencing valid customers and refunds are bereft of foundation and analysis.  Moreover, their contents have not been properly authenticated.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

For the foregoing reasons, the FTC's motion for summary judgment is **GRANTED**. Defendants' motion for summary judgment is **DENIED**. The FTC shall ensure that a copy of this order is served upon any and all LECs, billing aggregators, and financial institutions who may be subject to the injunctive relief ordered herein. The Court will retain jurisdiction to enforce the terms of the permanent injunction. Judgment shall be entered accordingly.


**IT IS SO ORDERED.**


Dated:  September 21, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

48